UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                                        )
PAUL KOCOUREK,REGINALD BOUDINOT, BRUCE  )   CIV. NOS. 09 CV 10203
PASTERNACK, and PAUL KOCOUREK ON BEHALF )             09 CV 10163
OF THE BOOZ ALLEN HAMILTON              )             09 CV 10204
STOCK RIGHTS PLAN,                      )             10 CV 05255
                    Plaintiffs,         )
          v.                            )
                                        )
RALPH W. SHRADER, C.G. APPLEBY,         )
SAMUEL R. STRICKLAND, JOSEPH E. GARNER, )
DENNIS O. DOUGHTY, GARY D. AHLQUIST,    )
SHUMEET BANERJI, PETER BERTONE, MARTIN  )
J. BOLLINGER, CHRISTIAN BURGER,         )   **CONSOLIDATED COMPLAINT**
FRANCIS J. HENRY, LLOYD W. HOWELL, JR., )
WILLIAM C. JACKSON,CHRISTOPHER M. KELLY,)
PAMELA M. LENTZ, JOSEPH W. MAHAFFEE,    )
JOHN D. MAYER, PATRICK F. PECK, JOE     )
SADDI, ERIC A. SPIEGEL, DANIEL LEWIS,   )
CARLYLE GROUP, CARLYLE PARTNERS V, L.P.,)
EXPLORER COINVEST LLC, EXPLORER         )
HOLDING CORPORATION, EXPLORER INVESTOR  )
CORPORATION, BOOZ ALLEN HAMILTON INC,   )
AND CREDIT SUISSE SECURITIES (USA) LLC, )
                                        )   **DEMAND FOR JURY TRIAL**
                    Defendants.         )
                                        )
_____)

     Plaintiffs, Paul Kocourek ("Kocourek"), Reginald Boudinot

("Boudinot"), Bruce Pasternack ("Pasternack"), Kocourek on behalf of

the Booz Allen Hamilton Shadow Stock Plan (the "Shadow Stock Plan"),

and Kocourek on behalf of the Booz Allen Hamilton Stock Rights Plan

(the "Stock Rights Plan") by and through their undersigned counsel,

files this  Complaint, and allege respectively on knowledge as to

matters concerning each and each's own acts and on information and

belief as to all other matters as follows:

## **Nature of the Action**

1.   Plaintiff Kocourek retired from Booz Allen Hamilton ("BAH") on

     April 1, 2007. He participated in two deferred compensation plans:

     the Stock Rights Plan and Shadow Stock Plan.

2.    Under the terms of the Shadow Stock Plan, Kocourek had the right to elect to have the quantum of his post-retirement payment calculated at any time between the date of his retirement and the second anniversary of the date of his retirement. Kocourek advised BAH that he elected to have his Shadow Stock Plan bonus determined on the second anniversary of the date of his retirement.  BAH refused, and expelled Kocourek from the Shadow Stock Plan in July , 2007, a few months after his retirement.

3.    At the time of Kocourek's retirement BAH had decided to terminate the Stock Rights Plan and the Shadow Stock Plan and their related provisions for redemption at "book value".  It had decided to split up into two entities, a commercial entity and a government entity, and to sell the government entity.

4.    At the time of Kocourek's retirement, BAH's insider executive management had decided to sell the government business to themselves and a financial partner in an LBO.  They had already executed a confidentiality and non-disclosure agreement so as to permit bidders to conduct due diligence on the government business.

5.    Plaintiffs Boudinot and Pasternack were senior executives of BAH. Each was a member of the Stock Rights Plan. Each was falsely threatened with imminent termination from Booz Allen for cause; Pasternack in spring, 2004, and Boudinot in or about August, 2004. As a result of such threats each voluntarily resigned. A principal purpose of the forced expulsion from employment was the desire to keep them from achieving enhanced benefits from the Stock Rights

Plan; as they were paid a lump sum benefit based upon a Stock Plan formula of $150 per share, as opposed to a value of $763 per share determined 15 months later.

### Under-Valuation in the Carlyle Transaction and Spin-off

6.    Both the Shadow Stock Plan and the Stock Rights Plan were administered by BAH itself. As a result of formal corporate decision made on September 22, 2006, in mid-May, 2008, BAH approved spin off of BAH's commercial business and a sale of the stock of BAH to the Carlyle Group on July 31, 2008 at a firm valuation of $2.54 billion (the "Carlyle Transaction").  As part of the transaction the commercial business of BAH was spun off to BAH's shareholders in the form of stock in a new entity Booz & Co., Inc.,("Booz, Inc." thereby leaving BAH with only its US Government Business ("New BAH").

7.    BAH Government employee shareholders and retired government shareholders were compelled to immediately sell their spun-off Booz, Inc. stock to Booz, Inc. itself for minimal consideration. Non-government retired employees, like Kocourek, may be compelled to sell their Booz, Inc. stock to Booz, Inc. on July 31, 2010, at a similarly minimal value, because Booz, Inc. was grossly under-capitalized, so as to yield a "book value" that is but 6% of its fair value.  Kocourek has received notice of Booz, Inc.'s intent to compel a sale at $41 per share in September, 2010. These redemptions at grossly undervalued prices provided a windfall to the active commercial shareholders, who became the sole owners of

Booz, Inc.

8.  The Carlyle Transaction priced the Government business at 50-60%
of its fair value, providing huge economic benefits to certain
stockholders and directors of BAH while depriving Kocourek of
nearly half of the fair value of the government business component
of the 27,300 shares of BAH stock allocated to his account in the
Stock Rights Plan, and over 90% of the amount of his Shadow Stock
Plan bonus.

9. By reason of the uneven treatment of shareholders and a sale at a
fraudulently low price in the Carlyle Transaction, and the
fraudulently low Booz, Inc. mandatory redemption price, Kocourek
was underpaid some $21,840,000 of value relating to his 27,300
shares of BAH common stock; the BAH Stock Rights Plan was deprived
of over $2.7 billion. Boudinot's was paid $47,200,000 less than
fair value for his stock; and Pasternack was paid $118,400,000 less
than fair value for his stock.

**ERISA**

10.  Prior to the Carlyle Transaction closing, all shares of stock in
BAH were held in an employee stock ownership plan by some 280
officer employees and retired employees pursuant to the Stock
Rights Plan. The Stock Rights Plan was operated as a vehicle to
defer compensation until separation from service and to provide

retirement income.

11.  The stock plan also provided for a special benefit for officers who separated from service due to normal retirement or due to early retirement on terms approved by the BAH Board Personnel Committee. Such retired employees received acceleration of benefit vesting and two years of growth of benefits post-retirement.

12.  The BAH Stock Rights Plan was an employee pension plan as defined in the Employee Retirement Security Act of 1974, ("ERISA"), 29 USC § 1002.

13.  The Stock Rights Plan was funded by distribution of stock to employees, held in the employees' individual names and not subject to the claims of creditors of BAH. Employees contributed to the plan by means of discount purchases of stock; thus the Stock Pension Plan was a funded employee pension benefit plan fully subject to ERISA, just as qualified employee stock ownership plans ("ESOP's") are funded plans.

14.  The Shadow Stock Plan in which Plaintiff Kocourek also participated is a deferred compensation employee benefit pension plan as defined by ERISA, 29 USC §1002, but was not funded, and, if its purpose was primarily to defer compensation, could be a "top hat" unilateral contract plan, subject to federal common law and

ERISA's enforcement provisions, but if its purpose included the provision of retirement income, as Kocourek alleges, it is fully subject to ERISA.

### Summary of Impact of Carlyle Transaction to Plan Participants

15.   In order to induce stockholders who were employed in the commercial consulting division ("Commercial Officers") to vote to approve the Carlyle Transaction BAH and Individual Defendants transferred the BAH Commercial Business, which had a fair value of $1.5 billion, into a new BAH subsidiary, Booz, Inc.

16.   Booz Inc. was then distributed to all shareholders of BAH, (i.e., the Stock Rights Plan Participants) with a fraudulently low valuation of $95 million, which was but 6% of the fair value of Booz, Inc.

17.   Kocourek and other retired Stock Pension Plan participants could not vote their stock.

18.   The active commercial officers, being two thirds of the voting shareholders, received $1.4 billion dollars of the fair value of Booz, Inc., to the exclusion of Plaintiff Kocourek and other retired employees of BAH and to the exclusion of shareholders employed in the government services sector of BAH.

19.   The Booz, Inc. stock was a benefit paid to the Stock Rights Plan participants; and the merger consideration paid by Carlyle for New

BAH was a benefit paid to the Stock Rights Plan participants.

## The Control Plan

20.  The Carlyle Transaction was done as part of a plan (the "Control Plan") executed by defendants Shrader, Garner, Strickland, Appleby, and Doughty (collectively, the "Individual Defendants")and Bertone and Lewis ("Commercial Defendants") to split off BAH's commercial sector and seize control of the remaining Government Sector of BAH.

21.   In order to enrich themselves, the Individual Defendants determined to secretly force a split of BAH and take control of the Government Sector Business by committing numerous fraudulent acts including the leveling of false accusations against senior managers; falsely advising senior managers that termination for cause was imminent; deliberate fraudulent manipulation of employee reviews; directing senior management to retire by falsely claiming that BAH's best interests required such retirement; as well as merely isolating certain senior managers from all executive management contact, or deliberately insulting their sensibilities, in order to induce their retirement.

22.   At the same time, Individual Defendants manipulated the BAH cost structure so as to drive the Commercial Business partners into an economic bind, which effectively forced the Commercial Partners to sign over the BAH Government Sector to Individual Defendants and Carlyle for a fraction of its true value.

23.   Defendants Carlyle Group and Explorer Holding Corporation aided and abetted the corporate breach of fiduciary duty by the Director Defendants by promising a thing of value to the Stock Rights Plan fiduciaries in order to influence their actions respecting the Stock Rights Plan assets. The Individual Defendants received a thing of value from Carlyle Group and Explorer Holding Corporation ("Explorer")as payment for their agreement to sell the BAH government business to Explorer Holding Corporation at a reduced value. In addition, at closing of the Carlyle Transaction, Explorer granted Individual Defendants participation in a special management Equity Incentive Plan and participation in a special executive bonus plan. Due to the undervaluation, these participation rights, the executive bonus plan, and the stock and options rolled over from BAH to Explorer have a value in the hundreds of millions of dollars.

24.   The decision to prematurely expel Plaintiffs Boudinot and Pasternack from the Stock Plan and Kocourek from the  Shadow Stock Plan reduced dollar for dollar the Carlyle equity contribution and, thus, aided the Control Plan.

## The Parties

25.   BAH is a Delaware corporation, with headquarters in McLean, Virginia.

26.   Director Defendants Burns, Gerenscer, Henry, Kelly, Mayer, Peck and Saddi are each natural persons and residents of Virginia.

27.  Director Defendant Aguirre is a natural person and is a resident of California.

28.  Director Defendant Banerji is a natural person and is a resident of London, England.

29.  Director Defendant Knott is a natural person and is a resident of New York.

30.  Director Defendants Mahaffee and Rosanski are natural persons and each is a resident of Maryland.

31.  Director Defendant Saddi is a natural person and is a resident of Beirut, Lebanon.

32.  Director Defendant Swenson is a natural person and is a resident of Randolph, New Jersey.

33.  The Carlyle Group is an unincorporated association and maintains offices at 520 Madison Avenue, New York, New York.

34.  Members of the Carlyle Group act as managing partners or managing members of a web of limited partnerships and limited liability companies.

35.  Carlyle Partners V, L.P. is a limited partnership which is managed by, and under the control of the Carlyle Group.

36.  Carlyle Partners V, L.P. is the owner of the majority of membership interest in Explorer CoInvest, LLC, which is the owner

of approximately 90% of the issued and outstanding common stock of Explorer Holding Corporation, which is the owner of 100% of the issued and outstanding stock of Explorer Investor Corporation, which is the owner of 100% of the issued and outstanding stock of New BAH.

37.   Plaintiff Kocourek is a natural person who is a resident of Singapore, Plaintiff Pasternack is a natural person and a resident of Atherton, California, Plaintiff Boudinot is a natural person and a resident of McLean, Virginia, Plaintiff Stock Rights Plan was an ERISA plan maintained by BAH in McLean, Virginia, and Plaintiff Shadow Stock Plan was an ERISA plan maintained by BAH in McLean, Virginia.

38.   BAH maintained a New York City office for over thirty years until the closing of the Carlyle Transaction in July, 2008, at which time the New York office was spun off to Booz, Inc., in connection with the consummation of the Carlyle Transaction. BAH continues to maintain an office in Rome, New York and frequently engages in business related meetings in New York, New York.

39.   Defendant Credit Suisse Securities (USA) LLC is a domestic limited liability company headquartered at 11 Madison Avenue, New York, NY 10010.

40.   Individual Defendants Shrader, Doughty, Strickland and Garner are each natural persons and are residents of the state of Florida.

Shrader, Doughty, and Strickland are also Director Defendants.
Individual Defendant Appleby is a natural person and is a resident
of McLean, Virginia.  Appleby is also a Director Defendant.
Commercial Defendant Lewis is a resident of La Jolla, California,
and Commercial Defendant Bertone is a resident of London, England.
Both Lewis and Bertone are Director Defendants.

## Jurisdiction and Venue

41.  This Court's jurisdiction is based upon 28 U.S.C. §§ 1391 and
     1332; 29 U.S.C § 1132 e(1),  18 U.S.C. § 1964 (a); and applicable
     principles of supplemental jurisdiction under 28 U.S.C. § 1367(a).

42.  Venue is proper in this judicial district pursuant to 28 U.S.C.
     §§ 1391 (b) and (c); 29 U.S.C § 1132 e(2); and 18 U.S.C. § 1965.

## Formation of the Stock Rights Plan

43.  BAH went public in 1970 with disastrous results. In November
     1975, the firm borrowed funds from lenders and bought in the stock
     owned by non-employee shareholders at a price of $7.50 per share.

44.  As a condition of taking the firm private, the partners created
     a stock plan, which governed the terms and conditions of the
     issuance of stock, and limited stock issuance to employee-officers
     of BAH.

45.  The Stock Plan could not be amended except by vote of
     participants with 75% of the vested and unvested benefit.

46.   The option to call stock in after two years was required by the BAH policy of "Always owned by the partners".

47.   The Stock Plan directly deferred the payment of compensation to participants until separation from service or post-retirement, at which time the retirement benefit was paid.

<u>Overview – The Control Fraud Model</u>
<u>The Flat vs. Hierarchical Compensation Model</u>

48.   During the period 1999 to July 31, 2008, (and to date) Individual Defendant Ralph W. Shrader was President of BAH with authority over both of BAH's two operating sectors:  the Government Sector and the Commercial Sector.  BAH operated in a partnership culture with, in 2003, 44 senior vice presidents.

49.   The CEO received only a marginally greater amount of compensation points than Senior Vice Presidents.

50.   Shrader was known to compare this relatively flat partnership lock-step compensation model unfavorably to the far more stratified compensation system prevalent in large corporations, other professional service firms and investment banks.

51.   Similarly, BAH's system of annual stock award provided little by way of additional compensation to the CEO; for example, in February 2005, after five years as CEO, Shrader owned 78,000 shares, while senior partners Nemec and Pasternack each owned 74,000, a marginal

difference.

52.  Typical corporate CEO's earn two to three times as much as their
most highly paid subordinate, who in turn earns one and a half to
two times as the next level of senior executives.  This model is
known as "Hierarchical Compensation".

53.  In the three and a half years before the Carlyle Transaction, 13
of the largest shareholders of BAH "retired," eight from the
Government side (the "Purge"), which had far fewer partners to
begin with.  All of the Purge retirements were involuntary.
Between the years 2003 and 2006, eight government partners owning
297,000 shares had been eliminated by Individual Defendants'
tactics, nine were forced out at closing of the Carlyle
Transaction, leaving Individual Defendants and their close
associate Gary Mather holding 276,250 shares out of a total of
577,050 held by government partners, with those other 300,800
shares scattered among some 50 junior partners.

54.  One reason for the Individual Defendants to plan to remove 8
government partners was to eliminate strong individual voices who
might question the wisdom and fairness of a split-up or LBO or the
revision of lockstep compensation to a hierarchical model.

55.  The second reason to remove 8 government partners was to make
sure that in the event of an LBO of the government business, the
Individual Defendants would make a fortune on the resale or "exit",
by eliminating a number of persons who would share in the profit
from an LBO.

56.  As a result, in the year prior to the Carlyle Transaction BAH
     redeemed 413,300 shares of stock at book value, at the same time as
     management was secretly positioning the Company for split up and
     seizure of control of the Government Sector.

57.  In the eventual Carlyle Transaction, pushing the 13 partners out
     reduced the shares outstanding and lowered the price required by
     over $250,000,000 and left the Individual Defendants as the
     principal remaining participants in the special equity "management
     promote".

### Growth of the Government Business

58.  During the 1990s BAH experienced dramatic internal change as
     revenues and profits produced by the Government Business Sector
     grew to exceed those produced by the Commercial Business Sector.

59.  As a result, by 1999 the Firm had a structural problem and was
     burdened by three key internal issues:

     Issue 1:  Beginning late in the 1990s, it was necessary for the
     Government Sector to subsidize the Commercial Sector at an
     increasing rate which grew to $100 million annually.

     Issue 2:  The Government Sector produced the preponderance of
     annual revenues (two-thirds) and profits, while the Commercial
     Sector had a clear majority (two-thirds) in shareholder voting
     power.

     Issue 3:  After 30 years of sole ownership of the Firm by the
     Partners, during most of which time the stock book value had

increased at a constant rate of 10% per annum, the book value was far less than estimates of market value.

60.  In 1999, the outgoing CEO, William Stasior suggested to Defendant Shrader that the simplest solution was to increase the stock owned by Government Sector partners by promoting more people to partner and to lessen the amount of stock held by Commercial partners by slowing down the creation of new partners in the Commercial Sector.

61.  Shrader engaged in the exact opposite of Mr. Stasior's plan, and made no changes to the rate at which commercial employees were promoted, and rather than increase the amount of stock held by government partners, pushed the majority of large government shareholders out of BAH.

## Shrader Proposes a Leveraged ESOP Recapitalization

62.  At the Firm Operating Council meeting held in or about 2000, the first during his tenure as CEO, Shrader proposed that the firm engage in a sale to an employee stock ownership plan ("ESOP"). Such stock sale would require amendment of the Stock Plan by a 75% super-majority.

63.  Shrader realized that due to the super-majority requirement, the older senior partners had the power to oppose and prevent a leveraged recapitalization.  In order to minimize this possibility, Shrader arranged a revision to the Stock Plan in 2000 so as to eliminate the ability of retired partners who had not yet sold

their stock to vote.

64.  Shrader's proposal involved a so-called "leveraged ESOP" transaction, a form of an LBO.

65.  BAH was a perfect candidate for a leveraged ESOP.  BAH had no debt and had a large base of employees to whom tax-deductible contributions could be allocated.

66.  The ESOP plan was explained by Strickland to the Operating Council in a detailed presentation which demonstrated the Leveraged ESOP proposal was a far superior wealth-creation strategy than the Stock Plan.

67.  A number of senior partners present spoke out against the ESOP proposal.  The senior partners who spoke against the plan expressed concern that even though the stock would be owned by employees of BAH, the plan violated the existing policy of "always owned by the partners," and was a step towards going public which would again destroy BAH's culture.

68.  No vote was taken on the proposal for BAH to engage in an LBO structured with the use of an ESOP loan as it was abundantly clear that a 75% vote was not obtainable.

69.  As a result of the negative reaction to the leveraged ESOP

proposal, Shrader began to manage the firm so as to assure himself that the next time he proposed radical change in corporate structure, such as a split-up or a leveraged stock sale, it would be highly unlikely for the proposal to be blocked by the Commercial Partners, and the super-majority necessary to approve a recapitalization would be achieved.

## Impact of 9/11

70.  BAH's government sector grew in the period 2001-2005 at a compounding rate of 15-20% per year as a result of heightened government expenditures for technically based weapons systems and technically driven intelligence gathering.

71.  By 2003, Shrader concluded that the business prospects for the government sector were so great that a transaction whereby the Commercial Partners would be eliminated could be structured.

72.  Shrader realized he would need nearly all the commercial partners' votes in order to achieve a recapitalization due to the 75% super-majority vote requirement in the stock plan.

73.  Therefore, he determined to position the commercial sector into a situation where the commercial partners would have no choice but to embrace a recapitalization as the means to escape from the

impact of ballooning government business that had overwhelmed BAH.

## 2003 Modification of the Stock Plan

74.  In or about March, 2003 the Individual defendants caused the
Board of BAH to modify the amount of stock issued pursuant to its
stock rights plan, reducing by one-third the amount of stock which
was to be distributed annually.

75.  Notice of the change was provided in a March 18, 2003 mailing
which stated that the purpose of the one-third reduction in annual
stock distribution was "to prevent the firm from being over
capitalized which would lead to negative tax consequences and
reduce our financial flexibility."  Such statement was false in
that it omitted to disclose the primary and/or concurrent reason
for the change which was to promote the Control Seizure Plan by
reducing the amount of equity which might be voted against the
split-up plan, and setting the stage for imposition of the
Hierarchical Compensation Model.

76.  The primary reason for the reduction of stock issuance was to
maintain Individual Defendants' relative voting strength and make a
split-up recapitalization easier of accomplishment.

## BAH Squeezed Out Partners Who Owned Significant Stock

77. Normally, an expanding business desires to keep senior managers in order to maintain structure and manage the impact of expanding growth with new hires and new projects, and to ensure that clients are kept satisfied despite the increasing demands on the organization.

78. Contrary to the needs of BAH, however, Shrader did the opposite and began to force experienced government sector managers out during a time of rapid growth.

79. In 2003, Shrader began the orchestration of the retirement of government partners Ted Shema and Fred Cipriano, who eventually retired on March 31, 2005. Shema was told by management that "it was time to go". He was promised substantial consulting assignments. At the time, Shema was very productive and his government business was increasing. He was shocked but felt he had to retire on those terms.

80. Management advised Fred Cipriano that he should retire so as to permit defendant Garner to increase his responsibilities. Cipriano's business was also thriving. Cipriano believed that this decision and suggestion was made in good faith for the good of BAH, felt he had no choice, and resigned.

81. Shema was pushed out and his 39,000 shares were redeemed at book

value in April, 2007.  Cipriano was pushed out and his 70,500
shares were redeemed at book value in April, 2007.

82.  Senior partner Mike Noonberg was performing at a very high level
in late 2004. His business was increasing greatly.  Noonberg had
principal responsibility for BAH contracts for the Central
Intelligence Agency.

83.  In or about January, 2005, as required by BAH policy, Senior
Partner Noonberg discussed with Shrader that he was considering the
issue of the time for his retirement.

84.  Noonberg anticipated that Shrader would resist the idea of
retirement for at least a few more years due to the needs of his
expanding business.

85.  Shrader's response was to express delight at the prospect of
Noonberg retiring ahead of schedule.  As a result of Shrader's
response, Noonberg accelerated his retirement. Shrader had never
exhibited any feelings of ill will towards Noonberg. There was no
reason for Shrader's response of delight other than the fact that
Noonberg's retirement satisfied a strong desire of Shrader
unconnected to the well-being of BAH.

86.  Noonberg's 35,500 shares were redeemed at book value in or about

October, 2007.

87.   Government partner Glen Bruels was a candidate to lead the government sector business, and was performing at a very high level in 2005. Shrader advised Bruels that Shrader had selected Garner to lead the government business and that Bruels should retire.  Bruels was shocked but complied.

88.   Bruels retired in 2006 and could not vote against the Carlyle Transaction and was not in a position to influence other partners.

89.   Government partners could not understand Shrader's desire to promote Garner. All considered Garner young and inexperienced for the position.  Shrader used the tactic of a desire to promote Garner as a means of insulting senior government partners and as a means to push them out of BAH.

90.   The result was that Garner, a Shrader loyalist, Doughty, a Shrader loyalist, and Shrader's close associate Gary Mather, were by the far the greatest stockholders of the senior government partners remaining after Shrader consummated his split-up plan.

## The Revision of Partner Evaluation Procedure

91.   By 2003, Shrader had completely revised the method by which partners were evaluated, promoted and compensated.

92.  Prior to 2003, all partner personnel decisions were made by the Personnel Committee of the Board of Directors.  Shrader revised the method for review of partners, ostensibly to streamline and improve the process. Under that false pretense, Shrader created the Partners Compensation Committee ("PCC")whose members he appointed, to manage the appraisal process, and report its recommendations to the Board Personnel Committee.

93.  Following the 2003 creation of the PCC, the PCC managed the appraisal process and made recommendations to the Board personnel committee, which effectively became a rubber stamp, as it had no direct knowledge of the appraisal process.

**Lead Partner Foster Rich was forced out in 2003**

94.  BAH personnel decisions respecting employee advancement, retention or termination were based upon a "360" degree evaluation procedure.  ("360 Assessment Process")whereby 10 or more co-workers senior, equal and below the subject are interviewed.

95.  Prior to August, 2003 the format required that the beginning of the assessment document must contain a recommendation respecting promotion, no action, or termination.

96.  Following July 2003, pursuant to a New Assessment Process the

assessment document prepared by the assessor was not to have any recommendations respecting promotion or termination.  Assessors were instructed not to make such recommendations.

97.  The assessment document was to be discussed by a group of ten or so partners in an Assessment Review Group meeting.  After such discussion, the group's chair was to instruct the assessor to make necessary alterations to the assessment document to reflect the Group's conclusion.

98.  All statements at the Assessment Review Group meeting were required to be true and correct objective comments believed to be true by the speaker.

99.  An August 17, 2003 document was disseminated by wire to the officers of the BAH government service sector (the " Assessment Review Document"). The Assessment Review Document portrayed the New Assessment Process as a method adopted to ensure that the review provide an accurate comprehensive and balanced perspective of the Assessment Review Group deliberations. In fact, the new assessment procedure was designed to permit Shrader to control the destiny of large stockholders.

100. The Assessment Review Discussion Group concerning Rich's assessment was held on September 11, 2003 in BAH's office in

McLean, Virginia.

101. Although not a member of Rich's Assessment Review Group,
defendant CEO Shrader attended the Group discussion.  In said
September 11, 2003 meeting defendant Shrader made false statement
concerning certain 1992 and 1993 events and alleged that Rich was
seriously deficient in managing the execution of a Warbreaker
contract.

102.   The assessor had conducted 12 interviews and the Warbreaker
program had not been mentioned in any interview, and advised
Shrader that whatever may have occurred ten years previously, the
assessment only related to the work done since 2000 and was very
positive.  But, CEO Shrader insisted that the recommendation be
altered so that Rich knew it was time to retire.

103. The Assessor changed the assessment document and WTB President
Defendant Doughty recommended that Rich was "Not on track, not
recommended for L3; initiate retirement plan with objective between
October 04 and October 05."

104. Even as altered, however, the assessment document dated
September 30, 2003 is laudatory.  The PAS summary states " . . .
not recommended for L-3", which was Rich's then position.  In this
regard the assessment document states: "Most partners feel that

Foster is having good impact, and is in a groove.  He is in the right spot doing the right things for himself and the firm."

105. Doughty's statement that the summary of Rich's assessment that Rich was not recommended to continue in his current level L3 was therefore false and completely contradictory to his assessment.

106. Doughty's recommendation was provided to the PCC by wire in the ordinary course of business, and it approved recommendation as did the Board Personnel Committee.

107. Rich retired and his 30,500 shares were redeemed at book value in effect in April, 2007.

### The Attack on Senior Partner Joyce Doria

108. In or about late 2003 to 2004, defendants Shrader, Doughty and Garner commenced a campaign to force the resignation or retirement of Joyce Doria, a senior partner of the BAH Government Sector.

109. Doria was unexpectedly accused by Shrader in a very public forum before a group of partners of not supporting the "One Firm" initiative, which had been endorsed by the senior partners of the firm.

110.  Such statements were false, and were knowingly so.  Indeed,

Shrader as set forth below was himself planning to split-up the firm at the very time he accused Doria of failure to support the sham "One Firm" initiative.  Shrader's objective in this attack was to provoke her to lose her temper and either voluntarily retire or behave inappropriately so as to precipitate termination for insubordination.

111. After that tactic failed, in violation of BAH procedures, defendant Shrader attempted to force a performance "Assessment" of Doria a year in advance of the normal time when such an assessment was due to be performed.

112. Doria held her temper during Shrader's public attack and then refused to submit to, or cooperate with, an assessment.  Doria threatened that she would sue BAH for sexual discrimination if Individual Defendants did not cease their false charges and cease their attempts to conduct a so-called out-of-cycle review of Doria's performance.

113. Individual Defendants heeded the threat and ceased their overt attempts to force Doria out in 2004.  She was, however, thereafter "frozen out" of all management discussion; was not permitted to attend meetings; and was, in effect, constructively terminated.

114. Doria retired in late 2006, as a result of Individual

Defendants' harassment and their continued exclusion of her from senior management discussions.

## Senior Partner Bruce Pasternack is Forced Out

115. Senior Partner Plaintiff Bruce Pasternack ("Pasternack") was a commercial partner who joined BAH in 1976, and in 1998, was nominated by the worldwide partners of BAH to be one of the three finalists for CEO. Shrader believed that in a new election for a CEO at the end of his 6 year term in 2005, that the Commercial Partners would be sure to elect one of their own.

116. Pasternack was very happy with his position at BAH. He had indicated that he had no plans to retire in the immediate future.

117. Pasternack's appraisal was in process in early 2004.  Shrader's term in office as CEO was due to expire on March 30, 2005; an election would be held in December, 2004, but Shrader had no intention of stepping down.

118. In the spring of 2004, Pasternack received a phone call from Commercial Defendant Lewis. At Shrader's behest, Lewis advised that the PCC committee had met and discussed Pasternack's appraisal and had determined that Pasternack had to resign and become a non-employee consultant immediately or else he would be terminated for cause.

119.  Pasternack accepted the representation of his long time
      colleague Commercial Defendant Dan Lewis.


120. In June of 2004, personnel director, Horatio Rozanski wrote
     Pasternack and described the terms of Pasternack's proposed
     retirement.  Ultimately Rozanski told Pasternack in no uncertain
     terms that he must sign the voluntary retirement forms immediately
     or termination would be initiated. Pasternack complied, as he could
     forfeit unvested stock, a termination payment for his 28 years'
     service, and lifetime medical benefits in the case of a for-cause
     termination.


121. Forcing Pasternack out reduced the amount of stock outstanding,
     as Pasternack held about 74,000 shares and eliminating a very
     powerful independent voice in BAH who had many supporters.


122. Elimination of Pasternack permitted Shrader to obtain an
     unprecedented extension of his term as CEO, a critical element of
     the plan to seize control of the BAH Government Sector.


123. The representation by Commercial Defendant Lewis to Pasternack
     that a truthful independent evaluation based upon careful unbiased
     investigation of Pasternack's performance had been conducted was
     false.  The representation made by Lewis that the PCC had
     determined in good faith that Pasternack's prompt resignation was
     in the best interests of BAH was false.

124. At the time of his retirement, Pasternack was not advised that Shrader had abandoned the BAH policies of remaining independent and owned solely by the employees, and to continue to be a unified company with both the Government and Commercial Sectors.

125. Pasternack could have rescinded his resignation at any time prior to November 30, 2004.

126. Pasternack retired on November 30, 2004. On January 04, 2007, he sold his 74,000 shares to BAH for book value, as required by BAH.

## **Senior Partner Reginald Boudinot is Forced Out**

127. Plaintiff Boudinot began working at BAH in 1991. He served as a senior vice president and from 1994 as a member of the Firm Leadership Team for the Government Sector.

128. Plaintiff Boudinot was fully acquainted with Shrader's management style. In each case where a group discussion was to be held, the agenda was set before the meeting, and all who participated were aware of Shrader's preferred course of action, which was invariably adopted.

129. Prior to 2004, each appraisal of Boudinot had resulted in the highest rating, which resulted in his steady pattern of promotions.

130. Plaintiff Boudinot was very happy with his position and career; he had enjoyed great success and had indicated he had no plans to retire from BAH in the near future. Boudinot advised Garner that he planned to retire in the 2007 or 2008 timeframe.

131. In 2004 Plaintiff Boudinot engaged in the assessment process as prescribed by the 360 review.  He drafted a self-assessment as a first step, and noted his achievements of the past year.  He felt he was performing at the same level as before and indeed had achieved particular success.  He forwarded the assessment to Garner, along with a list of partners and principals who he felt could be interviewed to comment upon his performance in the 360 appraisal process.

132. As the interviews were being conducted, Boudinot was told by two interviewees that Garner was attempting to induce negative comments.

133. Later in 2004, Boudinot attended a meeting at the Westfield Conference Center in Chantilly, VA. At the conclusion of the meeting Garner asked Boudinot to sit with him.

134. Garner proceeded to tell Boudinot that his appraisal assessment was very poor; so poor in fact that if forwarded to the PCC, the PCC members would undoubtedly terminate Boudinot for cause.

135. Garner did not debrief Boudinot in accordance with the established BAH procedure. Garner did not show the assessment to Boudinot. Instead Garner told Boudinot that if he agreed to retire immediately he would tear up the appraisal and it would not be seen by the PCC.

136. Garner pointed out that a "for cause" termination would cause Boudinot to forfeit valuable benefits: vesting of Stock Rights Plan, a bonus, the ability to be a consultant to BAH as a so-called Senior Executive Advisor, and the benefit of lifetime medical care.

137. After making that threat, Garner advised Boudinot that Garner could save these benefits if Boudinot voluntarily retired. Garner stated that he had approval from Shrader for Boudinot to be permitted to voluntarily retire and preserve all these benefits, keep his 2004 bonus and continue at the firm as a senior executive advisor and transition his career without the stigma of being "booted out". A few days later, Boudinot was told by Individual Defendant Doughty to sign the retirement papers by noon the next day or he would be fired.

138. Boudinot assumed that Garner was telling him the truth, and that inexplicably BAH had determined that the good of BAH required his retirement.

139. He realized moreover, that the PCC mechanism had given PCC the power to arrange his termination and that the loss of deferred compensation, unvested stock and bonus, as well as the loss of lifetime generous medical benefits for him and his spouse, and the injury to his career in the eyes of his business associates, would damage him financially and professionally.

140. Out of fear of the economic consequences, Boudinot tendered his voluntary resignation in September, 2004, effective March 31, 2005. In March 2007, BAH called Boudinot's shares and paid him book value.

141. Plaintiff Boudinot could have rescinded his resignation at any time prior to March 31, 2005.

142. Garner's representation that the interviews conducted in connection with Boudinot's appraisal were uniformly negative was false.  Garner's statement that the appraisal of Boudinot was so negative so as to provide grounds for termination for cause was false.

143. Garner, at the direction of Shrader, made fraudulent representations.  Garner made an explicit threat to Boudinot that unless Boudinot immediately retired and granted BAH the option to

purchase his shares at book value in two years, BAH would ruin him professionally and financially.

144. Garner made such misrepresentations and interfered with Boudinot's employment relationship for a corrupt reason, which was to enrich himself and Shrader in order to seize control of the BAH Government Business.

## Plaintiff Kocourek is Fraudulently Deprived of Shadow Stock Benefits

145.   In 2007 Plaintiff Kocourek held 27,300 shares of common stock and was also a participant in the deferred compensation Shadow Stock Plan.

146. As a result of the Australian tax laws, in 1992 Kocourek was enrolled in a "shadow stock" plan, which also covered BAH United Kingdom resident employees.

147. "Shadow stock", also known as "phantom stock" is a term of art in the field of executive compensation.

148. In a stock bonus plan, the executive is granted the right to purchase stock *in futuro* at a current price, and earns compensation and retirement benefit as the value of stock increases during the life of the grant. In a shadow or phantom stock plan, on the other hand, the executive does not receive the right to purchase stock. In lieu of stock purchase, the employer promises to make a post-

retirement payment to the employee which will be calculated to provide the employee with the equivalent to the net after-tax proceeds the executive would have received under a stock bonus program.

149. The amount of the "shadow stock" post-retirement payment is calculated by reference to the value of the employer's stock on the defined valuation date. Thus, the post-retirement payment "shadows" the value of the employer stock and creates the economic equivalent of a stock bonus plan.

150. The amount of the bonus payment is determined on the valuation date by taking the then per share value of the employer's stock and multiplying that value by an agreed number. The agreed number is the number of "shadow shares" which the employer has promised to use in calculating the amount of the post-retirement bonus.

151.  Between 1992 and 1998 BAH "awarded" Kocourek 26,700 shares of shadow stock instead of common stock grants under the Stock Rights Plan.

152. The Shadow Share Plan is a deferred compensation plan whereby payment of a cash bonus is explicitly deferred until at least separation of service and retirement and up to two years after retirement. The Shadow Stock Plan also is designed to provide income in retirement. The Shadow Stock Plan is an employee benefit pension plan as defined by ERISA at 29 U.S.C. §1002 (2)A.

153. In late 2006, Plaintiff Kocourek met with Shrader to discuss his future with BAH.

154. Kocourek told Shrader that although he was planning to marry a non-US resident, that he would remain in the BAH San Francisco offices if a strategic transaction involving BAH was likely to occur in the near future.

155. Shrader replied that no such strategic transaction was in the wings, which statement was false and Shrader intended that Plaintiff rely on the falsity thereof to Plaintiff's detriment.

156. Kocourek did reasonably rely thereon, moved to Singapore and was forced to retire by Shrader.  The rationale for forcing Kocourek out given by Shrader was that BAH did not want any profit "point" connection to South East Asia for reasons not divulged, and Shrader refused Kocourek's desire to go part-time because BAH did not allow part-time partners.

157. The decision to prohibit any profit "points" allocable to Southeast Asian practice was motivated by a desire to force Plaintiff Kocourek, and his 54,000 combined Shadow and Stock Plan shares, out of BAH because Plaintiff Kocourek's largest client was in Thailand.

158. In fact, management was in the midst of selling the Government business and was scheming to lessen the effective amount of stock outstanding by any means possible in order to increase the potential for management's personal gain as a result of an LBO at a cheap price.

159. In 2006, Plaintiff Kocourek announced his intention to retire in 2007 and Kocourek did retire as of March 31, 2007.

160. Plaintiff Kocourek desired and elected, that he would delay the time of the calculation of his post retirement bonus under the Shadow Stock Plan until March 31, 2009.

161. Numerous oral representations were made to Kocourek by senior managers during his tenure with BAH post-1992 which promised that all terms and conditions of the Stock Rights Plan which had an economic effect on the quantum of benefit payable under the Stock Pension Plan would be applicable to the Shadow Stock Plan. If instead of participation in the Shadow Stock Plan, Kocourek had in fact held 26,700 shares pursuant to the BAH Stock Rights Plan, and retired in 2007, he would have been able to hold his shares for two

years and could not have been forced to sell his stock to BAH until 2009.

162. The Shadow Stock Plan administrator, BAH, acting through Shrader

and Lewis therefore decided to breach the terms of the Shadow Stock

Plan in a manner favorable to Shrader and his personal interests.

163.   The executives caused the plan administrator expel Kocourek

from the Shadow Stock Plan in 2007, and forced the payout of

Kocourek's shadow stock bonus in 2007 in order to enrich themselves

and provided a false explanation for their actions.

164. On four separate occasions, beginning in 2005, Plaintiff

Kocourek requested copies of documentation concerning the Shadow

Stock Plan. He received no information respecting the Shadow Stock

Plan.

165. Plaintiff Kocourek appealed the decision to expel him from the

Shadow Stock Plan in 2007 to the Personnel Committee of the BAH

Board on May 1, 2008, and advised the Personnel Committee that

senior management had not provided him with a substantive response

to his requests for information; and that his retirement planning

had been based upon the election to delay valuation for two years

post retirement. The personal committee responded by email on June

9, 2008 that it saw no "compelling reason to undo the original

management decision".

166. Plaintiff Kocourek then discovered evidence that past retired

participants in the Shadow Stock Plan were permitted to defer

calculation of their Shadow Stock Bonus payment just as if they had

been subject to the Stock Rights Plan. He submitted this evidence

to the Personnel Committee with a second written appeal on July 28, 2008, and has received no response to date.

### The Peculiar Un-Retirement of Keith Oliver

167. The principal reason Kocourek retired was that Shrader had decided to close Asian operations for reasons that were not apparent.

168. Kocourek was told he could no longer service his Thai client base as a BAH employee. He was reminded that except in the case of partners who are young mothers, as a matter of policy, BAH does not permit partners to stay on as part-time employees

169. Kocourek's colleague Keith Oliver planned on retiring at the same time as Kocourek. Oliver relocated to Vancouver, BC from London, England, away from all BAH business.  Suddenly and inexplicably, in or about early 2007, Oliver changed course and announced he would not retire.

170. Instead of retiring, Oliver became a part-time employee of BAH, initially for 50% of his time and then for 30% of his time.

171. Oliver learned of the secret planning, and traded his silence for the right to maintain his employee status and delay calculation of his shadow stock payment until the LBO deal closed.

### The Cumulative Effect

172. In 2004, 27 partners owned 25,000 shares or more, including four of the Individual Defendants and 23 others.  By 2008, 16 of the 23 had retired or had been forced out at the height of their careers.

## Shrader Secures An Extension As CEO

173. Shrader fraudulently forced Pasternack to resign in the spring of 2004. Then, at the June 2004 Board Meeting Shrader raised the issue of succession and indicated that he wished to have his term as CEO renewed for six years from 2005 to 2011.  Shrader's term was scheduled to end in 2005, but his continuation as CEO made it far more likely that a personally enriching seizure of control of the government business could be accomplished.

174. As a condition of supporting Shrader's request for an extension of his term as CEO, which they limited to four years, senior commercial partners obtained a commitment from Shrader to take steps to integrate the Government Sector with the Commercial Sector so as to assure the future of the Commercial Sector within BAH. Unwittingly, the Commercial Partners had handed Shrader the weapon he could use to force them to sell the BAH Government Sector to Shrader and his associates at a fraction of its value.

## Shrader Sabotages The Attempt to Restructure BAH So As To Permit Commercial Business to Operate Profitably

175. During his tenure as CEO from 1999 to 2004, Shrader had not been attentive to the commercial business and spent little time on commercial matters.

176. Shrader intentionally caused the Commercial Business to lose focus, become fractured and suffer declining profitability for the simple reason that he had decided to force a split-up of the firm so that he could attain personal control of the valuable Government Business.  A weak and vulnerable Commercial Sector could be more easily manipulated.

177. After 9/11, Commercial Partner Joseph Nemec was requested to run the North American commercial business which had suffered a severe drop off due to the 9/11 shock. Lack of strong management had resulted in a high cost structure. Nemec instituted successful cost-cutting measures.  After 9/11 defendant Nemec had cut $65,000,000 of expenses in the commercial section of North America. Nemec achieved substantial savings by combining support functions and reducing administrative expense.

178. Nemec and other commercial partners believed that similar cost savings could be achieved by integrating duplicative support and administrative functions between the government and commercial sectors.

179. Following the extension of Shrader's term in 2004, and his agreement to pursue integration of the two sectors, Nemec was assigned the task of co-leading the effort to integrate the two

sections along with government senior partner Mark Gerencser.  The
initiative was named the One Firm Evolution ("OFE").

180. One concept behind the formation of the OFE initiative was that
commercial sector costs could be reduced by scaling the information
technology, and other administrative support functions of the
government sector to support the lesser needs of the commercial
business.

181. Government contracts have tremendous back office paperwork
requirements.  For example, each worker on a cost-plus contract
must prepare daily time sheets accounting for hours spent on the
contract.

182. At the outset of the OFE program, the government sector's back
office administrative and technology support functions were
administered by Strickland in a group known as the Global
Operations or GO Team.

183. The OFE initiative was governed by an OFE leadership council
which consisted of Shrader, Strickland, Rozanski, Nemec and
Gerencser.

184. Several proposals which Nemec and Gerencser thought made obvious
sense were rejected by the OFE leadership council without
particular explanation.  Shrader was non-committal and distant in
OFE leadership council meetings and would cut off discussion with

curt statements such as, "No, I don't want to do that."

185. Shrader in fact never had any intention of facilitating the
ability of the commercial sector to prosper within an integrated
BAH. The most egregious example of the failure of Shrader to permit
OFE to benefit the commercial sector concerned the cost accounting
practices of the GO team.

186. The commercial and government practices had substantially
differing needs for use of support services.  A government project
might have 3,000 employees while a commercial project would have
300 at most.

187. Public projects tend to be highly labor intensive and due to
government contracting requirements, and require far greater
administrative support.

188. In advising BAH clients, BAH commercial partners had dealt with
the dichotomy of administrative cost allocation among divisions of
an enterprise with differing levels of administrative support
needs.  Best practice was to create the ability of managers within
the firm to purchase units of administrative services from the
central administrative body, known as a central services
organization, as if one were contracting with a third party.

189. This technique is known as a service level contract, and would
permit a project chief to manage his costs by calibrating the

amount of support service required to the needs of the project at hand.

190. The approach had been highly successful for BAH clients and seemed to be the perfect and indeed the only method whereby the commercial sector of BAH could continue to exist alongside the behemoth that the government sector had become.

191. As part of the OFE, BAH created a central services organization by folding commercial administrative support functions into the government sector GO Team under Strickland.

192. After this integration was completed, Strickland rejected service level contracts.  He insisted on a flat allocation whereby the commercial sector units would receive a cost allocation determined by Strickland. No rationale was offered by Strickland for his position.

193. Insistence upon a flat allocation set by Strickland enabled Individual Defendants to  ensure that the commercial sector would have declining profitability.

194. Nemec advised Shrader and Strickland that BAH itself would never suggest to a client that a central service organization be implemented without service level contracts. The use of a flat allocation across divisions with differing support needs violates a principal tenet of organizational science.

195. Shrader backed Strickland and dismissed the service level contract proposal made by Nemec and Gerencser without providing a rationale.

196. Shrader wanted the commercial partners to believe that the growth of the government business would be a threat to the commercial partners' earnings and future prospects and that a transaction that offered them a significant immediate cash payment would be the only chance to realize a significant return.

197. Senior commercial leaders estimated that Strickland's allocation would decrease commercial sector profitability by 10%. The implementation of OFE under Shrader had a critical impact upon the BAH commercial sector's European business within less than a year.

198. Strickland and Shrader also imposed unrealistic staffing demands upon the European commercial business.  Under the guise of planning for growth, European offices were compelled to hire more staff in order to reduce profitability.

199. Due to Strickland and management's unreasonable cost allocations and staffing demands, the Commercial Sector's administrative costs exploded.  Germany, the most profitable unit in BAH after the US government sector, plunged into the red.  The 36 German partners had strong connections with the other European and Middle East partners and together represented 25% of the total BAH partner

group.  Most of said partners were in favor of a collegial culture
and a One Firm policy, but the impact of OFE due to the high cost
allocation caused consternation in the minds of the European and
Middle Eastern partners over their ability to prosper within BAH.

200. The commercial partners were geographically isolated from each
other in 60 offices worldwide, and lacked strong central
leadership. As a result of the sabotage of OFE, Shrader left
commercial partners little choice but to take the LBO price and
vote for the split-up.

### Shrader Delays the LBO and Redeems Two More
### Senior Partners at Book Value

201. In November 2007, BAH had selected the Carlyle Group as the
successful bidder to be management's partner in the government
business LBO, with an anticipated closing in March, 2008. BAH then
delayed formal approval of the sale until May 15, 2008, apparently
in order to force two retired shareholders to sell over 100,000
shares of stock to BAH on April 1, 2008 at book value.  See Nemec
v. Shrader et al, Civ. No. 09/7466, pending in this Court.

202. On April 2, 2008, Shrader advised Nemec that lawyers required the
immediate exercise of BAH's redemption option on Nemec's stock.

203. On April 5, 2008, CFO Swenson, who had been privy to the
discussions concerning the decision to force redemption of Nemec's
stock, advised Nemec that he vigorously disagreed with the

decision.   Swenson also advised Nemec to "follow the money-look for the person with the most to gain from this and it leads to Shrader… pursue all means open to you including litigation".

## Subsequent Disclosures and Events Confirm the Fraudulent Nature of Individual Defendants Actions

204. On May 22, 2008, BAH issued an Offering Circular by wire to its shareholders pursuant to which it sought approval of the Carlyle transaction from the shareholders.

205. In the Offering Circular, Shrader alleged that he was "tasked" by the Board of BAH in mid-2006 to explore ways to explore strategic options to maximize the business prospects of all parts of BAH while enhancing shareholder value.  This was false since Shrader set the Board agenda and suggested the "task" himself.

## The Secretive Selection of a Friendly Financial Advisor

206. The Information Circular stated that in the second half of 2006 management retained Credit Suisse as the exclusive investment bank to assist it in this assignment.

207. Management of large companies retain investment banking firms to assist in strategic planning.  Best management practices require that several investment banking firms be invited to review the company's situation and provide their respective views on possible strategic alternatives.  This selection process is known as a

"bake-off" or "beauty contest."

208. A bake-off is a valuable mechanism whereby management can obtain expert advice from a variety of pre-eminent sources as to possible approaches to the problem identified.

209. The advisability of conducting a bake-off is particularly acute when fundamental strategic decisions are being considered, and the company has no pre-existing investment banking relationship.

210. BAH itself recommends to its clients in need of strategic advice that a number of investment banks be interviewed in a bake-off process.

211. BAH did not have a significant relationship with an investment bank in the beginning of 2006.

212. BAH did not conduct a bake-off in order to select an investment bank to advise it with respect to its strategic planning.

213. If BAH's management truly was open to suggestions as to how best to address its future, it would have conducted a bake-off.

214. BAH's management had, prior to 2005, determined that a split-up resulting in their control of the government sector would be the course pursued.  BAH's management did not need any strategic advice and did not conduct a bake-off but instead retained Credit Suisse with whom defendants had a previous relationship.

47

215. The failure to follow normal procedure which would provide a
number of possible options is indicative of the fact that the
preferred option had already been selected, which was management's
hidden desire to pursue a split-up that would enrich management.

### The Information Circular Falsely Suggests That Strategic Buyers Did Not Wish to Bid

216. In order to mask the pre-determination to orchestrate a split-
up, Individual Defendants pretended that other options were
considered, but a management-led LBO was selected as a last resort.

217. At page 17 of the Information Circular, after indicating that
twelve "strategic" potential buyers had been solicited, the
Offering Circular states: "[BAH] received approximately twelve (12)
preliminary indications of interest and five (5) preliminary offers
all from private equity firms, three (3) of which were sufficient
to allow the bidders to move forward to conduct due diligence.  An
auction process was utilized in an effort to maximize stockholder
value."

218. The statement implies that the twelve strategic potential buyers
were not interested in acquiring BAH, even the five who indicated
interest and executed non-disclosure agreements, as revealed in
pages 25-26 of the Information Circular.

219. A "strategic buyer" refers to an operating business entity which

would buy BAH in order to increase the value of its existing business by more than the purchase price paid.  Frequently "strategic buyers" are competitors of the target; in BAH's case, this would be other entities with substantial contracting business with the United States government.  A strategic merger makes sense as the cost structure is lessened as departments are merged, and employees eliminated and marketing synergies are realized.

220. Because of its failure to disclose why strategic potential buyers did not bid, the shareholders were unaware that the Carlyle Transaction was not designed to secure the best price for the BAH government business, but in fact was designed to provide a price just high enough to be a seeming windfall to the commercial partners with the primary purpose or transferring control of the Government Business to Individual Defendants and yielding tremendous profit to Carlyle and Individual Defendants upon resale in an IPO.

221. Tremendous cost and expense is required in order to bid for a company such as the BAH government business.  Its assets are primarily government contracts.  A potential buyer would have to assign a portion of its staff to oversee a thorough review of each sizable BAH government contract, expend considerable funds to engage accountants and lawyers to review financial and legal issues, and finally its senior management would need to spend significant time to formulate a bid.

222. Therefore, as soon as a strategic buyer realizes that a management buy-out is also being considered, it usually decides not to divert itself into the exercise required to formulate a bid. Inside management can effectively block a strategic purchaser from succeeding in its bid by merely concluding the price is too low.

223. The statement that five strategic buyers expressed interest but that only LBO firms submitted bids is therefore a half-truth, as it omits the disclosure that strategic buyers will only bid when incumbent management assures the potential strategic buyer that it will retire, that there will be no demand that 15% - 25% of increase in value post-closing be given to current management, and that the highest bid will be accepted.  The Individual Defendants did not provide such assurances, thereby insuring that only private equity firms would bid.

224. By conducting a sham auction, BAH hid the fact that an LBO plan had been selected by 2005 as the preferred method of enriching management once the Government Control Seizure Plan was implemented.

## Management Provided a False Explanation As to Why Strategic Buyers Did Not Bid

225. Management alleges that five strategic buyers took significant steps to acquire BAH, but that the strategic buyers learned of difficulties involved in a potential transaction which caused the

interest in BAH to "wane."   Information Circular, p. 26.

226. The difficulty allegedly discovered was the existence of government regulations concerning "organizational conflict of interest."

227. All firms operating in the line of business in which BAH government sector operates are expert in understanding and interpreting the Federal Acquisition Regulation (known as "FAR").

228. Major defense contracting organizations all have a substantial engineering component that is similar to and competes with BAH.

229. The FAR addresses conflicts within an organization, but only to the extent that a contracting officer should search for such conflicts and ensure that appropriate safeguards are in place to prevent abuse, such as "firewalls" and FAR subpart 9.504 compels the contracting officer to award a contract to the "apparent successful offeror unless a conflict of interest has been determined to exist that cannot be avoided or mitigated".

230. The implied claim that all five strategic bidders determined that BAH's business presented conflicts which could not be mitigated was false.

**The Most Interested Strategic Bidder Had No Conflict of Interest**

231. The strategic bidder described but not identified in the

Information Circular had no conflict of interest whatsoever.

232. In describing the events leading up to the sham auction, the Information Circular states that:

> While this process was already underway, in December 2006, Dr. Shrader received an unsolicited expression of interest from another large professional services firm, Company A, indicating its interest in a potential acquisition of the Government Business.

233. Company A was SAIC, Inc. (*nee*; Science Applications International Corporation).

234. SAIC, Inc. ("SAIC") is in precisely the same line of business as the BAH government sector. Like BAH, SAIC is a System Engineering Technical Assistance ("SETA") contractor.

235. Unlike large weapons prime system contractors, which have SETA units, SAIC does not bid on the procurements which are shaped by its SETA services. It does not perform large, prime-system contracts.

236. SAIC is in precisely the same lines of business as the BAH government business, and does not engage in bidding on procurements it has advised on.  The acquisition of the BAH Government Business would not present a conflict of interest.

237. Although SAIC had no organizational conflict of interest, signed

a non-disclosure agreement, received a management presentation and conducted due diligence, it purportedly never bid.

238. SAIC had gone public in 2006, and was the perfect merger partner for the BAH government business. The split up would be accomplished by a merger and a sale of the commercial business to the commercial partners themselves or another management consulting firm. The BAH concern over market value would be resolved by the fact that SAIC stock was listed on the New York Stock Exchange providing both market value and liquidity.

239. This ideal option was hidden as the Information Circular fraudulently implied that there was no practical alternative to a sale to a private equity firm.

240. The only "problem" involved with a merger with SAIC was that SAIC already had a management team, and the Individual Defendants' jobs would be superfluous if SAIC acquired BAH.

241. The SAIC merger would not include a special management promote whereby 15% of the increase in value post- closing would be transferred to management *gratis*.

242. Therefore, in order to enrich itself by acquiring control of the BAH Government Business itself, management communicated to SAIC that a transaction would never be effected between BAH and SAIC. Upon realizing that BAH management was determined to enrich itself

as opposed to achieving value for its shareholders, SAIC ceased negotiations.

## Management Falsely Stated that an LBO Buyer Would Pay More Than a Strategic Buyer

243. The Information Circular also contains the astonishing claim that BAH management determined that a transaction with a financial investor "could" maximize purchase price.

244. It is fundamental that a strategic investor would likely pay more than a financial investor, and a statement that a financial investor "could" pay more fails to disclose that the probability that a financial investor *would* pay more is close to zero.

## Failure to Engage a Separate Investment Advisor Once a Split-up Option was Selected Evidences the Desire and Need for Secrecy

245. Once the decision was reached that management and government partners would become co-owners with a private equity investor of the entity that would purchase the government business, management was engaged in self-dealing.

246. Senior partners of BAH requested that separate representation be procured to represent the conflicting interests of the commercial and government partners.

247. Management should have retained separate financial and legal advisors to protect the interests of the selling commercial and

retired partners.

248. Management elected to 'paper-over' the conflict by creating a separate so-called "deal team" under Commercial Defendant Bertone. The failure to retain separate investment banking representation to negotiate on behalf of the selling commercial and retired shareholders is a red flag that management was doing all it could to prevent any option other than its pre-determined control shifting LBO plan from succeeding.

249. The Information Circular emphasized that BAH would indemnify Credit Suisse for claims which might be brought by selling shareholders arising out of Credit Suisse's simultaneous representation of sellers and part of the buying group.

250. Management did procure a separate opinion from Houlihan Lokey that the consideration was fair, assuming however that the firm can only sell to a private equity financial investor.  Houlihan Lokey specifically stated it was not considering the underlying decision to proceed with the merger and spin-off and did not consider the relative merits of the LBO transaction as compared to other business strategies that might have existed for BAH.

251. The management of the sale process and the failure to involve other advisors when separate representation was clearly indicated was designed to keep the transaction on the track pre-selected by management.

## Market Comparables Demonstrate that BAH Government Business Was Sold For Barely More Than Half Its Value

252. SAIC is a public company listed on the New York Stock Exchange which operates in precisely the same business as the BAH government sector.

253. As a comparable business its publicly traded value may be used as a benchmark for the BAH government business in order to determine the value of the BAH government business.

254. "Enterprise value" is the equity value plus debt. The May 22, 2008 letter of defendant Shrader transmitting the Information Circular to BAH stockholders states the enterprise value for the Government Business (including indebtedness) was $2.54 billion.

255. Carlyle and the other bidders developed their bids in the months leading up to November, 2007.

256. SAIC's SEC filings available in September 2007 indicate that as of 7/31/07 the last 12 months' revenues were $8.361 billion and SAIC had 418 million shares effectively outstanding and indebtedness of $1.56 value. Its October-Novemeber, 2007 stock price was at least $19.66, yielding an equity value of $8.22 billion and thus an enterprise value of $9.78 billion for SAIC in November, 2007.

257. The ratio of enterprise value of $9.78 billion to revenue of

$8.36 billion was 1.170, thus, enterprise value was 1.17 times revenue.

258. The Information Circular indicates that BAH Government Sector had grown to $3,470,551,000 for the last 12 months as of 10/31/07.

259. The ratio of the Carlyle Transaction enterprise value of $2.54 billion to revenue of $3.47 billion was .7320, which means that the BAH government business was valued at .732 times revenue.

260. The public market valuation of comparable company SAIC was 1.17 times revenues.

261. Application of the SAIC November, 2007 public valuation multiple of 1.17 times annual revenue to BAH's November, 2007  annual government sector revenue of $3,470,551,000 results in a comparable public market valuation of BAH in November, 2007 of $4.06 billion in enterprise value.

262. Individual Defendants conducted a sham auction designed to sell BAH's government business for a low price, some $1.52 billion below true value, only 62.5% of enterprise value based upon market valuations of comparable companies.  Since BAH borrowed $1.26 billion to finance the transaction, the equity value of the BAH Government business out of the total value of $4.06 billion was $2.8 billion, which Carlyle and management acquired by Carlyle's payment of $936 million, net of fees, at closing.

### Subsequent Events Demonstrate That Fraud Likely Occurred in the Carlyle Transaction

263. The gross undervaluation is confirmed by subsequent events. Carlyle purchased 80% of BAH on a diluted basis on July 31, 2008 with a net cash payment of $936 million after fees. The final price was based upon an enterprise valuation of $2.22 billion.

264. As a result of huge extraordinary dividends paid in July and December, 2009 Carlyle has paid itself back $545 million from BAH, nearly 60% of the price paid.

265. In July, 2009 Booz Allen paid a $114.9 million dividend, and in December 2009 Booz Allen paid another $650 million dollar dividend, part of which was used to pay the deferred portion of the very purchase price of BAH. $350 million of the December 2009 dividend was borrowed.  Thus, $415 million of $765 million of dividends was supplied by surplus cash generated in 15 months.

266. In December, 2009 a spokesman for Carlyle claimed that borrowing to pay a dividend made sense because Booz Allen Hamilton was performing well. "It was low-levered when we invested in the company and will have less leverage after the recapitalization than when we bought it".

267. Carlyle has admitted that BAH was "low-levered", i.e. "cheap" in the purchase, and has admitted that subsequent earnings have been

so huge that even after increasing debt by $350 million and paying
out $765 million in dividends, the net value is even greater than
at the purchase.

268. No fantastic event had occurred to BAH in fifteen months to
account for the phenomenon.  The only explanation is that the price
was fraudulently low, and that the earnings of the BAH Government
Business reported in the Information Circular (in the run-up to the
Carlyle Transaction) were fraudulently understated.Management
estimated FY 2009 EBITDA of only $238 million and FY 2010 EBITDA of
$254 million.

269. As revealed in an S-1 Registration Statement filed with the
Securities and Exchange Commission on June 21, 2010 (the
"Registration Statement"), Carlyle has valued the shares of BAH
subject to stock option at $128 per share for the tax purposes by a
formula which applies a discount for a lack of liquidity
marketability; customarily a 30-40% discount, which suggests an
estimated value of $200 per share, if liquid.

270. Carlyle's planned Initial Public Offering will render its
9,566,000 shares of Booz Allen Holdings liquid, and the liquid
price of $200 per share translates to a value of $1.913 billion for
its remaining investment of $492 million.  This is a gain of $1.42
billion on Carlyle's 80% holding in less than two years since
closing. Carlyle has also been paying itself 13% interest on a
large portion of the $550 million of mezzanine debt, as Carlyle in

large part loaned itself the money used to buy BAH and pay itself
dividends via Carlyle Mezzanine Partners II, L.P.

## The Registration Statement Evidences Fraud in the Carlyle Transaction

271. The price paid by Individual Defendants and Carlyle was reviewed
for fairness by Houlihan-Lokey, but management provided estimates
of only 11% revenue growth to the expert appraiser.

272. Revenue grew, however, by 20.3% in FY 09, a fact which BAH
claims to have been due to the 'deployment' of a net additional
2,700 consulting staff against backlog of government work. The
Carlyle Transaction closed on July 31, 2008, four months into FY
2009. BAH claims to have added 2,700 staff in FY 2009, which it
deployed against a backlog of government contracts with a resultant
20.3% revenue increase, but closed in the middle of the fiscal year
with a valuation based upon management projections of 11% growth.
By the time of closing, management had to have known that the
business plan projections it provided to the fairness opinion
expert were skewed grossly low.

273. According to the Registration Statement, despite the huge
increase in workers and completion of contract backlog work in FY
09, funded backlog increased by $4.8 billion in FY '09, a process
which also was ongoing at the time of closing. Management must have
known that existing contracts would be funded at a rate indicating
greater than 11% growth.

274. FY 10 again far exceeded estimates, as  revenue jumped another
     17.7%, 1500 more workers were deployed to attack the backlog in FY
     10, but the funded backlog grew another $5.3 billion. The 11%
     compounding increase projected by management to substantiate the
     low Carlyle valuation would have resulted in 23% growth in the
     April 1, 2008 to March 31, 2010 two year period. In fact, revenues
     grew by 42% in such two year period.

275. The Information Circular used to provide shareholder approval of
     the Carlyle Transaction projected revenue of $2.997 million for FY
     09; actual revenue was $4.351 million;  the Information Circular
     projected revenue of $3.327 million for FY 10; the actual revenue
     was $5.122 million;  the Information Circular projected revenue of
     $3.693 million for FY 11, in its Registration Statement Carlyle,
     does not project any increase in growth, but another 17.7% rise
     would mean over $6 billion in revenue for FY 11.

276. The EBITDA estimates provided to create a favorable Fairness
     Opinion respecting the low Carlyle price, are even more egregiously
     suspicious.

277. The Information Circular projected Government Business EBITDA of
     $238 million in FY 09 and $254 million in FY 10.

278. The Registration Statement reveals that BAH Government Business
     had EBITDA of $277.344 million in FY 09, but in FY 10, EBITDA shot

up to $363.323 million.

279. Actual FY 10 EBITDA was 45% greater for than the estimate used
in setting the Carlyle price.  The price was fixed in a conflict of
interest sales transaction where a fiduciary was seller and buyer,
in a sale that closed only 8 months before the beginning of FY 10,
based upon FY 10 estimates supplied by the fiduciary that were only
half as much as the actual results.

280. As a result of this fraud, Carlyle will earn a $1.5 billion
profit on its $400 million net investment, and Individual Defendant
management will take home hundreds of millions.

## Hierarchical Compensation Was Swiftly Institute

281. The compensation of Individual Defendants was radically adjusted
after they seized control.  BAH's 2009 report to the TARP program
reported annual compensation of

Shrader – $8,457,003

Appleby – $7,368,682

Garner – $6,234,831

Strickland – $5,073,385

Close associate Gary Mather received $8,168,136 in annual
compensation.

## Carlyle Was on Notice It Was Dealing with ERISA Fiduciaries

282. The Stock Rights Plan has references to employees; termination

due to death, disability or retirement; early retirement approved by a personnel committee; leave of absence approved by the personnel committee not being deemed termination. The plan clearly identifies beneficiaries and reflects an administrative scheme for the operation of the plan and the calculation and payment of the plan benefits. No benefits may be paid until after separation from employment. Thus, on its face the Stock Rights Plan is subject to ERISA. Any party dealing with the Stock Rights Plan, particularly a sophisticated investor such as Carlyle, would know that the Stock Rights Plan was an employee benefit plan, and would be on notice that it should examine the facts and circumstances of the Plan's operation to determine if it is an employee benefit pension plan subject to full coverage of ERISA.

283. Discovery will reveal many documents and testimony that the Stock Rights Plan's purpose was to provide retirement benefits to long serving employees.

284. Title to the plan's assets is held by the individual participants, and plan assets were set aside into individual accounts which were beyond the reach of judgment creditors of BAH as with any ESOP. The Stock Rights Plan is a funded plan.

285. Credit Suisse and each of the Carlyle entities (The Carlyle Group; Carlyle Partners V, L.P.; Explorer Coinvest, LLC; Explorer Holdings Corporation; and Explorer Investor Corporation, knew or

should have known that each was dealing with ERISA fiduciaries of an ERISA covered plan.

## Violation of 18 USC §1954

286. All stock in BAH, including Plaintiff Kocourek's 27,300 shares was subject to the Stock Rights Plan.  The stock of BAH constituted retirement plan assets, subject to the provisions of Title 1 of the Employee Retirement Security Act of 1974 ("ERISA").

287. Individual Defendants are officers of an employer who had employees covered by the Stock Plan.

288. The Carlyle Entities created, funded and controlled Explorer Holding Corporation ("Explorer").

289. Individual Defendants each received stock in Explorer, which stock had a value far in excess of the merger consideration per share received by other Plan participants.

290. Individual Defendants each received interests in the Explorer equity incentive plan.

291. Shrader, Appleby, Strickland and Garner received financial participation in a bonus compensation plan which paid then nearly $1.5 million each in FY 2010.

292. The Explorer stock options have value, and are each a thing of

value.

293. The Carlyle Entities, each directly or indirectly gave, offered or promised to give or offer a thing of value to Individual Defendants with the intent to influence Individual Defendants to approve the sale of Stock Rights Plan assets for a value far below fair value.

294. Individual Defendants agreed to receive, and did receive, money or a thing of value because of the actions and decisions they took concerning the Stock Rights, and such thing of value was not received in good faith exclusive of fraud and deceit.

295. Each of Individual Defendants and each Carlyle Entity has violated 18 U.S.C. §1954.

## Counsel Received Benefits In Violation of Law

296. A group of shareholders consisting of current and retired officer-employees who worked in the BAH government sector (Government Business officers)received the right to share in the proceeds of a resale of Booz, Inc., should that condition occur within three years of the July 31, 2008 Carlyle closing. ("Anti-Flip Protection").

297. The Anti-Flip Protection was wholly illusory. A resale of Booz, Inc. occurring after July 31, 2011 would provide 50% more consideration to Booz, Inc. shareholders.  The Anti-Flip Protection is illusory because the possibility of it ever being triggered is

remote.

298. A law firm acted as counsel to the Stock Rights Plan; such law firm acted as counsel to BAH; and such law firm acted as counsel to Booz, Inc.

299. Such counsel to BAH, and its employees' Stock Rights Plan received a special payment in connection with the services such counsel rendered as, *inter alia,* counsel to the Stock Rights Plan.

300. In addition to cash payment of very considerable legal fees from BAH, Booz, Inc. delivered to such counsel 1,000 shares of Series A preferred stock, $100 par value, paying a cumulative dividend equal to 14% of par value per annum.  The Booz, Inc. preferred stock may be redeemed by payment of par plus cumulative but unpaid dividends. Redemption may not occur until after the third anniversary of the sale of BAH to Carlyle and Individual Defendants, the very date upon which the illusory Booz, Inc. Anti-Flip Protection expires.

301. Thus, counsel will be paid an excessive above-market 14% rate of interest for the exact same period of time as the Anti-Flip Protection is in effect, after which Booz, Inc. may be recapitalized and the Commercial Partner windfall monetized.  The Series A preferred had to be redeemable as soon as the Anti-Flip Protection expired, otherwise its existence would complicate a monetizing transaction.  As of July 31, 2011, Booz, Inc. may be sold for fair value of $500 per share free of the Anti-Flip dilution, and, counsel's above market 14% interest payment may be terminated by redemption and payment of $1,420,000.

302. At the time it issued the Series 1 preferred stock to the law firm, Booz, Inc. borrowed, or could have borrowed, money from commercial institutions at rates far less than 14% interest.

303. Booz, Inc. held net liquid assets of $95 million dollars when it issued the preferred stock to the law firm.

304. $2.26 billion dollars plus all of the stock of Booz, Inc changed hands at the closing of the Carlyle Transaction. Booz, Inc. could have been readily capitalized with an additional $1,000,000 in order to hold net liquid assets of $96,000,000, and $95,000,000 after the payment of an additional $1,000,000 to the law firm.

305. Customarily, a firm such as such law firm would not accept payment with illiquid preferred stock in circumstances such as obtained at closing of the Carlyle Transaction.

306. The Information Circular used to solicit shareholder approval of the Carlyle Transaction, stated that the financial projections were not to

> "be regarded as an indication that BAH, its Board or any of the Board committees, Credit Suisse, Houlihan Lokey or any other recipient of this information considered, or now considers, it to be a reliable predication of future results.  The Company does not intend to update or otherwise revise the Company's projections to reflect circumstances existing after the date such projections were made or to reflect the occurrence of future events even in the event that any or all of the assumptions underlying the projections are shown to be in error".

307. Such statement is an attempt to disclaim fraud, and put the law firm on inquiry notice that a fraud was being perpetrated.

308. The law firm should have known that the Information Circular was suspicious.

309. An issue of fact is presented as to whether or not the legal fees paid to the law firm in connection with the sale of plan assets, the payment of benefits and the termination of the plan, were received in circumstances free of deceit.

310. Such law firm is a party in interest as defined at 29 U.S.C. §1002(14) and is subject to the remedial provisions of ERISA of 29 U.S.C. §1132.

### Financial Counsel Received Payments Contrary to Law

311. By letter dated May 14, 2008, Credit Suisse Securities (USA) LLC ("Credit Suisse") opined to the board of BAH that the Merger Consideration provided for the acquisition of the assets of the Stock Rights Plan in the Carlyle Transaction was fair from a financial point of view (the "CS Fairness Opinion").  Such opinion was specifically addressed to the consideration received by persons such as Plaintiff Kocourek who were being cashed out in the merger and were not "rolling over" shares into Explorer stock.

312. Management provided Credit Suisse with estimates that indicated

that BAH Government Sector revenues would grow only 11% in FY '09 and only another 11% in FY'10. In rendering the Fairness Opinion, as set forth on  at page 45 of the Information Circular, Credit Suisse explicitly assumed that the financial forecasts provided by management were reasonably prepared and represented the best available estimates as to the future  financial performance of BAH (the "Projection Assumption").

313. Credit Suisse had been retained by BAH in the summer of 2006 to provide advice and counsel to the sponsor and administrators of an employee benefit pension plan.

314. Credit Suisse was a person who provided benefit plan services to an employee pension benefit plan respecting sale of assets and plan termination.

315. Credit Suisse knew SAIC, Inc would pay more than the Merger Consideration for the plan assets.

316. During the period July, 2006 through May 14, 2008, Credit Suisse examined the books and records of BAH. Credit Suisse knew or should have known that the Projection Assumption was false. The books and records show that for the 6 years prior to FY '09, BAH Government Sector revenues grew at an annual compounding growth rate ("CAGR") of 20%, and on May 14, 2008, the BAH Government sector was in the

midst of another year of 20% growth of revenue over the prior year.

317. Credit Suisse knew or should have known that management's estimates of future revenues and future EBITDA were grossly understated, and were not an accurate estimate of future revenue or EBITDA.

318. Credit Suisse received a fee of tens of millions of dollars for advising and counseling the sponsor and administrator of the Stock Rights Plan with respect to the sale of plan assets, and termination of the plan.

319. Affiliates of Credit Suisse provided financing to Explorer, both as agent and as lender in the Senior Credit facilities of $715 million, and as agent and a lender in the Mezzanine Credit Facility which pays interest to the lenders of 13%, and will receive 3% of the proceeds of the planned IPO, some $9,000,000, as pre-payment penalty when the proceeds of the IPO are applied to retire a portion of the Mezzanine Credit Facility as stated in the Registration Statement.

320. Credit Suisse knew the proceeds of the Senior and Mezzanine credit facilities were to be used to acquire Stock Rights Plan assets at a price which was but 50-65% of the fair value.

321. Credit Suisse knew of and participated in fraud and deceit in connection with the sale of Stock Rights Plan assets and termination of the Stock Rights Plan.

322. Credit Suisse mailed and/or emailed the CS Fairness Opinion to BAH, and knew it would be disseminated by mail and/or email to the participants in the Stock Rights Plan.

323. The CS Fairness Opinion was so mailed and/or e-mailed in furtherance of the fraudulent sale of plan assets.

324. The CS Fairness Opinion was intended to and did lull the participants in the Stock Rights Plan into a belief that the merger was an honestly negotiated transaction; that the Merger Consideration was fair value, and caused such participants' acquiescence in the sale of plan assets at below fair value.

325. Credit Suisse is a party in interest as defined at 29 U.S.C. §1002(14) and is subject to the remedial provisions of ERISA of 29 U.S.C §1132.


**In the Alternative the Retirement Provisions of the Stock Rights Plan
Constitute an ERISA Covered Funded Plan**

326. The Stock Rights Plan has specific provisions respecting

retirement and provides that employees who separate from service on account of retirement, death or disability may participate in a retired employees plan (the "Retiree Plan").

327. If a retiring employee elected to participate in the Retiree Plan, he or she was permitted to immediately purchase non- voting stock in BAH represented by prior unvested stock grants for the discount price determined in accordance with original grant. Such retiree was promised to receive when BAH elected to remove such Participant from the Retiree Plan (but not before a period of up to two years after retirement) an amount equivalent to the increase in the value of the stock over the amount contributed.

328. Participants in the Retiree Plan could not vote with respect to management of the Retiree Plan or the Stock Plan, and were compelled to surrender all A voting stock registered in such retiring employee's Plan account and receive therefore A non-voting stock in like amount.

329. The retired employee's benefit is thus an ERISA covered funded pension benefit plan held in individual account stock certificates.

**ERISA Fiduciaries**

330. Each Director Defendant, Individual Defendant and BAH is a

"fiduciary" of each of the Stock Pension Plan and/or the Retiree Plan.  Each of BAH,  Individual Defendants, such law firm and Credit Suisse are a "party in interest" with respect to the Stock Rights Plan and the Shadow Stock Plan as defined in 29 U.S.C. §1002(14).

### Possession of Plaintiff's BAH Stock or Its Proceeds

331. On July 31, 2008, BAH merged into a wholly owned subsidiary of Explorer Investor Corporation, Explorer Merger Sub Corporation, with BAH as the surviving corporation ("New BAH").

332. All of the outstanding shares of New BAH are held by Explorer Investor Corporation, which shares represent the proceeds of the sale of the assets of the Stock Rights Plan and/or the Retiree Plan.  100% of the stock of New BAH is held by Explorer Holding Corporation.

### Source of Information Alleged

333. The source of Plaintiff's information and belief as to the matters identified below is discussions by Plaintiff's counsel either directly with the persons identified below or with Foster Rich, Reginald Boudinot, Lawrence Wright or Bruce Pasternack, based upon discussion with the below identified source of information:

- William Stasior: Discussions between Foster Rich, former lead

partner and manager of the BAH San Diego office with Mr. Stasior.

- The Rich Assessment Review Group meeting held on September 11, 2003: Discussions between Foster Rich and Ted Shema, the Chair of the Group.

- The winter 2000 Leadership Council Meeting in Cabo San Louis: Discussion with Bruce Pasternack who attended.

- The ESOP proposal at the Forum Leadership Council in or about 2000. Discussion with Bruce Pasternack and Joseph Nemec, Senior Vice-Presidents who attended.

- The suggestions for retirement made to Ted Shema, Fred Cipriano, Glen Bruels and Mike Noonberg: Discussions with Foster Rich who held discussions with each of such persons.

- The forced retirement of Bruce Pasternack: Discussions with Bruce Pasternack.

- The forced retirement of Reginald Boudinot: Discussions with Reginald Boudinot.

- The deprivation of the great bulk of Kocourek's shadow stock bonus payment: Discussions with Paul Kocourek.

- The un-retirement of Keith Oliver: Discussions with Paul Kocourek and Bruce Pasternack.

- The extension of Shrader's term as CEO: Discussion with Senior Vice President Joseph Nemec who participated in the discussions referred to.

- OFE: Discussions with Joseph Nemec who participated in

discussions with Shrader and Strickland referred to.

- The impact of OFE to cripple European and Middle Eastern

  European commercial profits: Discussion with Gerd Wittkemper,

  Senior Vice President and former manager of the BAH German

  business.

## Plaintiffs Learned of the Control Plan

334. In November, 2009 each of Plaintiffs Kocourek, Boudinot and

  Pasternack was contacted by Foster Rich who advised each Plaintiff

  of many of the facts contained herein. As a result of that

  information, each Plaintiff determined that he had been defrauded

  as part of a long standing plan perpetrated by Individual

  Defendants, and had suffered damage, and Boudinot and Pasternack

  determined that their resignations were procured by fraud for an

  improper purpose.

### COUNT ONE-RICO

335. Each Plaintiff repeats and realleges each of the allegations

  contained in paragraphs 1 through 341 as if fully set forth herein.

336. At all relevant times, each Plaintiff was a "person" within the

  meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964©.

337. At all relevant times, Shrader, Garner, Appleby, Doughty, Lewis,

  Strickland, Credit Suisse, the Carlyle Group, Carlyle Partners V,

  LP, Explorer CoInvest, LLC, Explorer Holdings Corporation and BAH

  (collectively, the "Collaborators")were "persons" within the

meaning of RICO, 18 U.S.C: §§ 1961(3) and 1962©.

338. The Collaborators executed a plan to seize control of and loot the BAH Stock Plan (the "Stock Plan Enterprise"). The Stock Plan Enterprise was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

339. At all relevant times, the Stock Plan Enterprise was engaged in activities which affected interstate and foreign commerce, within the meaning of RICO. 18 U.S.C. § 1962©.

340. At all relevant times the Collaborators conducted or participated directly or indirectly, in the conduct of the  Stock Plan Enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO. 18 U.S.C. § 1962©.

341. Specifically, at all relevant times BAH and the Collaborators engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth below and further described above. The acts set forth below and so described constitute a violation of one or more of the following statutes: 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1951 (extortion); and 18 U.S.C. § 1954, (racketeering). The Collaborators each committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

342. In particular, Doug Swenson, CFO of BAH, at the behest of

Shrader, mailed or emailed the March 11, 2003 memorandum, and such document was received by Foster Rich.  This transmission lulled Dr. Rich and other participant recipients into believing that the reduction in stock distribution was a normal event dictated by obtuse financial considerations.  In fact, the transmission was a half truth as it failed to reveal that a purpose of the reduction was to limit distribution of stock to Commercial Partners thus making amendment of the Stock Plan more likely and reducing the amount of equity required in an LBO, should an LBO be the preferred method for Individual Defendants to seize control of the BAH Government Business. The transmission was done for the purpose of diverting a portion of the value of the BAH to Individual Defendants for no consideration.

343. On or about December 14, 2004 Defendant Shrader emailed a message to the officers of BAH (the "December 14, 2004 email"). Foster Rich received the email.  The transmission lulled the recipients into believing that the policy of "Always Owned By the Partners" continued to be inviolate policy and that a split-up of the firm was highly unlikely and a very remote possibility. Shrader alleged that OFE was policy and stated he intended to use OFE to improve the Commercial business of BAH. In fact, management was executing a scheme to seize a sizable portion of the value of the BAH Government Business for themselves for no consideration, and this transmission furthered the scheme by tricking commercial

partners into surrendering control over their cost structure to Individual Defendants under the false pretense that Individual Defendants' goal was to benefit the Commercial Business in the OFE process.

344. In particular, Doughty's recommendation that Rich retire was transmitted to the PCC by wire on or about September 11, 2003 as part of a scheme to seize control of the BAH government business in order to divert a portion of its value to Individual Defendants by fraudulent means.

345. In particular, as described by BAH in the Information Circular revenue and other financial projections as identified in the Information Circular were transmitted to fairness opinion experts Credit Suisse and Houlihan-Lokey by wire as part of a scheme to seize control of the BAH government business in order to divert a portion of its value to Individual Defendants by fraudulent means.

346. In particular, Credit Suisse delivered the CS Fairness Opinion to BAH by mail and/or email on or about May 14, 2008.

347. The CS Fairness Opinion was disseminated to all BAH shareholders/Stock Pension Plan participants by letter of Shrader dated May 22, 2008, as an Exhibit to the Information Circular, which was itself transmitted to the BAH stockholder/Stock Pension

Plan Participants with such letter, and was transmitted by mail and email.

348. The May 22, 2008 Shrader letter, the Information Circular and the CS Fairness Opinion were each intended to lull the Stock Pension Plan participants into a belief that the Merger Consideration was fair and had been negotiated in good faith as the result of an open auction process.

349. The transmission of the Swenson Memo, Doughty's Rich Recommendation, the Shrader December 14, 2004 email, the revenue and other financial projections, the CS Fairness Opinion, Shrader's May 22, 2008 Letter, and the Information Circular were each in furtherance of scheme or artifice to deceive which scheme was to obtain property at less than fair value.

350. In particular the threat made to Pasternack was wrongful. Pasternack had a property interest in his employment relationship; in his reputation; in his stock awards which would vest at the rate of 1/9 of the number of shares granted by awards given in each of 2004, 2003, 2002, 2001, 2000, 1999, 1998, 1997, and 1996,  and lifetime medical benefits.  BAH by Commercial Defendant Lewis at the behest of Shrader falsely threatened that all such property interests would be forfeited unless Pasternack surrendered his employment relationship and the right to acquire stock at a

substantial discount in the future.   Out of fear of the economic consequences which would flow from the execution of the threat, Pasternack surrendered property to BAH. These facts constitute extortion.

351. In particular the threat made to Boudinot was wrongful. Boudinot had a property interest in his employment relationship; in his reputation; in his stock awards which would vest at the rate of 1/9 of the number of shares granted by awards given in each of 2004, 2003, 2002, 2001, 2000, 1999, 1998, 1997, and 1996,  and lifetime medical benefits.  BAH through Defendant Garner at the behest of Shrader in Chantilly, Virginia falsely threatened that all such interest would be forfeited unless Boudinot surrendered his employment relationship and the right to acquire stock in the future at a substantial discount.  Out of fear of the economic consequences which would flow from the execution of the threat, Boudinot surrendered property to BAH.  These facts constitute extortion.

352. The Carlyle Group and/or Carlyle Partners V, LP, and/or Explorer CoInvest LLC, and/or Explorer Holdings Corporation directly or indirectly gave, offered or promised payment of a thing of value to officers of an employer whose employees were covered by the Stock Rights Plan and/or the Retiree Plan because of or with intent to influence actions, decisions and/or duties related to matters concerning the Stock Rights Plan and/or the Retiree Plan. Such

conduct constitutes racketeering under 18 U.S.C. §1954.

353. Individual Defendants each were officers of an employer whose employees are covered by the Stock Rights Plan and/or the Retiree Plan.  Each Individual Defendant received or agreed to receive or solicited money or a thing of value with intent to be influenced with respect to actions, decisions or other duties relating to the Stock Rights Plan and/or Retiree Plan. Such conduct constitutes racketeering under 18 U.S.C. §1954.

354. The acts of racketeering activity referred to in the foregoing ten paragraphs constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5). The acts alleged were related to each other by virtue of common participants, similar victims, a common method of commission and the common purpose and common result.

355. As a result of the conduct of Stock Plan Enterprise through such pattern of racketeering, each Plaintiff suffered loss of employment, reputation, pension plan benefit and money.

356. The fraudulent scheme continued for over four years until July 31, 2008 and threatens to continue longer as the Collaborators will likely continue to orchestrate the termination of BAH employees prior to vesting in equity related benefits; and the Carlyle Group's *modus operendi* is to corrupt corporate management into executing a self-dealing transaction with a Carlyle Entity at prices below fair value.

357. As a result of the Collaborators' violation of 18 U.S.C. §

1962(c), each Plaintiff lost millions of dollars.

358. As a result of the misconduct the Collaborators are liable to each Plaintiff for his losses in an amount to be determined at trial.

359. Pursuant to RICO, 18 U.S.C. § 1964(c), each Plaintiff is entitled to recover threefold his damages plus costs and attorneys' fees from the Collaborators.

## COUNT TWO – RICO

360. Each Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 359 as if fully set forth herein.

361. At all relevant times, Plaintiff was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

362. At all relevant times, Shrader, Garner, Appleby, Doughty, Lewis, Bertone, Strickland, Credit Suisse, the Carlyle Group, Carlyle Partners V, L.P., Explorer CoInvest, LLC and Explorer Holding Corporation (collectively, the "BAH Collaborators") were "persons" within the meaning of RICO, 18 U.S.C: §§ 1961(3) and 1962(c).

363. At all relevant times BAH was an "enterprise" (the "BAH Enterprise") within the meaning of RICO 18 U.S.C. § 1961(4).  At all relevant times the BAH Enterprise was engaged in, and its activities affect, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

364. At all relevant times, the BAH Collaborators conducted or participated, directly or indirectly, in the conduct of the BAH

Enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

365. Specifically, at all relevant times the BAH Collaborators engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth in Count One.

366. The acts of racketeering activity referred to in the previous paragraph constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5). The acts alleged were related to each other by virtue of common participants, similar victims, a common method of commission and the common purpose and common result.

367. As a result of the conduct of BAH Enterprise through such pattern of racketeering, each Plaintiff suffered the loss of millions of dollars.

368. The fraudulent scheme continued for over four years until July 31, 2008 and threatens to continue longer as the BAH Collaborators will likely continue to orchestrate the termination of BAH employees prior to vesting in equity related benefits and the Carlyle Entities have filed for an Initial Public Offering of the Explorer Holding Corporation which corporation is the holder of each Plaintiff's shares in pension assets, without revealing many material facts respecting the method by which Explorer came into possession of the BAH stock.

369. As a result of the BAH Collaborators' violation of 18 U.S.C. § 1962(c), each Plaintiff lost millions of dollars.

370. As a result of the misconduct the BAH Collaborators are liable to each Plaintiff for its losses in an amount to be determined at trial.

371. Pursuant to RICO, 18 U.S.C. § 1964(c), each Plaintiff is entitled to' recover threefold his damages plus costs and attorneys' fees from the BAH Collaborators.

### COUNT THREE - RICO CONSPIRACY

372. Each Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 371 as if fully set forth herein.

373. At all relevant times, each Plaintiff was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

374. At all relevant times, each of the Collaborators, (collectively "the Conspirators") were each a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

375. At all relevant times, the Conspirators agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the BAH Stock Plan Enterprise and the BAH Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d), (the "Conspiracy").

376. The Conspirators committed and caused to be committed a series of overt acts in furtherance of the Conspiracy and to effect the objects thereof, including but not limited to the acts described in Count One.

377. Each of the Conspirators committed acts which were wrongful and as a result of Conspirators' violations of 18 U.S.C. §1962(d), each Plaintiff lost millions of dollars of benefits he would have otherwise enjoyed.

378. As a result of such violation the Conspirators are liable to each Plaintiff for his losses in an amount to be determined at trial.

379. Pursuant to RICO, 18 U.S.C. §1964(c), each Plaintiff is entitled to recover threefold its damages plus costs and attorney's fees from the Conspirators.

380. As set forth in Count Two, at all relevant times, the Conspirators other than BAH each were associated with the BAH Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the BAH Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

381. The Conspirators other than BAH committed and caused to be committed a series of overt acts in furtherance of the BAH Enterprise Conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

382. Each of the Conspirators other than BAH committed acts which were wrongful and as a result of the Conspirators other than BAH's violations of 18 U.S.C. § 1962(d) respecting the BAH Enterprise,

each Plaintiff lost millions of dollars of benefits he would have otherwise have enjoyed.

383. As a result of the BAH Enterprise Conspiracy, the Conspirators other than BAH are liable to each Plaintiff for his losses in an amount to be determined at trial.

384. Pursuant to RICO, 18 U.S.C. § 1964(c), each Plaintiff is entitled to recover threefold its damages plus costs and attorneys' fees from Conspirators other than BAH.

**COUNT FOUR – BREACH OF TERMS OF SHADOW STOCK PLAN UNDER 29 U.S.C. §1132(a)(1)(B)**

385. Plaintiff Kocourek repeats and realleges each of the allegations contained in paragraphs 1 through 384 as if fully set forth herein.

386. Under the terms of the Shadow Stock Plan, Plaintiff Kocourek held the option to continue to participate in the Shadow Stock Plan post-retirement.

387. Plaintiff Kocourek elected to continue in the Shadow Stock Plan post-retirement.

388. As a result of his election to continue in the Shadow Stock Plan post-retirement, under the terms of the Plan, Plaintiff Kocourek held the option to elect the date of calculation of his Shadow Stock Bonus at any date within the two year period following retirement.

389. Plaintiff Kocourek elected March 31, 2009 as the date of calculation of his Shadow Stock Bonus.

390. On March 31, 2009, each share of BAH stock had a value of $1,700.

391. Plaintiff Kocourek was paid $150 per share.  Accordingly, under the terms of the Plan, BAH owes Plaintiff an additional Shadow Stock Bonus payment of a quantum sufficient to yield after tax an additional $1,550 per share, or $40,765,000.

**COUNT FIVE – INTERFERENCE WITH ERISA PROTECTED RIGHTS AGAINST BAH AND CO-FIDUCIARY ADMINISTRATORS**

392. Plaintiff Kocourek repeats and realleges each of the allegations contained in paragraphs 1 through 391 as if fully set forth herein.

393. Shadow Stock Plan participants participate in the Shadow Stock Plan until such time as BAH makes the payment of the Shadow Stock Plan bonus.

394. Shadow Stock Plan participants who retired prior to the date of Plaintiff Kocourek's retirement were permitted to remain in the Shadow Stock Plan until a day selected by the participant so long as such day were a day falling between the date of retirement and/or on the date which is the second anniversary thereof.

395. Plaintiff Kocourek's sought to remain as a participant in the

Shadow Stock Plan until the date which was the second anniversary of his retirement date.

396. In September, 2006, BAH and the Individual Defendants had decided to split up BAH and sell the BAH government business to themselves and a financial partner.

397. BAH, Shrader and other Plan administrators expelled Plaintiff Kocourek from the Shadow Stock Plan shortly after his retirement in April, 2007 for the purpose of denying and/or interfering with Plaintiff Kocourek's right to share in the benefit as would be payable to him upon the termination of the Plan if he were still a participant at such time.

398. BAH, Shrader and other Plan administrators treated Plaintiff Kocourek differently than other Plan participants and discriminated against Plaintiff for the purpose of denying and/or interfering with Plaintiff's right to share in the benefit as would be payable to him upon the termination of the Plan.

399. Plaintiffs Pasternack and Boudinot were each participants in the Stock Rights Plan.  Pursuant to the terms of the Stock Rights Plan the only method to expel or involuntarily remove a participant from the Stock Rights Plan was to cause the participant's employment with BAH to be terminated; because as a result of termination as of the second anniversary of the termination of employment, BAH gained an optional contractual right to expel the participant from the

plan.

400. In spring of 2004, BAH had decided to liquidate and terminate the Stock Rights Plan which would result in vastly increased benefits for each of Pasternack's and Boudinot's accounts in the stock plan.

401. In order to prevent such increase in benefits, Shrader and Lewis, in the case of Pasternack, and Shrader and Garner, in the case of Boudinot caused the termination of each of Pasternack's and Boudinot's employment.

402. In each of January, 2007 and March, 2007, BAH was in the process of terminating the Stock Rights Plan and liquidating its assets, which would vastly increase the benefits payable to each of Pasternack and Boudinot.

403. In January, 2007 in the case of Pasternack, and in March, 2007 in the case of Boudinot, Individual Defendants caused the expulsion of Pasternack and Boudinot from the Stock Rights Plan for the purpose of preventing each from attaining the increase of benefits as would be payable upon the anticipated Plan liquidation and termination.

404. Plaintiff Pasternack was deprived of more than $44 million in gain he would have enjoyed under the terms of the Sale and Split-up Transaction, and Plaintiff Boudinot was deprived of $17.7 million

in gain he would have enjoyed under the terms Sale and Split-up Transaction, in each case, some of which deprived funds went directly to the pockets of the Individual Defendants.  In addition, the valuation of BAH stock in Sale and Split-up Transaction was fraudulently low, in order to provide a windfall to active employees.  The fair value of BAH stock was $1700 per share. Plaintiff Pasternack's fair value benefit damages are $1,550 per share or $115 million, and Plaintiff Boudinot's fair value benefit damages are $1,550 per share or $45.7 million.

405. The expulsion of  and/or the discrimination against each of Pasternack, Boudinot and Kocourek was unlawful pursuant to 29 U.S.C. § 1140.

406. Plaintiff Kocourek is entitled to receive benefits under 29 U.S.C. §1132(a)(1)B, and to enforce his rights under the Shadow Stock Plan pursuant to such section 1140.

407. Each of Pasternack, Boudinot and Kocourek is entitled to obtain appropriate equitable relief to redress such violation of 29 U.S.C. §1140, and, in the case of Kocourek, to enforce his right under the terms of the Shadow Stock Plan to select March 31, 2009 as the Shadow Calculation Date for calculation of this benefit, and each plaintiff is entitled to such relief to enforce such other provisions of Title 1 of ERISA.

**COUNT SIX – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST CO-FIDUCIARY PLAN ADMINISTRATORS AND BAH**

408. Plaintiffs repeat and allege each of the allegations contained in paragraphs 1 through 407 as if fully set forth herein.

409. Federal common law of unilateral contract implies a covenant of good faith and fair dealing in all contracts subject to ERISA.

410. To the extent the  determination of the valuation date for calculation of Plaintiff Kocourek's Shadow Stock Bonus was discretionary with the Shadow Plan fiduciaries under BAH's Shadow Stock Plan, BAH, Shrader and the other plan administrators owed Plaintiff a duty of good faith and fair dealing when acting under the Shadow Stock Plan.

411. BAH, Shrader and the other Plan administrators, however, acted at a time when the Sale and Split-up Transaction was all but certain to occur, and made a calculation of Plaintiff Kocourek's Shadow Stock benefit and each of Plaintiff Boudinot and Pasternack's Stock Plan benefit based on book value instead of the much higher price available through the planned Sale and Split-up Transaction and planned Plan termination and Plan liquidation.

412. On behalf of BAH, Shrader, Lewis and the other plan administrators arbitrarily selected Plaintiff Kocourek's retirement date as the valuation date for calculation of Plaintiff Kocourek's Shadow Stock Bonus, for the purpose of enriching the Individual Defendants and Lewis.

413. As a result of their decision to calculate Plaintiff Kocourek's

Shadow Stock bonus as of Plaintiff Kocourek's retirement date Shrader, Lewis and the other plan administrators received more value for their personal stockholdings than they would have otherwise, and the decision to select the date of calculation of Plaintiff Kocourek's Shadow Stock Plan bonus (the "Shadow Calculation Date") as the retirement date was tainted by conflict of interest.

414. Selection of Plaintiff Kocourek's retirement date as the Shadow Calculation Date was a breach of the implied covenant of good faith and fair dealing contained in the Shadow Stock Plan document.

415. In exercising the power to compel redemption of Boudinot's and Pasternack's shares under the Stock Rights Plan, BAH owed Plaintiffs Boudinot and Pasternack a duty of good faith and fair dealing. The contractual purpose of the power to effect termination of participation by compulsory sale of all stock in a participant's account was to ensure that BAH would always be owned by its employees. By January, 2007, BAH had abandoned the policy of sole employee ownership. BAH gained no benefit from forcing the termination of Paternack and Boudinot from the Stock Rights Plan.

416. The BAH Stock Plan did not contemplate or provide for this extraordinary circumstance, namely the commencement of a call option at the time when the Sale and Split-up Transaction was being negotiated, which transaction represented a once-in-a-lifetime

opportunity to sell BAH's Government business, creating enormous
financial benefits for Stock Plan participants.

417. By redeeming Boudinot and Pasternack's stock under the
circumstances described herein, BAH frustrated the purpose of the
stock program, as well as Plaintiff's reasonable expectations, and
the Individual and Director Defendants took advantage of their
fiduciary position to cause or allow the redemption in a way that
materially benefited themselves.  Therefore, BAH at the direction
and/or with the acquiescence of the Director Defendants, breached
its implied covenant of good faith and fair dealing.

418. Had the assets of BAH been sold or transferred for fair value,
then value of the BAH stock in the accounts of each of Boudinot and
Pasternack would have been $1,700 a share, after dilution by and
payment of Shadow Stock plan bonuses to each Shadow Stock
participant.

### COUNT SEVEN COUNT  – SECURITIES FRAUD

419.   Plaintiffs Pasternack and Boudinot repeat and reallege each
of the allegations contained in paragraphs 1 through 418 as if
fully set forth herein.

420.   Despite having a duty to do so, Individual Defendants failed
to disclose to either  Plaintiff Pasternack in November, 2004 or
to Plaintiff Boudinot in March,2005 that certain fundamental long

standing BAH policies were under examination and had been discarded by senior management.  Such information would be material to Plaintiff and would have caused him to delay his retirement.

421.    Individual Defendants failed to disclose to either Plaintiff Pasternack in November, 2004 or to Plaintiff Boudinot in March,2005 that Individual Defendants had determined to explore and/or effect a Split-up and Sale of the Firm. Such information would be material to each of Plaintiff Pasternack and plaintiff Boudinot and would have caused each to delay his retirement.

422.    The failure to make such disclosures was a manipulative device in connection with the sale of a security, in violation of both federal and state securities laws.

423.    As a result of such failure to disclose, each Plaintiff suffered damages.

### COUNT 8 – COMMON LAW FRAUD AGAINST SHRADER AND BAH

424. Plaintiff Kocourek repeats and realleges each of the allegations contained in paragraphs 1 through 423 as if fully set forth herein.

425. In July, 2006 Plaintiff Kocourek spoke to Shrader and specifically inquired if any strategic changes were under consideration for BAH, which would be material to Plaintiff Kocourek's decision to retire or not.

426. Shrader was planning to split-up the firm, information which would, Shrader knew, if revealed to Plaintiff Kocourek, cause Plaintiff Kocourek not to move to Singapore and resign from BAH.

427. Shrader told Plaintiff Kocourek that no strategic change to BAH was under consideration, or likely to occur, which was false and Shrader knew such statement was false.

428. Plaintiff Kocourek reasonably relied upon the truth of Shrader's representation and relocated to Singapore, and was required to resign, and suffered damage as a result.

**COUNT NINE – CLAIM FOR BENEFITS UNDER 29 U.S.C. §1132(a)(1)(B)**

429. Plaintiffs incorporate by reference herein the allegations contained in paragraphs 1 through 428 above.

430. Plaintiff Kocourek was a participant in the Shadow Stock Plan, and Plaintiffs Boudinot and Pasternack were each participants in the Stock Rights Plan.

431. Individual Defendants and BAH determined to increase the value of benefits payable to participants of the Stock Rights Plan and Retiree Plan, and consequently the Shadow Stock Plan. The increase was to be accomplished by liquidation of the plan assets.

432. Such change in policy materially changed the valuation of BAH stock in each of January, March, and April 2007.

433. By January, 2007 BAH and Individual Defendants had already

decided to terminate the Stock Plan and sell or distribute the stock of BAH.

434. Plaintiff Kocourek received payment of his Shadow Stock Bonus post retirement and Plaintiffs Boudinot and Pasternack each received a lump sum benefit payment from the Stock Rights Plan in each case calculated pursuant to a formula which Individual Defendants and BAH knew did not reflect fair value. As of the January, March and April, 2007 payment dates Individual Defendants and BAH continued to value each share of BAH as if no merger, sale or recapitalization was being planned or was even possible, and as if no release of sale restrictions on BAH shares was being planned which assumptions were false.

435. If Plaintiffs Pasternack, Boudinot and Kocourek's benefits were calculated at the value a hypothetical purchaser would pay with the near certainty of sale of Plan assets at market value in the near future, each Plaintiff would have been paid far more in retirement benefits than he received under the method of calculation employed, which assumed BAH would never be split-up or sold.

### COUNT TEN- ATTORNEY'S FEES PURSUANT TO 29 U.S.C. § 1132(g)

436. Plaintiffs incorporate by reference herein the allegations contained in paragraphs 1 through 435 above.

437. By engaging in and perpetuating a scheme to deny Plaintiffs

their full pension benefits, defendants BAH, Shrader and Lewis have
caused Plaintiffs to expend sums which are considerably in excess
of that which would have otherwise been required to secure their
rightful pension benefits.

438. Such defendants committed these acts in bad faith and in
furtherance of their own interests and in derogation of their
fiduciary duties to Plaintiffs.

439. Such defendants have the financial ability to pay an award of
attorneys' fees.

440. An award of attorneys' fees will deter such defendants and
others from depriving other participants of their rightful
pensions, through fraud, concealment, delays and evasions, as
occurred with Plaintiffs.

441. As a result of their conduct, defendants BAH, Shrader, Lewis and
other plan administrators are jointly and severally liable for the
attorneys' fees incurred by Plaintiffs in securing their pension
and other employee benefits, pursuant to 29 U.S.C. § 1132(g), in an
amount to be determined by the Court.

**COUNT ELEVEN – DAMAGES FOR FAILURE TO PROVDE INFORMATION PURSUANT TO
29 U.S.C. § 1132(c)(1)**

442. Plaintiff Kocourek incorporates by reference herein the
allegations contained in paragraphs 1 through 441 above.

443. BAH is the administrator of the Shadow Stock Plan.

444. In violation of 29 U. S. C. §1133 BAH failed to provide any
notice in writing to Plaintiff Kocourek respecting the denial of
his claim for benefits based upon the increase in value of BAH
stock during the two year period following Plaintiff Kocourek's
retirement. At no time has the plan administrator set forth the
specific reasons for the denial, even after Plaintiff Kocourek
submitted a written request in May 2008, nor did the plan provide
Plaintiff Kocourek with a reasonable opportunity for a full and
fair review for his claim. Such information is required to be
available to Plaintiff Kocourek, and Plaintiff Kocourek duly
requested same. Such non-compliance with Plaintiff Kocourek's
request for such information began in April, 2007 and continues to
date and, some 750 days.

445. In violation of 29 U.S.C. § 1024(b) BAH failed to provide
Plaintiff Kocourek with any written description of the Shadow Stock
Plan despite written requests. Such defiance of obligations has
continued since before January 1, 2005 up to April 8, 2009, a
period of at least four years and ninety-eight days, a total of
1558 days in all. In each case, such failure to provide information
is due to bad faith and intentional conduct of the plan
administrator, even to the point of implicitly representing to the
New York Supreme Court and its Appellate Division that no writings
existed which documented the Shadow Stock Plan.  Plaintiff Kocourek

made four separate written requests for plan documentation. The
delay continued until April 8, 2009 when as a result of limited
discovery ordered in the state court, Plaintiff Kocourek received
documents in discovery, (which are subject to confidentiality order
as claimed business secrets and thus may not be described herein).
Only on April 8, 2009 did Plaintiff learn that any documents
concerning the Shadow Stock Plan existed, and Plaintiff Kocourek
suffered great prejudice by not having such documents prior to the
commencement of an action in state court, which has been dismissed
on Statute of Fraud grounds.  Pursuant to 29 U.S.C. §1132 (c)(3)
BAH, Shrader and other Plan administrators should be liable to
Plaintiff Kocourek for 720 days (750 days less 30 day grace
period)at $100 per day, or $72,000 for their failure to provide the
requested rationale for Plaintiff Kocourek's benefit claim
determination and for 1528 days (1558 days less 30 day grace
period) at a rate of $100 per day or $152,800 for their failure to
provide Plaintiff Kocourek with information respecting the Shadow
Stock Plan. Defendant BAH has advised Kocourek that it  holds other
documents which refer to the shadow stock program but has withheld
same from discovery upon the grounds that said documents respect
the terms of the shadow stock contract and are not related to
claims of fraud. In the event it is determined that BAH should have
provided such additional documents to Kocourek pursuant to his
request, then additional damages at the rate of $100 per day have
accrued from April 10, 2009 and continue to accrue as of the date

99

hereof.


**COUNT TWELVE – REPRESENTATIVE CLAIM ON BEHALF OF PLAN - BREACH OF FIDUCIARY DUTY AGAINST BAH AND CO-FIDUCIARY PLAN ADMINISTRATORS RESPECTING SHADOW STOCK PLAN AND AGAINST BAH, INDIVIDUAL DEFENDANTS AND DIRECTOR DEFENDANTS RESPECTING THE STOCK RIGHTS PLAN**

446. Plaintiff Kocourek on behalf of the Shadow Stock Plan ( the "Shadow Plan Representative") and Plaintiff Kocourek on behalf of the Stock Rights Plan (the "Stock Plan Representative")repeats and realleges each of the allegations contained in paragraphs 1 through 445 as if fully set forth herein.


447. The Director Defendants, as directors and officers of BAH, owed the participants in the Stock Rights plan and the Stock Rights Plan itself fiduciary duties of loyalty, care, and good faith, and they had a duty to treat participants fairly and equally as they treated other shareholders.


448. Plaintiff Kocourek was a retired partner and received far less compensation from his Stock Rights Plan account than did other participants who were not retired.


449. The Director Defendants and the Individual Defendants and Plan administrators were all active employees.


450. The Director Defendants' financial interests were materially adverse to Plaintiff Kocourek's interests because the extent of the Director Defendants' per-share profit was directly linked to whether Plaintiff Kocourek and other like situated retired participants would be permitted to participate in the profits of the Sale and Split-up Transaction on the same basis as active

employee shareholders.

451. As fiduciaries, the Board owed shareholders a duty of equality, which requires that all shareholders be treated equally. The failure to treat Plaintiff Kocourek equally resulted in greater consideration for the Directors.

452. The Directors elected to sell the Government Business for less than fair value, and provide a windfall to the active government partners; and, instead of providing Plaintiff Kocourek with equal consideration for his Booz, Inc. shares, the Directors compelled Plaintiff Kocourek to be required to sell his Booz, Inc. shares at $41 per share and provide a windfall to the active commercial partners.

453. The Director Defendants, BAH, Shrader, and other plan co-fiduciaries ("ERISA Fiduciaries") were bound to act solely in the interest of the participants and for the exclusive purpose of providing benefit to the participants.

454. In executing that purpose the ERISA Fiduciaries were bound to act solely in the interests of beneficiaries, and to act with the care, skill and prudence as a prudent man familiar with matters such as the Carlyle Transaction, would conduct an enterprise with the sole purpose of providing benefits to participants.

455. A prudent man familiar with LBO transactions would recognize that a sale of the government business to a strategic buyer such as

SAIC, Inc. would be in the best interests of the participants.

456. A prudent man familiar with LBO transactions would not sell a business to a financial investor such as Carlyle unless all other alternatives had been pursued in good faith.

457. A prudent man familiar with LBO transactions would not divert 33% of the value of plan assets to Carlyle and management for no consideration.

458. A prudent man familiar with LBO's would realize that a business such as Booz, Inc. with $973 million in revenues and a 40% gross profit margin had a value far in excess of $95 million.

459. A prudent man would not divert $1.5 billion in commercial sector assets to 60% of the participants for no consideration.

460. A reasonably prudent man as director would determine that Individual Defendants were seeking approval of the Carlyle Transaction so as to divert hundreds of millions of value of plan assets to themselves for no consideration in violation of the duty to manage plan assets for the exclusive benefit of participants.

461. Each Director Defendant approved an unfair allocation of substantially less consideration to Plaintiff Kocourek's shares, than to their own shares by approving far greater consideration be paid for shares in the accounts of active employee shareholders than the amount of consideration paid for shares in the account of retired shareholders.

462. Plaintiff Kocourek, a retired partner, received consideration of approximately $730 per share for his 27,300 shares of BAH common stock. Directors who as a result of the Carlyle Transaction emerged as shareholders in the new BAH owning the BAH government business participated in an immediate $1.86 billion dollar windfall.  Directors who as a result of the Carlyle Transaction emerged as shareholders in Booz, Inc. owning the BAH commercial business participated in a $1.5 billion dollar windfall. Individual Defendants received hundreds of millions for their own accounts. The directors failed to discharge their duties to protect the interest of Plaintiff Kocourek and instead lined their own pockets.

463. Under the circumstances, the ERISA fiduciaries exercise, or abdication, of the decision-making process that resulted in the allocation of less consideration to the Plaintiff Kocourek's shares, constituted breaches of their duties of loyalty, care, and/or good faith.

464. As a proximate result of these breaches of fiduciary duties, the Plaintiff was damaged in an amount of approximately $22 million.

465. The fair value of Stock Plan assets on July 31, 2008 was $5.56 billion.

466. Director Defendants and Individual Defendants caused $1.5 billion of said assts consisting of the stock of Booz, inc. to be distributed to participants with substantial restrictions on sale,

pledge or transfer (the "Restrictions"). The Restrictions reduced the value of the Booz, Inc. stock to the participants from $1.5 billion to $95,000,000.

467. The Restrictions were not imposed so as to secure benefit for the participants and a reasonably prudent man seeking the exclusive benefit of the participants would not have imposed the Restrictions and the Restrictions were imposed in violation of the Director Defendants' and Individual Defendants' 'fiduciary duties set forth in 29 U.S.C. § 1106.

468. Director Defendants and Individual Defendants caused $4.06 billion in value of said assets consisting of the BAH government sector business to be sold for a value of $2.2 billion, a loss of $1.86 billion below fair value.

469. The sale price was not negotiated and agreed to so as to secure benefit for the participants and a reasonably prudent man seeking the exclusive benefit of the participants would not have sold such government sector business at such a price. The sale of the government sector business at a price below fair value was done in violation of the Director Defendants' and Individual Defendants' fiduciary duties set forth in 29 U.S.C. § 1106.

470. Each of the sale and distribution was tainted by conflict of interest as certain Director Defendants stand to benefit from the Restrictions to the exclusion of the participants and certain other

Director Defendants and the Individual Defendants indirectly purchased the government sector business at below fair value for their own personal accounts to the exclusion of the participants. Each Shadow Stock participant who was paid a Shadow stock bonus therefore lost an amount equal to $1,000 times the number of "shadow shares" that were agreed to be used in calculation of such participants Shadow Stock bonus.

471. Director Defendants and Individual Defendants caused the Stock Plan assets to lose $3.26 billion dollars in value in violation of their duties imposed by 29 U.S.C. § 1106 and as required by 29 U.S.C. § 1109 are jointly and severally liable to the Shadow Plan Representative and the Stock Plan Representative to make good such $3.26 billion loss to the plan and are subject to such other equitable or remedial relief as the court shall deem appropriate.

**COUNT THIRTEEN – REPRESENTATIVE CLAIM ON BEHALF OF PLAN – AIDING AND ABETTING BREACH OF STOCK PLAN FIDUCIARY DUTY AGAINST CARLYLE ENTITIES AND CREDIT SUISSE**

472. Plaintiffs Shadow Plan Representative and the Stock Plan Representative repeats and realleges each of the allegations contained in paragraphs 1 through 471 as if fully set forth herein.

473. Defendants Carlyle Entities and Credit Suisse aided and abetted the breach of the duty of loyalty, the breach of the duty of candor, and the breach of duty of equality applicable to the directors of a Delaware corporation.

474. ERISA does not preempt state claims which are not themselves the subject of ERISA's reticulated scheme.

475. ERISA does not regulate the conduct of persons aiding and abetting breaches of fiduciary duty by ERISA fiduciaries.

476. Each Carlyle Entity and Credit Suisse are liable for Plaintiffs' Shadow Plan Representative's and Stock Plan Representative's losses respecting the sale of his 27,300 shares of BAH stock for less than fair value, as one who aided or abetted the breach of fiduciary duty by the directors of a Delaware corporation.

**COUNT FOURTEEN – REPRESENTATIVE CLAIM ON BEHALF OF PLAN – PROHIBITED TRANSACTION**

477. Plaintiff Kocourek incorporates by reference herein the allegations contained in paragraphs 1 through 476 above.

478. Individual Defendants, Director Defendants and BAH are each fiduciaries with respect to the Stock Pension Plan within the meaning of 29 U.S.C. § 1002(21).

479. As fiduciaries, Individual Defendants and BAH are prohibited from acting in the interests of, or representing, a party whose interests are adverse to the interests of the Stock Rights Plan and the Retiree Plan and their participants and are prohibited from selling any assets of the Plan to a party in interest, or transferring any asset of the Plan to a party in interest.

480. A fiduciary of a Plan may not deal with Plan assets in his own interest or for his own account, and my not receive any consideration for his own account from any party dealing with the Plan in connection with a transaction involving assets of the Plan.

481. Individual  Defendants and BAH  engaged  in a prohibited transaction by, among other things:

   a. The government employee fiduciaries sold the government business of BAH to themselves and a financial partner.

   b. The commercial fiduciaries determined to transfer the Commercial Business of BAH to themselves and other commercial partners, and paid Plaintiff and other retired partners but 6% of fair value of his interest in the Commercial Business.

   c. The Individual Defendant fiduciaries made determinations concerning the terms and conditions of the employment of employees for the purpose of expelling them from the plans so as to divert the value of plan benefits to themselves.

   d. The Individual Defendant fiduciaries caused employees to leave the plans for the purpose of enriching themselves.

   e. Benefits which would otherwise been payable to Plaintiff and other participants were therefore diverted to the

fiduciaries themselves.

f. The fiduciaries made discretionary determinations and set policy to continue to force participants to sell stock at a price far below fair value solely for the purpose of enriching themselves and not for any valid corporate purpose or other valid purpose.

g. The Individual Defendant fiduciaries caused the Plan to sell the Plan assets at a value of at most 65% of market value to an entity in which they held a substantial ownership interest and gained hundreds of millions of dollars in value personally as a result of these transactions.

h. The fiduciaries paid fees to the law firm and Credit Suisse in circumstances not free of fraud and deceit and therefore not exempt under 29 U.S.C. §1108.

i. BAH and the Director Defendants' fiduciaries likewise caused $1.5 billion in value to be paid active Commercial partners in order to secure their acquiescence in the split-up and sale, in violation of 18 U.S.C. § 1954, and 29 U.S.C. §1106.

482. As a result of the aforesaid fiduciary breaches, pursuant to 29 U.S.C. § 1132(a)(3), 29 U.S.C. § 1104 and §1105, such fiduciaries

are personally  liable to repay the Shadow Plan Representative and the Stock Plan Representative Plan accounts of the amount of any losses suffered by them as a result of their breach of their fiduciary duties, in the aggregate amount of at least $1,000 per share for each share sold by a plan participant pursuant to the split up and merger with Carlyle, an amount believed to approximate $3 billion.

**COUNT FIFTEEN – REPRESENTATIVE CLAIM ON BEHALF OF PLAN - INJUNCTION TO COMPEL ENFORCEMENT OF ERISA TITLE 1**

483. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 482 as if fully set forth herein.eenth

484. 29 U.S.C. §1132 (a)(1) authorizes Plaintiffs to seek an injunction against any act which violates the provisions of title I of ERISA, and to seek other equitable relied to redress a violation of title I.

485. 29 U.S.C. §1954 is contained within title I of ERISA.

486. The sale of BAH to a subsidiary of Explorer, a corporation the stock of which is owned by Explorer CoInvestor, LLC and Individual Defendants, and which stock is subject to stock options in favor of defendants with a value  of hundreds of millions of dollars was a violation of 18 U.S.C. §1954.

487. The Court should enjoin the Carlyle Group, or any affiliate thereof and any Individual Defendant from taking monies from BAH (such as the $765 million in dividends paid by BAH in July and December 2009, as described above) whether by dividend, loan, fee, or otherwise, enjoin the persons in control of BAH against the sale of the stock of BAH, direct the return of such stock to the Plan, appoint Plaintiff former Senior Partner Kocourek and Plaintiff former Senior Partner Pasternack as trustees of the Plan; and enjoin Booz, Inc. from exercising its option accrued on July 31, 2010 to compel Plaintiff and other former shareholders of BAH to sell their Booz, Inc. stock to Booz, Inc. for a consideration which is below fair value.

**COUNT SIXTEEN – REPRESENTATIVE CLAIM ON BEHALF OF PLAN - CONSTRUCTIVE TRUST; ACCOUNTING TO TRACE ASSETS; DISGORMENT OF PROFITS; RECISSION AND RESTITUTION**

488. Plaintiff  Stock Plan Representative repeats and realleges each of the allegations contained in paragraphs 1 through 487 as if fully set forth herein.

489. A transferee of ill gotten trust assets, even when purchased for value, when the transferee knew or should have known of the existence of the trust and the circumstances which rendered the transfer in breach of the trust, is liable to restore such assets to the trust.

490. Wherever legal title is obtained by means or under circumstance

which render it unconscientious for the holder of the legal title
to retain and enjoy the beneficial interest, equity imposes a
constructive trust and equity may reach the property in the hands
of the original wrongdoer or in the hands of any subsequent holder
who has not taken the property in good faith without notice and for
fair value.

491. Credit Suisse and Explorer knew or should have known that the
stock of BAH constituted the assets of a retirement benefit pension
plan.

492. Credit Suisse and Explorer knew that the trust assets were sold
for less than fair value, and knew that the Individual Defendants
knew that the sale was for less than fair value, and knew that the
acquiescence by the Director Defendants and the Plan participants
to the Carlyle Transaction was procured by fraud, including but not
limited to the misrepresentations set forth in the Information
Circular.

493. Pursuant to 29 U.S.C. §1132(a)(2) and 29 U.S.C.
§1132(a)(3)(B)(i) and (ii) the Court should compel Defendant Credit
Suisse to return all fees paid to it by BAH and/or Booz, Inc., and
the affiliates of Credit Suisse must disgorge all interest and fees
paid to them by Explorer in connection with loans to Explorer or
BAH, or secured by the stock of BAH, or the assets of BAH, of the
payment of which is guaranteed by BAH.

494. Defendant Carlyle Entities must disgorge all dividends or fees paid to them by Explorer Holding. Defendant Explorer Holding must disgorge all dividends or fees paid to it by BAH.

495. Credit Suisse is a person in interest respecting the Stock Pension Plan, and is a non-fiduciary person who participated in a breach of trust.

496. Explorer is a person which participated in a transaction prohibited by 29 U.S.C. §1106. 29 U.S.C. §1132(a)(3) authorizes appropriate equitable relief for the purpose of redressing violations of ERISA. Equitable remedies are appropriate relief when imposed upon persons who are counterparties to a prohibited transaction who knew, or had reason to know, that the transaction violated 29 U.S.C. §1106.

497. The Carlyle Entities indirectly, and Explorer directly acquired the stock of BAH for less than fair value.

498. The Stock Rights Plan is entitled to rescission of the Merger Agreement and restitution of the common stock of BAH to the Plan.

499. The Stock Rights Plan and the Shadow Stock Plan were administered by BAH, the employer.

500. BAH was the administrator of the Stock Pension Plan and therefore an ERISA fiduciary under the Plan. Defendants Shrader,

Appleby and Lewis participated in decision making concerning the BAH as co-fiduciaries.

501. The Carlyle Entities assisted Individual Defendants in a sale of plan assets for less than fair value.  The Carlyle Entities knew or should have known that they were dealing with fiduciaries who had a conflict of interest, and were acting contrary to their fiduciary duty of loyalty.

502. Where a fiduciary in breach of trust transfers property to a person with knowledge of the breach of trust, the transferee does not hold the property free of trust even although the transferee has paid value for the property.

503. The Court should impose a constructive trust on the common stock of BAH and the proceeds thereof, and order disgorgement of all profits received from ownership of BAH stock by Individual Defendants, Commercial Defendant Lewis, Credit Suisse, and the Carlyle Entities since July 31, 2008, and compel the Carlyle Entities to account for the stock or disposition of the assets of BAH, so as to trace the whereabouts of such assets.

**COUNT SEVENTEEN – REPRESENTATIVE CLAIM ON BEHALF OF PLAN - EQUITABLE RECEIVER**

504. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 503 as if fully set forth herein.

505. Where a fiduciary has been guilty of a breach of trust, the

Court may appoint a receiver to take charge of trust property, such as plan assets, see e.g. Uniform Trust Code, Section 1001(b)(5).

506. Plaintiffs request that pursuant to Rule 66, the Court order a special fiduciary to take possession of Plan assets which the Court shall order returned to the trust, so that such special fiduciary will execute the trust and distribute such Plan assets to the participant beneficiaries of such plan accounts after reduction for benefits previously paid to account holders.

**STATEMENT RESPECTING RULE 19 JOINDER - REPRESENTATIVE CLAIM ON BEHALF OF PLAN**

507. Plaintiff Kocourek is not aware of any other Shadow Stock Plan participant who retired after Plaintiff Kocourek other than Keith Oliver.  Plaintiff Kocourek believes that the Shadow Stock Plan was terminated on July 31, 2008.

508. Plaintiff Kocourek has attempted to contact Keith Oliver, participant in the Shadow Stock Plan who has not responded to Plaintiff Kocourek's inquiry.  Keith Oliver was employed in the commercial sector of BAH and holds a claim respecting undervaluation of 80,000 shares of Booz, Inc. stock in computation of his Shadow Stock Bonus, a claim for undervaluation of $1,000 per shadow unit in such calculation, or $80,000,000, grossed up for tax equalization purposes to $106,667,000.

509. Plaintiffs Stock Plan Representative and Shadow Plan Representative each claim for breach of fiduciary duty and remedy

against counterparties who knowingly partook in such breach pursuant to 29 U.S.C. §1132(a)(2) and (a)(3)in connection with the Carlyle Transaction is asserted on behalf of the Stock Rights Plan, and on behalf of the Shadow Stock Plan respectively and includes Plan assets fraudulently sold for less than fair value to Explorer which assets were in the individual accounts of retired partners, and Plan assets distributed to active commercial offices in violation of fiduciary duty.

510. Plaintiff Kocourek has been advised that Foster Rich had been in touch with Mr. Bruels, Mr. Busson and Ms. Doria and all have expressed doubts as the whether the claim can overcome BAH and Carlyle's legal defense team, but would join if such legal obstacles could be overcome.

511. Plaintiff does not have a current list of persons who were shareholders of Booz Allen on and before July 31, 2010 and therefore participants in the Booz Allen Stock Plan and does not have a current list of persons who were participants in the Shadow Stock Plan on and before July 31, 2010 but such information is in the possession of defendant BAH. Attached hereto as Exhibit A is a list of shareholders and "holders" of shadow shares as of February, 2006, all of whom may be required parties except for Nemec, Wittkemper, Rich, Pasternack, Boudinot, Cipriano, Noonberg, and Shema.

512. In light of the treble damage provisions the possibility exists that the Plan assets, and the assets of the fiduciaries and the assets of the Carlyle Entities may be insufficient to satisfy all claims as exist against BAH and the Individual Defendants.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

(A) Make whole or compensatory damages to the Shadow Stock Plan and the Stock Rights Plan in an amount not now known, but in Plaintiff's Kocourek's case believed to be in excess of $54,081,250 million for breach of the Shadow Stock Plan, and make whole or compensatory damage of $21,840,000 for breach of duty respecting the Stock Rights Plan and additional monies at the rate of $1,000 per share for absent Stock Rights Plan participants, and additional monies at the rate of $1,000 per shadow share for the absent Shadow Stock Plan participant trebled pursuant to RICO in each case;

(B) Punitive damages in an amount to be determined at trial;

(C) Costs, fees, and other expenses, including attorneys' fees, pursuant to 18 U.S.C. § 1964(c)and or 29 U.S.C. § 1132(g);

(D) Equitable relief as provided in 29 USC §1132(a)(3) for Plaintiff and all parties who are subject to Rule 19 Joinder;

(E)   Payment to Plaintiff Kocourek of $72,000 and $152,000
      pursuant to 29 U.S.C. § 1132(a)(1)(A) for relief set forth
      in 29 U.S.C. § 1132(c)(1)(B);

(F)   Payment to Plaintiff Pasternack of $118,400,000, to
      Plaintiff Boudinot of $47,200,000 trebled pursuant to RICO
      in both cases;

(G)   Such other and further relief as the Court may deem to be
      just and proper.


DATED: September 7, 2010        s/s Mark C. Kelly

                                **MARK C. KELLY, 7992**
                                Attorney for Plaintiffs Bruce
                        Pasternack, Reginald Boudinot,
                                Paul Kocourek, and Paul Kocourek
                                on behalf of the Booz Allen Hamilton
                                Stock Rights Plan and Shadow Stock Plan
                                Kelly & Hazen
                                122 East 42nd Street, Ste 4400
                                New York, NY 10168
                                Tel. (212 953-2626
                                Fax  (212)983-5271
                                Email markkelly@kellyroth.com


Plaintiffs hereby demand a jury trial in this matter.


                                 s/s Mark C. Kelly
                                **MARK C. KELLY, 7992**
                                Attorney for Plaintiffs Bruce
                        Pasternack, Reginald Boudinot,
                                Paul Kocourek, and Paul Kocourek
                                on behalf of the Booz Allen Hamilton
                                Stock Rights Plan and Shadow Stock
                                Plan
                                Kelly & Hazen
                                122 East 42nd Street, Ste 4400
                                New York, NY 10168
                                Tel. (212 953-2626
                                Fax  (212)983-5271
                                Email markkelly@kellyroth.com