

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

PAUL KOCOUREK, INDIVIDUALLY and as )
TRUSTEE OF THE PAUL KOCOUREK TRUST, )
and ON BEHALF OF ALL OTHERS SIMILARLY )
SITUATED, )
  )
                       Plaintiffs, )  09 CV 10203
  )  09 CV 10163
       v. )  09 CV 10204
  )  10 CV 05255
  )
  )
RALPH W. SHRADER, C.G. APPLEBY, )  **AMENDED CONSOLIDATED**
SAMUEL R. STRICKLAND, DANIEL LEWIS, )  **CLASS ACTION COMPLAINT**
DOUGLAS SWENSON, BOOZ ALLEN HAMILTON )
INC., )
  )
                       Defendants. )  **DEMAND FOR JURY TRIAL**
  )

------------------------------------------------------------------------X

        Plaintiff Paul Kocourek ("Kocourek"), individually and as Trustee of the Paul Kocourek

Trust, dated October 3, 2006 (the "Trust," and together, the "Plaintiff"), and on behalf of the

Class (as defined below), by undersigned counsel, alleges as and for its Amended Consolidated

Class Action Complaint against Defendants Booz Allen Hamilton, Inc. ("Booz Allen," "BAH"

or the "Company"), Ralph W. Shrader ("Shrader"), C.G. Appleby ("Appleby"), Samuel R.

Strickland ("Strickland"), Daniel Lewis ("Lewis"), and Douglas Swenson ("Swenson"; together

with Shrader, Appleby, Strickland, and Lewis, the "Individual Defendants"), as follows:

## Introduction

        1.      This is a putative securities fraud class action arising from the 2008 sale of BAH

to The Carlyle Group ("Carlyle"). Due to the secret maneuverings of the Individual Defendants

– the details of which did not emerge until years later – BAH was sold to Carlyle at a substantial

discount from fair value, with various sweeteners thrown in only for Shrader (BAH's CEO) and

his inner circle.  As a result, the majority of BAH's partner-shareholders were shortchanged in the transaction, receiving substantially insufficient consideration for their BAH equity while Shrader and the Individual Defendants benefitted personally by tens of millions of dollars.

2.     The Carlyle sale was the culmination of a secret plan hatched by Shrader in late 2005, knowing that his tenure at BAH otherwise would expire in 2009.  From late 2004 until 2007, Shrader lulled BAH's partners with a strategic initiative purportedly designed to unify BAH's two core business units: the business consulting division (the "Commercial Division") and the government contracting division (the "Government Division").  The communicated intent of this strategy was to create a more cohesive, synergetic firm, privately owned by its partner-shareholders and preserved for generations of partners to come.

3.     While BAH's partners worked trustingly toward this vision, Shrader and the Individual Defendants set in motion a clandestine chain of events designed to do the exact opposite: to break the Company apart for sale – and not to the highest bidder for the benefit of all BAH partner-shareholders, but instead to a buyer who would reward the Individual Defendants for steering the transaction its way.

4.     Critical to this scheme was convincing BAH's partners that the sale process had been thorough and fair, that it had the backing and supervision of the entire BAH Board, and that a sale to Carlyle represented the best deal possible for the shareholders.  To that end, on May 22, 2008, BAH management distributed an Information Circular ("IC") to all partner-shareholders setting forth the recommendation by the BAH Board of Directors that BAH's partner-shareholders approve the sale to Carlyle.

5.     Unbeknownst to BAH's partners at that time – but as Shrader later admitted in 2015 testimony before this Court – the IC contained serious falsehoods.  Among other things, the

IC contained materially misleading statements about the timeline and thoroughness of the auction process, it dramatically understated the value of the Government Division as well as the amount of consideration Carlyle would be paying, and it omitted information about key conflicts of interest by the Individual Defendants which had infected the entire process from the start.

6.      The deception worked: BAH's partner-shareholders relied upon management's misrepresentations and omissions in surrendering their BAH shares for a fraction of what they were worth, and Carlyle was able to purchase the Government Division at a significant discount pursuant to an Agreement and Plan of Merger entered between BAH and, *inter alia,* Explorer Investor Corporation dated May 15, 2008 (the "Merger Agreement").

7.      Two years later, the full scope of the fraud and its greed-driven underpinnings finally began to surface.  In 2010, Carlyle took the Government Division public at a valuation of nearly double what it had paid.  Contained within the Form S-1 filed in connection with that event was a wealth of information about the true intentions of the Individual Defendants at the time of the sale, as well as the full details about the generous financial rewards they had reaped for themselves by directing the transaction to Carlyle.  For Shrader alone, such benefits included millions of dollars in additional salary, accommodations, and "perks" that he never would have obtained otherwise.

### Jurisdiction and Venue

8.      This Court's jurisdiction is based upon 28 U.S.C. §§ 1331 and 1332; Section 27 of the 1934 Securities Exchange Act, 15 U.S.C. §77aa.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c); 29 U.S.C § 1132e(2); and Section 17 of the 1934 Act.

## The Parties

10.     At all relevant times during the Class Period, Plaintiff Kocourek was a partner-shareholder of BAH, and the trustee of the Trust.   Prior to the Carlyle sale, Kocourek had transferred his 27,300 shares of BAH common stock to the Trust. On July 31, 2008, the Trust exchanged the 27,300 shares of common stock of BAH in connection with the Carlyle transaction.   Plaintiff was provided cash consideration of $763.00 per share for a total of $20,829,900.00.  Plaintiff received a dividend of 27,300 shares of Booz & Company, Inc., which BAH represented to him had a value of $32.00 per share.   As more fully set forth below, Plaintiff, along with the other members of the Class, agreed to exchange his shares at a significant discount based upon his reasonable reliance on statements by Defendants, including those contained in the Information Circular, which statements were later learned to have been materially false and misleading.   By reason of Defendants' fraud, Plaintiff (along with other members of the Class) was damaged by, *inter alia*, receiving substantially less consideration for his BAH stock than it was worth, by foregoing his appraisal rights under Delaware law in connection with the merger and sale transaction, and by forgoing the opportunity to roll over a portion of his shares.

11.     At all relevant times during the Class Period, Shrader served as CEO of BAH and Chairman of its Board.  Shrader also served on and controlled the BAH "Deal Team" and was also a member of the Firmwide Leadership Team and the Operating Council.   In these roles, Shrader effectively managed and controlled the Transaction and all material communications to BAH's partner-shareholders including the IC.   Shrader knew that the Carlyle price was grossly below fair value and took steps to hide that fact from Plaintiff and the Class.

12.     At all relevant times during the Class Period, Strickland served as BAH's Chief Administrative Officer and Senior Vice President and reported directly to Shrader.  Strickland was in charge of providing cost accounting and administrative services and served on the "Deal Team."  Strickland knew that the Carlyle price was grossly below fair value and took steps to hide that fact from Plaintiff and the Class.

13.     At all relevant times during the Class Period, Appleby served as BAH's General Counsel and Secretary.  Strickland and Appleby met with Shrader frequently in private and were his principal deputies in executing the Carlyle Transaction.  Appleby served on the "Deal Team" and reviewed all material communications concerning the Transaction.  Appleby knew that the Carlyle price was grossly below fair value and took steps to hide that fact from Plaintiff and the Class.

14.     At all relevant times during the Class Period, Swenson served as BAH's Chief Financial Officer.  As such, Swenson was privy to confidential financial information concerning the value of BAH (and its respective divisions) and the value of consideration being sold to, and received by, Carlyle.

15.     At all relevant times during the Class Period, Lewis was the head of the Commercial Division and, upon information and belief, was privy to confidential information about the Transaction.

16.     At all relevant times during the Class Period, the Individual Defendants, because of their positions with BAH, had access to all internal corporate documents, conversations and connections with other corporate officers and employees, attended management and Board of Directors meetings and committees thereof and received information via reports and other information provided to them in connection therewith.  They therefore were privy to highly

confidential information concerning BAH's business, finances, products, markets, and present and future business prospects, and knew or recklessly failed to learn that the Carlyle price was grossly below fair value and took steps to hide that fact from Plaintiff and the Class.

17.     Because of their positions of control and authority over BAH and the Transaction, the Individual Defendants were able to and did control the content of the IC and related communications sent to shareholders concerning the Transaction, including the request to BAH partner-shareholders to execute closing documents just prior to the closing, and were also responsible for preparing the estimates of future revenues provided to the fairness experts.

18.     Furthermore, the Individual Defendants took advantage of BAH's longstanding culture of transparency, because of which BAH's partners believed and understood that material information about the Transaction would be shared with them in an open and honest manner.  As Shrader has now admitted in sworn testimony before this Court, that trust was misplaced, in that Shrader knowingly failed to disclose material information about BAH's overall strategy and his secretive exploration of opportunities to monetize BAH's equity value, among other things.

### Class Action Allegations

19.     Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), and under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); 15 U.S.C. §§ 78j(b) and 78t(a); SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 and §14(3) of the Exchange Act; 15 U.S.C. §78n(e) and SEC Rule 14e, 17 C.F.R. §240.14e.

20.     The proposed class (the "Class") consists of all individuals who sold or exchanged BAH securities in connection with the Transaction during the period available for such exchange and/or sale (the "Class Period") and were damaged thereby.  Excluded from the Class are: (i) the Individual Defendants herein, and their legal representatives, heirs, successors

or assigns and any entity in which defendants have or had a controlling interest; and (ii) the "Rollover Stockholders" as that term is used in the IC.

21.     The members of the Class are sufficiently numerous that joinder of all members is impracticable.  Some 280 persons held BAH equity rights, and, on information and belief, in excess of 200 of those are Class members.  Record owners and other members of the Class may be identified from records maintained by BAH and/or Booz & Company, Inc. and members may be notified of the pendency of this action by mail and email, using the form of notice similar to that customarily used in securities class actions.

22.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are affected by Defendants' unlawful conduct as complained of herein. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained Harris, St. Laurent & Chaudhry LLP and Mark Kelly, Esq.  Both firms are experienced in securities litigation and class actions.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are the following:

- whether Defendants engaged in the acts alleged herein;

- whether Defendants' conduct violated Federal securities laws;

- whether statements made by Defendants to the Class in the IC and accompanying and subsequent materials, which the Class relied upon in tendering their shares in connection with the Transaction, were materially misleading and omitted material information;

- whether members of the Class reasonably relied upon Defendants' misstatements and omissions in tendering their BAH shares; and

- the proper measure of damages sustained by members of the Class.

24.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  It will not be difficult to manage this action as a class action.

25.    Plaintiff, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his Class Action Complaint against Defendants, makes these allegations upon personal knowledge as to himself, and upon information and belief as to all other matters, based on the investigation conducted by and through his attorneys, which included, among other things, the following: interviews with BAH senior managers; a thorough review of the Defendants' publicly-filed documents, announcements made by the Defendants, press releases published by and regarding BAH, advisories about BAH, BAH's IPO road show, consultation with a highly experienced merger and acquisitions executive, a review of the trial transcript of *Nemec v. Shrader, et al.*, 1:09-cv-07466-LAK and the exhibits introduced during same, and information obtainable on the Internet.

### Brief History Of BAH Leading To The Carlyle Transaction

26.    Prior to the Carlyle Transaction BAH was a privately-owned consulting firm with a long and storied history.  Until 2008 BAH consisted of two primary divisions: (i) the Government Division, which provided (and still provides) technical services to the United States Defense Department and the United States intelligence community, and (ii) the Commercial Division, which supplies consulting services to non-governmental entities.  After the firm briefly went public for five years in the 1970s, BAH's partners resolved that it would be privately held for decades and generations to come, with "Forever Private" as one of its bedrock principles and the partners adhering to a strong culture of stewardship, honesty, and transparency.

27.    Shrader became CEO in 1999 for a six-year term.  In 1998, shortly before his election as CEO, Shrader and a small group of BAH partners floated the idea of a sale or

transaction to monetize the partners' equity in the company.  Sticking to the core value of private ownership, the partners rejected the proposal outright.

28.    In 2004, as the end of Shrader's term as CEO approached, he met with the most senior partners in the firm and sought their approval for a second six-year term.

29.    Such extensions were viewed unfavorably given BAH's tradition of stewardship and the partners' preference for CEO turnover.  Because of this, BAH's Board (after polling BAH partners) permitted Shrader to remain as CEO for an additional four years subject to two specific mandates: first, he was to combine the two divisions of BAH (Government and Commercial) into one cohesive operating unit, and second, he was to prepare a successor to replace him in 2009.

30.    In March 2005 Shrader and firm management released BAH's firmwide plan for 2006.  Key to the 2006 firmwide plan was a new strategy known as "OFE," which stood for "One Firm Evolution."  The objective of OFE was to synergize and unite the Government and Commercial Divisions in order to create a single strengthened and enduring whole.

31.    Shrader touted OFE at shareholder meetings and in internal communications, and purported to support internal restructuring initiatives designed to complete the unification.  As of 2006, it appeared to BAH's partners that Shrader had commenced at least the first of his two mandates and that the Company's strategic trajectory was settled for the foreseeable future.

**While Partners Were Focused On OFE, Shrader Secretly Pursues A Sale To Carlyle**

32.    BAH's longstanding culture of openness and stewardship gave its partner-shareholders no reason to suspect that their CEO was doing anything other than carrying out his mandate, which he publicly pretended to be doing.  At the very least, they would have assumed that any significant initiatives by Shrader would be shared with, and supervised by, BAH's Board.

33.     As it turned out, however, Shrader had a different plan for the Company's future, one that had nothing to do with OFE and would lead to the Carlyle Transaction in 2008 and BAH's subsequent IPO in 2010.

*Shrader Secretly Hires Credit Suisse To Explore A Transaction*

34.     Partner-shareholders would not learn until years later that, while they worked diligently to implement OFE under Shrader's direction, Shrader was working behind the scenes on shopping the Government Division, and himself with it, for sale to a financial investment firm – a transaction that would destroy OFE entirely.

35.     Thus, in late 2005, Shrader secretly directed Strickland to contact investment bankers at Credit Suisse whom Strickland had known from his employment with another government consulting firm.  That firm had been sold to Carlyle and subsequently was taken public in a two-step transaction that netted Carlyle ten times its investment and enriched the sellers' management – an event that no doubt cultivated seeds of greed in the minds of Shrader and his circle.

36.     Without informing his Board, Shrader secretly retained Credit Suisse in January of 2006.  That retention ostensibly was for the purpose of studying strategic alternatives, which could have included an initial public offering of stock or a sale of the Government Division to a competitor.  As it turned out, these options were given short shrift, as Shrader soon zeroed in on a third option: a sale of all or a portion of the Company to an outside investor.

*Credit Suisse Presents Shrader With "Strategic Alternatives"; Shrader Targets A Private Equity Acquisition Of BAH*

37.     In July 2006, Credit Suisse presented on a number of scenarios, including the possibility of an initial public offering of BAH to maximize shareholder value.  However, with his partners focused on OFE and remaining "forever private," Shrader knew that an IPO would

be a near-impossible sell.  Shrader further understood that pursuit of that option without a spinoff of the Commercial Division could immediately leave him out of a job.  Unsurprisingly, then, Shrader rejected the IPO option at that time.

38.     A sale to a strategic buyer, *i.e.*, a competitor in the government contracting industry, also would have resulted in a high return.  In BAH's case, strategic buyers would have included entities with significant contracting business with the United States government.  A strategic merger offers the buyer synergies and economies of scale that typically result in a higher purchase price.  As Carlyle CEO and founder David Rubenstein has stated:

> "…[T]hroughout the history of the private equity world [ ] if a strategic buyer wants to buy a company, almost invariably he can get that company because they can pay a higher price." Oct. 6, 2010 (Bloomberg).

39.     Shrader surely knew, however, that an acquisition by a competitor was likely to result in his ouster as CEO.  For this reason, Shrader and the Individual Defendants steered the sale towards Carlyle, a private equity buyer, which would guarantee their continued roles and provide lucrative financial rewards for them in exchange for shepherding the sale process.

40.     Shrader limited the circle of BAH executives who were "in the know" regarding the Transaction to himself, Strickland, Appleby and Swenson, ensuring that they would retain control of the process to achieve a pre-determined outcome.

### Carlyle Is Awarded BAH At A Discounted Price

41.     On October 30, 2007, Credit Suisse made a presentation to its credit committee urging that Credit Suisse itself loan money to Carlyle in order to finance the purchase of the Government Division.   The presentation materials estimated the purchase price to be approximately $3.25 billion.

42.    Credit Suisse's estimated purchase price was based upon its analysis of comparable transactions.  Several examples it identified were Titan Corporation, which sold for $2.7 billion (1.2 x gross revenue and 15.2 x EBITDA), Engineering Support Systems, which sold for $1.97 billion (1.9 x gross revenue and 12.4x EBITDA), Anteon, which sold for $2.3 billion (1.6 x gross revenue and 17 x EBITDA), US I S Inc., which sold for $1.7 billion (2x gross revenues), and United Industrial Corporation, which sold for $1.13 billion (14.4x EBITDA).

43.    Despite the fact that Credit Suisse's internal metrics predicted a $3.25 billion price, Shrader and his inner circle kept that analysis a secret until long after the Carlyle Transaction was complete, until other litigation had commenced which forced them to disclose the analysis during the course of discovery, subject however to a confidentiality order.

44.    Also unbeknownst to Plaintiff and the majority of BAH partners, the "auction" conducted by Credit Suisse (at the direction of Shrader and BAH management) was tainted from the very start.  Strategic buyers, who would have been able to bid at a high price, declined to submit bids.  Only private equity firms ultimately submitted formal bids, and Carlyle – a private equity firm that matched the profile of what Shrader was looking for – emerged as the victor in the "auction."

45.    Upon information and belief, the main reason strategic buyers declined to follow through on their expressions of interest was that they knew that the sale would be steered by Shrader and BAH management toward private equity buyers, and so their pursuit would be futile and certainly not worth an investment of time and money.  These concerns would have been exacerbated by the fact that Shrader effectively had sufficient votes to block any transaction that was not to his liking.

46.     Indeed, upon information and belief, Shrader discretely requested that two Government Division partners delay their retirements so that they would vote in support of the proposed Transaction, further guaranteeing his controlling voting bloc.

47.     Ultimately, only private equity firms submitted bids, and the price range obtained in the auction became far less than what Credit Suisse had projected.

48.     Thus, in order to convince BAH's partner-shareholders to approve the deal, Shrader and the Individual Defendants had to make it appear as though the auction process had been open and comprehensive, and that a fair price had been attained.

**BAH Issues The Information Circular (IC), Which Is Rife With False Statements And Material Omissions**

49.     On May 15, 2008, BAH entered into an agreement of merger and sale with Carlyle, conditioned upon (among other things) approval by BAH's partner-shareholders.

50.     The Individual Defendants were privy to material, inside information concerning the background of the Transaction, the potential alternatives that had been explored (and rejected), and the discounted price at which BAH was proposing to be sold.  Such information was not available to BAH's partner-shareholders who were being asked to vote on the proposed deal.

51.     On May 22, 2008, Shrader sent the IC to BAH's partner-shareholders along with a cover letter seeking their approval of the Transaction.

52.     The IC, together with Shrader's cover letter, was designed to elicit that approval, emphasizing the positive aspects and financial upsides of the transaction for the partners – and misrepresenting or omitting various facts about the transaction and its history that might have caused the partners to withhold their agreement or (at minimum) ask for more information.

53.     More specifically, the material misstatements and omissions:

(a)     provided a false and misleading explanation as to why strategic buyers failed to submit formal bids;

(b)     deliberately understated the projected revenue and EBITDA of the Government Division to support a purchase price well below market value, and $1.2 billion below the price BAH's own financial advisor expected it to bring from a financial buyer;

(c)     misstated the purchase price as being $2.54 billion, failing to disclose and quantify significant and material adjustments to the purchase price that would result in an approximately $444 million reduction;

(d)     affirmatively misrepresented that the purchase price was fair, with the implicit representation that such opinion was based upon expert valuation techniques which in turn had been applied using appropriate numbers (in fact, false information had been supplied to the outside evaluators), and suppressed the Credit Suisse analysis of comparable transactions;

(e)     failed to disclose that the Transactions would confer upon the buyer a tax benefit worth in excess of $350 million;

(f)     failed to disclose valuation methodologies and estimates as required by Delaware law in order for the partner-shareholders to determine whether to seek appraisal or rollover a portion of their shares; and

(g)     undervalued the spun-off Commercial Division.

*The IC Materially Mischaracterized The Process And The Reasons For Choosing A Private Equity Transaction*

54.     The IC represented that BAH held an auction in order to determine the best available price, and that three types of unidentified purchasers were solicited: strategic buyers (defined as parties involved in government contracting), professional service firms, and financial buyers (*i.e.*, private equity firms such as Carlyle).

14

55.    This description of the process was materially misleading.  As the Individual Defendants knew, or were reckless in not knowing, the "auction" process had not been fully open, but was instead steered toward financial buyers.  As they further knew (or were reckless in not knowing), the proposed purchase price was significantly less than what could have been realized through a sale to a competitor or an IPO.

56.    BAH's partner-shareholders were not privy to this critical information.

57.    According to the IC, five strategic firms performed due diligence but ultimately concluded that "difficulties" caused their interest in BAH to "wane."  Those "difficulties," according to the IC, related to the supposed existence of government regulations concerning "organizational conflicts of interest."

58.    These statements were knowingly false and materially misleading.  Upon information and belief, there was no bona fide or good faith solicitation of strategic buyers or professional service firms; rather, Shrader and the Individual Defendants directed Credit Suisse toward financial buyers, and only financial buyers ultimately participated in the auction process. Indeed, there were no genuine conflicts of interest or other difficulties precluding a transaction with key strategic buyers and the IC's statements to the contrary were untrue.  Such transactions are commonplace between companies engaged in the defense and national security industries.

59.    Rather, upon information and belief, the Individual Defendants took measures to deter such strategic buyers in favor of a private equity transaction that would allow Shrader to remain as CEO and would allow the Individual Defendants to negotiate more favorable terms for themselves in connection with the Transaction.

60.    In 2013 deposition testimony given in connection with a related case filed in the Southern District of California styled as *Rich v. Shrader, et al.*, Case No. 09-CV-0652, Swenson

15

gave testimony that is inconsistent with the statements in the IC about supposed conflicts of interest. When asked to describe the discussions with strategic firm SAIC, Swenson confirmed that SAIC "seemed very interested" in BAH's Government Division but ultimately declined to bid on it. Swenson made no mention of any supposed organizational conflicts of interest that might explain why SAIC failed to bid; he instead referred vaguely to SAIC concerns over differences in partner compensation.

61.    BAH partner-shareholders were not aware of the real reasons explaining lack of participation by competitors. The misstatements and omissions in the IC concerning the supposed lack of interest by strategic buyers were relied upon by BAH partner-shareholders in declining to exercise their appraisal rights under Delaware law or rollover a portion of their shares, and by voting in favor of the Transaction.

62.    Likewise, in order to sell BAH's partner-shareholders on the premise that an acquisition by a private equity buyer represented a good outcome, BAH management stated in the IC that a transaction with a financial buyer "could" maximize the purchase price. This statement was materially misleading, as in reality the only way to maximize the purchase price was a sale to a strategic buyer or by way of an IPO.

63.    The IC also omitted material information about the possibility of an IPO. Credit Suisse had provided Shrader with information about a potential IPO in January 2006, and in July 2006 Credit Suisse made a presentation to management which included the possibility of an IPO to maximize shareholder value. Without the knowledge of, or input by, BAH's partners, the IPO option was rejected in favor of a spin-off of the Commercial Division and a sale of the Government Division.

*BAH Management Obtained Fairness Opinions Based Upon Understated Projected Government Division Revenues*

64.     The IC annexed two fairness opinions that BAH management had obtained in connection with the Carlyle acquisition, one from Houlihan Lokey and the other from Credit Suisse.  The purpose of including information about the fairness opinions was to convince BAH's partner-shareholders that the price being paid by Carlyle was fair so that they would forego exercising their shareholder appraisal rights under Delaware law.

65.     Unbeknownst to BAH's partner-shareholders, however, the fairness opinions rested on false information and estimates supplied by BAH management.  Both Credit Suisse and Houlihan Lokey based their opinions upon multi-year revenue projections that had been provided to them by BAH management, which had "assumed a constant net revenue growth rate of 11% for fiscal years 2010 through 2014" for the Government Division.  An approximate 11% revenue growth rate over the FY '08 result also was used for the FY '09 revenue projection. This was beyond conservative; it was artificially (and materially and intentionally) too low, because the Individual Defendants were determined to ensure that a sale to Carlyle would occur.

66.     Indeed, in 2007 BAH management had conducted a study that predicted up to 15% growth for fiscal years 2008 and 2009, although this information was not provided to BAH's partners.  Similarly, on October 30, 2007 BAH management represented to Credit Suisse a projected growth rate of 14%.  Actual results confirmed that higher estimates were warranted, as BAH subsequently disclosed growth of 16.9%, 20%, and 17.7% for the fiscal years ending on March 31 of 2008, 2009 and 2010, respectively.  As a result, Shrader and the rest of BAH senior management surely expected revenue to continue to increase at or about 17% annually after the proposed Transaction.

67.     Furthermore, the revenue from BAH's Government Division was a function of government contracts that were carefully planned in advance, and for which government appropriations were required.   The U.S. Government has detailed budgeting procedures. According to BAH Senior Vice President Reginald Boudinot, BAH could project with pinpoint accuracy the amount the U.S. government would pay BAH in connection with a contract for the next fiscal year and could estimate revenue for the year after that with a high degree of accuracy as well.   BAH typically had these estimates in advance of the beginning of each fiscal year and therefore was in a position to accurately estimate and project the Government Division's revenue growth.   Accordingly, as a government contractor, BAH could project its revenues with far more precision than companies in most other industries.

68.     The Transaction closed on July 31, 2008, four months into FY 2009.   BAH added 2,700 staff in FY 2009, which, as explained in the S-1, were deployed to service a backlog of government contracts.   The pre-Transaction backlog of government contracts – requiring servicing by BAH – meant that Defendants must have known that BAH would be staffing up considerably, with the obvious expectation of a corresponding material increase in workflow and revenue.   Indeed, the 2010 IPO prospectus at page 70 states: "Revenue increased to $4,351.2 million in pro forma 2009 from $3,625.1 million in fiscal 2008, or a 20% increase.   This revenue was primarily driven by the deployment during pro forma 2009 of approximately 2,700 net additional consulting staff against funded backlog."

69.     Subsequent events further prove the lie.   Revenue for FY 2010 once again well exceeded the IC's estimates, increasing by 17.7%.   A total of 1500 more workers were deployed to address the backlog in FY 2010, but the funded backlog grew another $5.3 billion.   The 11% increase projected by management to substantiate the low Transaction purchase price, if applied

to FY 2008 to FY 2010, would have resulted in 23% growth.  In fact, revenues grew by 42% in that period.  Such growth was predictable to Defendants, yet deliberately misrepresented to (or worse, concealed from) BAH's partner-shareholders.

70.     Based upon its understated 11% growth projections, the IC projected EBITDA of $237.8 million for the fiscal year ending 3/31/09.  This was materially understated, as actual EBITDA during that time turned out to be $277.3 million – remarkably similar to what Credit Suisse had internally predicted.

71.     BAH's Board later claimed that in reaching its decision to approve the Transaction and recommend it to the BAH partner-shareholders, the Board considered, among other things:

> [T]he financial analysis reviewed by and discussed with the Board of Directors by representatives of Credit Suisse, as well as the oral opinion of Credit Suisse to the Board of Directors on May 14, 2008 (which was subsequently confirmed in writing by delivery of Credit Suisse's written opinion dated the same date) with respect to the fairness from a financial point of view of the Aggregate Cash Consideration to be received by the Nonrolling Stockholders in the Merger;

> [T]he financial analysis reviewed by Houlihan Lokey and discussed with the Board of Directors, and the oral opinion to the Board of Directors (which was confirmed in writing by delivery of Houlihan Lokey's written opinion dated May 13, 2008), with respect to the fairness, from a financial point of view, of the aggregate Merger Consideration to be received by the holders of Company Shares in respect of such shares, other than Buyer Parent, Buyer, Merger Sub, the Rolling Stockholders and their respective affiliates, in the Merger pursuant to the Merger Agreement, as of May 13, 2008 and based upon and subject to the procedures followed, assumptions made, qualifications and limitations on the review undertaken and other matters considered by Houlihan Lokey in preparing its opinion.

72.     In opining that the consideration paid to the Nonrolling Stockholders (*i.e.*, BAH shareholders who would not continue as shareholders in the surviving entity owned by, *inter alia*, Carlyle and the Individual Defendants) was "fair" from a financial point of view, Credit Suisse and Houlihan Lokey made clear that they (i) assumed that the projections the Individual

Defendants provided were prepared in good faith and reflected the best currently-available estimates; and (ii) did not independently verify the BAH projections provided to them.

73.     BAH management's revenue estimates therefore were critical assumptions underlying the fairness opinions.  Increased revenues would lead to increased profits, which formed the basis of comparison for publicly-held companies and selected comparable transactions.  Similarly, the discounted cash flow analysis relied heavily upon the projections, and the leveraged buyout analysis indicated that it was based upon the projections for the years 2009 through 2014.

*The IC Materially Understated The Value Of The Transaction To Carlyle*

74.     The IC also materially understated the value of what Carlyle would be receiving.

75.     First, BAH had significant option-related obligations to its employees which generated a valuable tax deduction for BAH and any acquirer.  BAH had issued stock options on 916,092 of its shares.  696,000 of these options were cashed out prior to the Transaction by payment equal to the difference between the $763 merger stock value and the exercise price.  Similarly, BAH made certain payments to applicable employees pursuant to a shadow or phantom stock employee compensation program.  All of these payments were treated as compensation to the employees, a tax-deductible expense to BAH.

76.     For the fiscal year ended March 31, 2009, BAH booked a $1.2 billion loss.

77.     For the fiscal year ended March 31, 2009 (the first year under Carlyle's ownership), the Government Division reported increased revenue by 20% but paid no taxes on account of the deductions arising from the stock option payment and the shadow stock payment, as well as a large loss carry-forward.

78.     On March 31, 2009, after avoiding taxes for that year, BAH had a net operating loss carry forward of $608.2 million.

79.     The settlement of the stock options and shadow stock obligations therefore generated some $800 million in tax deductions.  BAH's Federal income tax rate was 35% and the state income tax rate (net of a Federal tax benefit) was 7.6%, resulting in a combined effective rate of 42.6%.  The $800 million of tax deductions would have had a value as a deferred tax asset of $325 million up front and an additional $58 million later, an amount which is material to a transaction with a price of $2.1 billion.

80.     Only a select few BAH partners were aware of the value of these deductions, including, upon information and belief, Swenson as CFO.  The Class partners were not aware of the value of these deductions.   The IC references the contemplated compensation deduction arising from the stock option payments, discussing the fact that BAH had petitioned the IRS for rulings concerning the manner in which settlement of the shadow stock obligation would be treated under certain tax regulations.   The Merger Agreement concluded that the IRS rulings would reduce the price by precisely calculated amounts ($179,349 for one ruling and $18,467,326 for another), indicating that careful study had been given to the impact of the deductions.  Despite this, no disclosure was made to BAH partners concerning the magnitude of this aspect of consideration.

81.     The Transaction also required the BAH shareholders to indemnify Carlyle for exercise of stock options before closing with respect to any BAH stock rights exercised after the signing of the Merger Agreement and prior to the Acceleration of Company Stock Rights pursuant to the Merger Agreement.  The partner-shareholders' indemnification obligations were made to be a function of the excess of (i) any compensation deductions that would have arisen in

connection with the exercise of such Company Stock Rights pursuant to the acceleration over (ii) any deductions that actually arose with respect to the earlier exercise of such Company Stock Rights, subject to a multiplier of .2732.

82.     Operation of this formula may be illustrated by example:  a BAH shareholder who exercised an option at a $60 grant price before closing would receive stock at a book value price of $160, and her "profit" of approximately $100 would be deductible by BAH.  The share in question would then be resold to Carlyle for a then-estimated $794 dollars, but there would be no further tax deduction.  If, on the other hand, the option were not exercised, Carlyle would cash out the option by paying $734, the difference between the $794 valuation and the $60 strike price, and Carlyle would have a tax deduction of $734.  In such an event, pursuant to the negotiated indemnity, the compensation deduction that would have been applicable, $734, less the actual deduction from the early exercise of $100, or $634, would be multiplied by .2732, and BAH shareholders would pay Carlyle $173.21.  This provision establishes that Defendants knew the mechanics of the Transaction would produce material tax deductions, yet the value of this deferred tax asset was not disclosed to BAH's partners.

*The IC Failed To Disclose Precedent Transaction Metrics*

83.     Credit Suisse, BAH's financial advisor and the architect of the sale process, had conducted internal analyses which supported a bid in the range of $3.225 billion plus transaction costs.  Credit Suisse's projections and its analysis of comparables were omitted from the IC entirely; indeed, Shrader frequently stated to Commercial Division partners that BAH's Government Division was unique and had no comparables.

84.     Although the Credit Suisse fairness opinion provided to BAH shareholders provided the identity of comparable transactions that Credit Suisse had examined, BAH

shareholders would have lacked information about the net revenues of those comparable companies sufficient to perform an "apples to apples" comparison.

85.     Similarly, no comparable transaction benchmarks were supplied to BAH's partner-shareholders which would have alerted them that Carlyle was paying a steep discount for the Government Division.  And in any event, BAH's Commercial Division partners in particular had very little visibility into the Government Division industry and would not have been in position to perform comparables of their own.

86.     As a result, the partner-shareholders were deprived of material information they needed in order to evaluate the Transaction.

*The IC Omits Mention Of Material Conflicts Of Interest*

87.     The IC addresses conflicts of interests relating to the Transaction but limits that discussion to the differing interests of Commercial Division partners versus the Government Division partners.  The conflict of interest of BAH management with respect to strategic versus financial buyers is not mentioned, nor is the ability of Shrader and his allies to prevent a sale to a strategic buyer.  These other conflicts certainly existed, but were not known to BAH's partners.

88.     Once the decision was reached that management and Government Division partners would become co-owners with a private equity investor of the entity that would purchase the Government Division, management was engaged in self-dealing and had an inherent conflict of interest.

89.     The IC failed to disclose that Senior officers of the Commercial Division requested that separate representation be procured to represent the conflicting interests of the Commercial and Government partners, and they requested that a reputable financial advisor such as Goldman Sachs or Morgan Stanley be engaged.  Their request was denied.

90.     Instead, BAH management elected to "paper over" the conflict by creating a so-called "Deal Team."  The IC touts Commercial Division partner Bertone's involvement in the "Deal Team," no doubt in an effort to cloak the group in credibility despite it being largely dominated by partners from the Government Division:

> . . . [O]n April 5, 2007, BAH management made a presentation to Company A. Mr. Bertone, as Chair of the Finance Committee, and representative of the stockholders, had weekly briefings with the deal team from the middle of January 2007.  Mr. Bertone's involvement with the "deal team" increased during the course of 2007 and became full time in the fall of that year.

91.     Bertone's presence on the deal team as a representative of the Commercial Division partners was specifically relied upon by the Board in recommending the transaction. Ultimately, however, Bertone opted to rollover his shares and he remained a shareholder in the Government Division.  No disclosure was made that Bertone, the only Commercial Division partner member on the Deal Team, invested in the Carlyle transaction alongside Carlyle.

92.     Commercial Division partners relied on these misstatements and omissions in concluding that their interests had been adequately represented in connection with the consideration of alternative transactions, when in fact they had not been.

*The Value of the Commercial Division Was Understated*

93.     The Merger Agreement advised that the Commercial Division would be separated as a new subsidiary called Booz & Company Inc., which would be spun off.  The Commercial Division was valued at $95 million in the Merger Agreement.

94.     Based upon appropriate comparables, to which the BAH partners would not have had reasonable access, the Commercial Division should have been assigned a value hundreds of millions of dollars higher.

*Shrader Admits In 2015 That The IC Contained Material Misrepresentations*

95.     In his 2015 testimony during the trial of *Nemec v. Shrader, et al.*, 1:09-cv-07466-LAK, Shrader unapologetically admitted that the IC contained material misstatements concerning the timing of Credit Suisse's engagement and BAH's Board's awareness thereof.

96.     The IC stated that the Board of Directors retained Credit Suisse in the middle of 2006 to explore strategic alternatives for the Company.   BAH has since admitted that this statement was almost completely untrue.

97.     Testifying before this Court, Shrader conceded that Credit Suisse had been engaged in January 2006, not the middle of 2006 as the IC had misrepresented.  Shrader further acknowledged that the statement that "the Board" was involved in Credit Suisse's $500,000 retention was materially misleading, as he was the *sole* member of the Board who was aware of the retention (although he informed the Individual Defendants, who were not Board members), and that he had taken steps to suppress the retention from his fellow BAH partners.

98.     According to Shrader's testimony, the reason he concealed the retention of Credit Suisse from BAH's partners was that Shrader knew that they might alter their behavior if the true facts had been disclosed to them.  In other words, Shrader understood and expected that BAH partners – including the Plaintiff and the Class here – would rely upon misstatements in the IC, and that deception was his way of getting rid of obstacles standing in the way of his preferred outcome.

99.     The admitted misstatement that the Board was involved in retaining Credit Suisse prior to the rejection of an IPO and the decision to split up BAH and sell the Government Division was particularly important in helping to convince the Commercial Division partners that their interests had been adequately protected in connection with the Transaction, because the

Board contained members of the Commercial Division.  Had the Commercial Division partners known the truth – that the sale process was initiated and controlled by Shrader, and key decisions were made by him, without substantial involvement of the Board – it would have caused them to question the *bona fides* of the process.  It also likely would have caused BAH partners to question whether the Board had been involved in the decision not to pursue an IPO, one of the alternatives that had been analyzed by Credit Suisse.

### Defendants' Motives for the Fraud and Its Aftermath

100.    Shrader and the other Individual Defendants had powerful financial incentives to ensure that the Transaction closed and BAH was sold to a private equity buyer at a buyer-friendly discount.

101.    First and foremost, a sale to Carlyle ensured that the Individual Defendants could secure their positions at BAH for the longer term with enormous compensation and personal benefits.  Shrader and the other Individual Defendants surely understood that, unlike a sale to a competitor or an IPO, a sale to a financial investor such as Carlyle could be orchestrated in such a way so as to preserve their jobs.  Shrader admitted in his trial testimony in the *Nemec* case that he had discussions with Carlyle early on about remaining in the CEO role (including specific compensation parameters), and that it had been "a key part of" the deal.

102.    Another key component of the Individual Defendants' plan was effectuating the spin-off of the Commercial Division.  The Individual Defendants knew that at the time of the Transaction, the BAH shareholders in the Commercial Division had far more voting shares than members of the Government Division of which Shrader was a member, and the spin-off helped ensure that the Commercial Division partners were no longer a threat to the Individual Defendants' roles.

103.    Finally, the Individual Defendants also knew that Carlyle was likely to pursue an

IPO at some point, which would greatly enrich them.

104.    Shrader's trial testimony in the *Nemec* matter confirmed his acute awareness of

this eventuality:

> Q.  Did you make the following statement to the *Washington Post:* "We knew when we
> executed the transaction with Carlyle that we were embarking on a trail that would have
> us become a public company at some juncture down the road.  We were expecting that
> and we spent the last two years preparing for that."
>
> A.  I can tell you that whether it's a quote or a paraphrase, it certainly is a statement that I
> would have made, yes.
>
> Q.  So that even at the time of the Carlyle transaction, you knew at the end of that road
> there was going – two years later, there was going to be a public offering; you knew that.
>
> A.  I knew that when you do business with a private equity firm, their usual exit strategy
> is to do a public offering.  And so, yes, that was quite well anticipated; that was not a
> surprise.

105.    And ultimately, in fact, Shrader was rewarded lavishly for steering the

Transaction to Carlyle (and at a substantial discount).  Shrader remained as CEO following the

Transaction (a departure from the term limits BAH traditionally had followed, with the clock

ticking on his last, shortened term), and his annual compensation increased to $4.25 million per

year from $2 million.  In addition, Carlyle instituted an Equity Incentive Plan under which

Shrader was granted approximately 140,000 additional shares.

106.    Shrader also received valuable perks from Carlyle.  He was allowed to work

remotely out of Sarasota, Florida, and in addition to his substantial salary increase Carlyle paid a

fee of approximately $600,000 per year to a private jet corporation controlled by Shrader, which

he has used in order to travel between Sarasota and BAH's business offices in the Washington,

D.C. area.

107.    And perhaps most critically, as the S-1 made clear, even after cashing out $37.7 million in shares under the Transaction, Shrader retained approximately 2.14 percent of the acquired entity, which ultimately went public (as Shrader had predicted) a mere two years later at a substantially increased valuation.   Shrader continued to receive valuable dividends on these shares amounting to approximately $16.6 million up to the IPO and an additional approximately $30 million thereafter.   Finally, as a result of the IPO event and valuation, Shrader's remaining holdings became worth approximately $70.6 million.   In sum, as a result of the sale to Carlyle, which he had effectuated and orchestrated, Shrader had been enriched by an astounding $178.6 million over six years.

**The S-1 Filed By BAH In 2010 Contained New Revelations About The Transaction**

108.    On June 21, 2010, Carlyle filed an S-1 Registration Statement with the SEC (the "Registration Statement") in connection with an initial public offering of BAH stock.   The IPO closed on November 22, 2010.   The S-1 disclosed stunning new details about the Transaction which had previously not been known, or knowable, to BAH's partner-shareholders.

109.    Most critically, the S-1 revealed that that the purchase price Carlyle paid was only $1.567 billion, exclusive of the rolled over shares.   This amount was substantially less than what had been reported to BAH's partner-shareholders in the IC, and *nearly two billion dollars less* than what Credit Suisse had projected at the outset of the sale process.

110.    Also disclosed in the S-1 was the drawdown by BAH of its entire $245 million line of credit immediately preceding the Transaction, without explanation as to what this money was used for.   This had the effect of reducing the compensation obligation owed by Carlyle *and* became deducted from the purchase price, producing a double benefit to the buyer.   Credit Suisse had predicted that no material revolver debt would exist at the time of the closing.

111.     The S-1 further revealed that Carlyle reported a cost basis of $5.40 per share.  The IPO price was 3.15 times Carlyle's cost.  Carlyle had initially paid $956 million, net of fees, and had repaid itself $548.1 million by way of dividends ($114.9 million in July 2009 and $497.5 million in December 2009), leaving a net investment of $408 million.  A week after the IPO, Carlyle's shares were worth $1.896 billion, a $1.5 billion profit, a remarkable 465% growth of its investment in less than two years.

112.     The S-1 also revealed that pursuant to its stock option plan, Carlyle had valued BAH's shares at $128 per share after a presumed liquidity discount, which grossed up to $200 per share.  At the Transaction multiple of 7.63, this amounted to $1,526 per BAH share.

113.     The full details of Shrader's resulting compensation were also revealed in the S-1. According to that filing, Shrader received $33,743,467 and 1,412,880 "A" shares (after an IPO split), 156,668 "C" shares, and 1,040,390 "E" shares, for a total of 2,609,950 shares.  He was also paid $9,421,000 in dividends.  As a result of these substantial dividends, his unexercised stock rights from the SRP, now represented by the "E" stock, had a negative exercise price. Thus, instead of paying BAH for stock, the seller company delivered the stock *gratis* to Shrader, plus a cumulative $3,000,000 bonus.  As of the post-IPO price, Shrader's remaining shares had a value of $58,830,299.

114.     The S-1 further revealed the substantial undervaluation of the Government Division by BAH management, providing information about backlogged U.S. Government business, both funded and unfunded, which warranted a much higher growth projection.  This information was highly material, since the most reliable indicator of future revenue growth in this industry is the amount of backlog held by the contractor.

115.    In the S-1, BAH identified "[g]rowth in total backlog and consulting staff headcount growth as the two key measures of our business growth."   As the S-1 revealed, backlog had grown nearly 20% annually over the period 2003-2007, and grew 17.8% during the fiscal year ended 3/31/07 over the prior year.   Billings were up by 20% for the period from April 1, 2008 to the closing of the Transaction on July 31, 2008.   BAH attributed the 20% revenue increase to headcount growth.   The increase in headcount could only have been in support of contracts expected to be awarded after March 31, 2008, and thus the undisclosed backlog as of March 31, 2008 would have indicated a revenue growth rate far higher than the 11% represented in the IC.

## CLAIMS FOR RELIEF

### COUNT I

### (AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 10(b) AND RULE 10B-5 PROMULGATED THEREUNDER)

139.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

140.    This Count is asserted against Individual Defendants and BAH and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

141.    Defendants violated Section 10(b) and Rule 10b-5 thereunder by knowingly misrepresenting and omitting material facts in the Information Circular, which misrepresentations and omissions were relied on by Plaintiffs and the Class in connection with the sale of their BAH equity securities.

142.    The Information Circular contained numerous false and misleading statements. Specifically, it:

(a)     Mischaracterized the process and reasons for pursuing a leveraged buyout transaction by falsely representing that BAH's efforts to pursue strategic buyers had failed, when in fact, on information and belief, BAH engaged in no good faith efforts to pursue a sale to any strategic buyers;

(b)     Relied on flawed fairness opinions that were based on incorrect data that BAH management knowingly provided to BAH's financial advisors;

(c)     Knowingly and materially understated the value of the Transaction to Carlyle by a material sum;

(d)     Failed to disclose relevant transaction metrics that would have informed the Class members that the Information Circular was materially misleading; and

(e)     Knowingly concealed management's conflicts of interests, making it seem like they had been acting to secure a deal that was best for all shareholders when they were in fact prioritizing their own bottom line through self-dealing.

143.    Plaintiff and the Class were able to determine and confirm that these statements were false or misleading after reviewing Carlyle's Form S-1 statement for its IPO of BAH stock submitted in 2010.  In that filing, Carlyle was forced to disclose for the first time how much it actually paid for BAH, the nature of the deal process, its goals for the acquisition, and how much Shrader and BAH management had been compensated by Carlyle pursuant and subsequent to the Transaction.

144.    Shrader and the Individual Defendants had to have known the statements above were false. They were each control persons of BAH, owing to their senior positions in the Company and their respective roles in steering the sale of BAH to Carlyle.  In overseeing the Transaction – which included disseminating materially false statements in the Information Circular – they were acting within the scope of authority conferred on them by BAH.  They each had ample motive and opportunity to commit fraud, a fact reinforced by the outsized compensation packages they received from Carlyle after the Transaction closed, which far outstripped any benefit earned by Plaintiff and the Class on the transaction.  To be clear, the

Individual Defendants, as insider members of management, have reaped tens of millions of dollars of benefits above the transaction proceeds paid to the other BAH partners (*i.e.*, the Class).

145.    As control persons, the Individual Defendants' state of mind is imputed to BAH itself.  All Defendants therefore acted with requisite scienter to commit securities fraud.

146.    Indeed, Shrader later admitted, at trial and under oath, that he knew statements in the Information Circular were misleading and untrue.

147.    The Individual Defendants and BAH are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of BAH.  As officers and/or directors seeking shareholder approval of a sale of BAH stock, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to BAH's operations, future financial condition and future prospects, and the fair value of BAH, including but not limited to the factors concerning the ability of strategic potential acquirers to participate in the auction process, which factors resulted in a price bid of one-half of the value of the BAH Government Division that was obtainable in other methods of sale.

148.    As the Information Circular was the sole source of definitive information about the Transaction, every member of the Class had no choice but to rely on the statements made therein.  They demonstrated this reliance by participating in the transaction advertised by the Information Circular, tendering their BAH stock at $763 per share, far below its fair value.

149.    BAH had knowledge of the actual value of the BAH securities superior to that of the buyer of the securities, Plaintiff and other members of the Class, and therefore had a duty to disclose such material information.

150.    Had Plaintiff and the members of the Class have known the truth, they would not have agreed to tender or vote their shares for the consideration offered by BAH and/or Explorer Investor Corporation and would not have received the low price that was paid.  At the time of the vote to approve the Transaction, BAH's true value was substantially higher than the consideration received by Plaintiff and the other members of the Class.  Indeed, the market price of BAH's securities doubled upon public disclosure of the true state of the business and prospects of the BAH Government Commercial Business.

151.    As a direct and proximate result of BAH's and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in an amount to be proven at trial in connection with their respective sale or exchange of, or decision whether to roll over, their BAH securities during the Class Period.

## COUNT II

### (VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS)

151.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

152.    Section 20(a) of the Exchange Act imposes liability on "control persons" for wrongdoing in connection with the purchase or sale of the controlled entities' securities.  The Individual Defendants each violated Section 20(a) because they violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, while in possession of insider information.

153.    During the Class Period, the Individual Defendants participated in the operation and management of BAH, and conducted and participated, directly and indirectly, in the conduct of BAH's business affairs.  Because of their senior positions, they knew the confidential

information about BAH's misstatement of projected revenue and EBITDA income and the circumstances that prevented strategic bidders from participating in the auction of BAH.

154.    As officers and/or directors of a company soliciting acceptance of a tender offer, the Individual Defendants and, as the party making the tender offer, BAH, had a duty to disseminate accurate and truthful information with respect to BAH's prospective financial condition and results of operations, to provide accurate revenue and EBITDA forecasts to financial experts who were opining on the fairness of the price to be paid as consideration in the tender, to adequately disclose the value and impact of the tax deduction inuring to the benefit of the buyer, and to ensure that the statements made by BAH in the Information Circular dissimilated to shareholders was true, and did not omit statements necessary in order to make the statements  made, in light of the circumstances under which they were made, not misleading.

155.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the Information Circular, which BAH disseminated to Plaintiff and to BAH's financial analysts concerning the supposed desirability and fairness of the Transaction.

156.    The Individual Defendants therefore were "controlling persons" of BAH within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they exercised their power and authority to cause BAH to engage in the wrongful acts complained of herein, and specifically the violations of the securities laws identified in the previous cause of action.  They misled Plaintiff and the Class regarding the economics of the transaction with Carlyle and the availability of a superior buyer, and caused the Class to approve a spin-off and merger and tender shares where the consideration was but one-half of the fair value of the securities sold or exchanged.

157.    By reason of the above conduct, the Individual Defendants are liable to Plaintiff and the Class pursuant to Section 20(a) of the Exchange Act for the violations committed by BAH, for an amount of damages to be determined at trial.

**COUNT III**

**(VIOLATION OF §14(e) OF THE EXCHANGE ACT
AGAINST ALL DEFENDANTS)**

157.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

158.    Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances in which they are made, not misleading … in connection with any tender offer."

159.    The Information Circular constitutes communications made under circumstances reasonably calculated to result in the procurement of tenders from BAH shareholders in favor of the offer to purchase BAH for a price of approximately $763 per share.

160.    The Information Circular is materially misleading, as alleged herein.

161.    The fraudulent statements and omissions in the Information Circular were material to the BAH shareholders' decision to tender their shares, particularly in light of the fact that they had no reason to suspect that the valuation was below fair value and thus no reason to seek appraisal of their shares under Delaware law.

162.    SEC Staff interpretive Release 34-430069, effective date July 31, 2000, establishes that Rule 14e requires targets to disclose conflicts of interest, and explains how the proceeds from alternative strategies, such as a liquidating sale of assets (here, the spinoff of the Commercial Division and the sale of the Government Division in a sale process open to all

bidders), compares to the tender price; that the target should disclose valuations it, or its affiliates have prepared; and summarizes reports that the target or affiliates have received which relate to the transaction valuation.

163.    BAH and the persons in control of BAH failed to make the disclosures required under Rule 14e.

164.    The Information Circular was first mailed on May 22, 2008, the Thursday prior to the 2008 Memorial Day weekend.  The decision to accept the tender was required to be provided on or before June 13, 2008, a date which was but 16 business days from the date of notice of the tender, in contravention of Rule 14e, which mandates a minimum period of 20 business days.

165.    By reason of the above conduct, BAH and the Individual Defendants are liable to the Plaintiff and the Class under Section 14 (e) of the Exchange Act, who have suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against defendants, and each of them, as follows:

(A)    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

(B)    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

(C)    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other fees and costs;

(D)    Punitive damages in an amount to be determined at trial;

(E)    Such other and further relief as the Court may deem to be just and proper.

DATED: April 6, 2018

Respectfully submitted:


_____/s/_____

Yonaton Aronoff
Jonathan Harris
Joseph T. Gallagher
HARRIS, ST. LAURENT & CHAUDHRY LLP
40 Wall Street, 53rd Floor
New York, NY 10005
Tel: (212) 397-3370

Mark Kelly, Esq.
99 Madison Avenue, Suite 503
New York, NY 10016
Tel: (212) 953-2626

*Attorneys for Plaintiff Individually*
*and as Trustee, and as Class*
*Representative*

**CERTIFICATION OF PAUL KOCOUREK, INDIVIDUALLY AND AS TRUSTEE OF
THE PAUL KOCOUREK TRUST, IN SUPPORT OF CLASS ACTION COMPLAINT**

Paul Kocourek declares, as to the claims asserted under the federal securities laws, that:

1. I make this declaration personally and in my capacity as sole Trustee, grantor and current beneficiary of the Paul Kocourek Trust dated October 3, 2006 (the "Trust"), and pursuant to Section 101 of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(2). References to myself herein by use of the pronoun "I" and "me" are intended to refer to and include both myself personally, and the Trust.

2. I have reviewed the attached Amended Consolidated Class Action Complaint (the "Complaint") against Ralph W. Shrader, C.G. Appleby, Samuel R. Strickland, Daniel Lewis, Douglas Swenson, and Booz Allen Hamilton Inc. ("BAH"), prepared by counsel in this case, and have authorized its filing.

3. I did not purchase any security that is the subject of the Complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4. I am willing to serve as a representative party on behalf of a class, including giving testimony at deposition and trial, if necessary.

5. The only transaction I engaged in involving the security that is the subject of the Complaint was: On July 31, 2008, the Trust exchanged 27,300 shares of common stock of BAH, and was promised to receive merger consideration of $763.00 per share for a total of $20,829,900.00, and I received a dividend of 27,300 shares of Booz & Company, Inc., which BAH represented to me had a value of $32.00 per share.

6. During the three-year period preceding the date on which this certification is signed, other than in this action, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the class as proposed in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: April 5, 2018

_____
PAUL KOCOUREK, *individually
and on behalf of The Paul Kocourek
Trust*