UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PAUL KOCOUREK, INDIVIDUALLY and as
TRUSTEE OF THE PAUL KOCOUREK TRUST,
and ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

                               Plaintiffs,

                    -against-

RALPH W. SHRADER, C.G. APPLEBY,
SAMUEL R. STRICKLAND, DANIEL LEWIS,
BOOZ ALLEN HAMILTON INC.,

                               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____               │
│ DATE FILED: 6/12/19                  │
└─────────────────────────────────────┘
```

09-cv-10163 (LAK)(FM)
and consolidated cases:
09-cv-10203 (LAK)(FM)
09-cv-10204 (LAK)(FM)
10-cv-05255 (LAK)(FM)

## MEMORANDUM OPINION

Appearances:

Yonaton Aranoff
Jonathan Harris
Joseph T. Gallagher
HARRIS, ST. LAURENT & CHAUDHRY LLP

Mark Kelly, Esq.

*Attorneys for Plaintiff Individually and as Trustee,*
*and as Class Representative*

J. Christian Word
Sarah A. Tomkowiak
Jamie L. Wine
LATHAM & WATKINS LLP

*Attorneys for Defendants*

Lewis A. Kaplan, *District Judge.*

This dispute relates to the sale of the government division of Booz Allen Hamilton ("BAH") to the Carlyle Group ("Carlyle") in 2008 (the "Transaction"). The Transaction sparked a myriad of claims litigated in a variety of fora over the past decade. What remains of this action are the securities fraud claims of Paul Kocourek, acting individually, as trustee of the Paul Kocourek Trust, and on behalf of a purported class of individuals who sold or exchanged BAH securities in connection with the Transaction. Kocourek alleges that BAH and its officers fraudulently misrepresented and omitted material information to secure the votes of BAH partners needed to approve the Transaction. This matter is before the Court on defendants' motion to dismiss the Amended Consolidated Class Action Complaint (the "ACC") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act ("PSLRA"). For the reasons set forth below, defendants' motion is granted.

## Background

### I.    *Relevant Procedural History*

We discuss only the history of this action that is helpful for resolving the present motion. Additional information is contained in the Court's opinions in *Boudinot v. Shrader*, No. 09-10163 (LAK), 2013 WL 1481226 (S.D.N.Y. Apr. 10, 2013), and *id.*, 2012 WL 489215 (Feb. 15, 2012).

Kocourek first filed suit in this Court in December 2009.[1]  The Court consolidated

---

[1]    DI 1.

3

his case with two others brought by former BAH officers asserting similar claims.[2]  In September 2010, Kocourek, along with co-plaintiffs Reginald Boudinot and Paul Pasternack, filed a consolidated complaint alleging securities fraud,[3] RICO, ERISA and various common law claims against BAH, its former chief executive officer, Ralph Shrader, and a number of former BAH officers.[4]  In addition, the consolidated complaint asserted RICO and state law aiding and abetting claims against Carlyle and several Carlyle-related entities, as well as claims against Credit Suisse Securities (USA) LLC ("Credit Suisse").[5]

The Court dismissed the claims against Credit Suisse in May 2011[6] and granted in part defendants' motion to dismiss in February 2012.[7]  The only claims that survived were those brought by Kocourek based on certain alleged violations of ERISA.[8]  Plaintiffs filed a motion for

---

[2]   Before filing this action, Kocourek sued BAH also in New York state court, asserting claims for breach of contract, unjust enrichment, fraud, and equitable fraud. *Boudinot*, 2013 WL 1481226, at *2.

[3]   DI 13.

The securities fraud claims in the 2010 complaint were brought only by Boudinot and Pasternack and were based on legal theories different than Kocourek's present securities fraud claims.  DI 14 at ¶¶ 419-23.

[4]   DI 14, Consolidated Complaint ("CC").

[5]   *Id.*

[6]   DI 37.

[7]   *Boudinot*, 2012 WL 489215.

[8]   *Id.*

4

reconsideration,[9] and the Court upheld its dismissal of plaintiffs' claims in all relevant respects.[10]

Plaintiffs moved for leave to file an amended complaint which included, *inter alia*, Kocourek's new securities fraud claims purportedly asserted on behalf of a class of BAH shareholders.[11]  Following briefing and oral argument, the Court denied plaintiffs' motion for leave to amend in September 2012.[12]  It did so with respect to the newly-proposed securities fraud claims on several grounds including waiver, undue delay and futility.[13]  With regard to futility, the Court noted that Kocourek had not "come remotely close to pleading fraud with the particularity required by Rule 9(b) and the Private Securities Litigation Reform Act."[14]

Kocourek's remaining ERISA claims were decided against him pursuant to a motion for summary judgment in April 2013.[15]  Defendants' remaining counterclaims were voluntarily dismissed thereafter in December 2015.[16]

Plaintiffs appealed the judgment of the Court with respect to several claims, including

---

[9]   DI 41.

[10]   DI 51.

[11]   DI 55.

[12]   DI 67.

[13]   DI 78, Mot. Tr. 39-40.

[14]   *Id.* at 40:2-5.

[15]   *Boudinot,* 2013 WL 1481226.

[16]   DI 81.

5

the RICO and ERISA-based claims and the Court's denial of Kocourek's motion to re-plead securities fraud.  The Second Circuit affirmed the Court's dismissal of plaintiffs' claims in all respects, save that it vacated the judgment to the extent it had denied Kocourek leave to amend the CC to add securities fraud causes of action.[17]

Kocourek filed the ACC in April 2018.[18]  It alleges that the defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by knowingly misrepresenting and omitting material facts in an Information Circular ("IC") distributed to BAH partners, which allegedly were relied upon by plaintiff and the putative class members in connection with the sale of their BAH equity securities.  The ACC alleges also control person liability under Section 20(a) of the Exchange Act and violations of Section 14(e) of the Exchange Act.  Defendants move to dismiss on the grounds that plaintiff has failed to plead adequately any material misstatement or omission, *scienter*, or damages.   Defendants move also to dismiss the class-action claims as time-barred and to strike portions of the ACC.[19]

II.    *The Parties*

Kocourek retired as a partner of BAH in April 2007,[20] but he remained a holder of

---

[17]    *Pasternack v. Shrader*, 863 F.3d 162, 174-75 (2d Cir. 2017).

[18]    DI 104.

[19]    DI 116.

[20]    CC at ¶ 1.

BAH stock during the class period.[21]  The proposed class consists of "all individuals who sold or exchanged BAH securities in connection with the Transaction during the period available for such exchange and/or sale," excluding the individual defendants and the "Rollover Stockholders," as defined in the IC.[22]  Kocourek alleges that "[s]ome 280 persons held BAH equity rights, and, on information and belief, in excess of 200 of those are Class members."[23]

BAH was a privately-owned consulting firm prior to the Transaction, and during the class period.  Ralph W. Shrader was its chief executive officer and board chairman.  Samuel R. Strickland was its chief administrative officer,  C.G. Appleby was its general counsel and secretary, and Daniel Lewis was the head of the commercial division.[24]

III.     *Factual Allegations*

Unless stated otherwise, the facts described below are those as alleged in the ACC and the documents incorporated by reference therein.  The Court accepts them as true for purposes

---

[21]

ACC at ¶ 10.

[22]

*Id.* at ¶ 20.

A "Rolling Stockholder" is defined as a "Person set forth on Schedule 1.1(b) under the heading Rolling Stockholder" and is understood to include active government partners of BAH.

[23]

*Id.* at ¶ 21.

[24]

*Id.* at ¶¶ 11-15.

Douglas Swenson, BAH's former chief financial officer, was named also as a defendant in the ACC.  The parties have since voluntarily dismissed him from the case pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii).  DI 113.

of this motion.[25]

        *a.      BAH Before the Transaction*

        Prior to the Transaction, BAH consisted of two primary divisions.  The government division provided technical services to the United States defense department and intelligence community.[26]  The commercial division supplied consulting services to non-governmental entities.[27]  BAH was privately-owned by its partner-shareholders pursuant to stock ownership plans.[28]

        As explained in a previous opinion of the Court, one of those plans, the stock rights plan ("SRP"), governed the issuance of BAH stock options to officers and the subsequent repurchase of BAH shares in connection with their retirements.[29]  Under its terms, the BAH board awarded stock options periodically, and officers were allowed to exercise 10 percent of these options each year.  Within 60 days prior to or following the date of retirement, officers were entitled to exercise all previously unexercised options, and BAH had the right to purchase their shares at book value starting two years after they retired.[30]

---

[25]

        *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).

[26]

        ACC at ¶ 26.

[27]

        *Id.*

[28]

        CC at ¶¶ 1, 126, 140; *Boudinot,* 2012 WL 489215, at *1.

[29]

        *Id.*

[30]

        *Id.*

Shrader became chief executive officer of BAH in 1999 and served for an initial six-year term.[31]  When the end of his first term was nearing completion, Shrader met with senior partners and sought their approval for a second six-year term.[32]  The board permitted Shrader to remain as chief executive officer for an additional four years, subject to mandates that he combine the government and commercial divisions into a cohesive operating unit and that he prepare a successor to replace him at the end of his term in 2009.[33]

b.    *Exploring Potential Transactions*

BAH retained Credit Suisse in January 2006 to explore strategic alternatives for the company, including the potential sale of all or portions of the business.[34]  In July 2006, Credit Suisse presented on a number of scenarios, including the possibility of an initial public offering ("IPO").[35]  Shrader allegedly rejected the IPO option at that time because pursuing an IPO in the absence of a concomitant sale of the commercial division would result in his termination as chief executive officer.[36]  Shrader allegedly believed also that the partners would not approve a plan to take the

---

[31]    ACC at ¶ 27.

[32]    *Id.* at ¶ 28.

[33]    *Id.* at ¶ 29.

[34]    *Id.* at ¶ 36.

[35]    *Id.* at ¶ 37.

[36]    *Id.*

9

company public due to their commitment to remaining "forever private."[37]

Another potential strategic alternative involved the possible sale of BAH to a competitor in the government contracting industry.[38] Kocourek alleges that the economies of scale afforded by selling the government division to a strategic competitor would have yielded a higher purchase price than a sale to a private equity buyer, such as Carlyle.[39] However, Shrader allegedly believed that he would not be able to continue serving as chief executive officer in the future if BAH or the government division were acquired by a competitor.[40] For this reason, alleges Kocourek, Shrader and the individual defendants influenced the sale of the government division toward a financial buyer and against a strategic competitor in exchange for guaranteeing their continued positions and increased financial rewards.[41]

c.    *The Auction*

At the direction of Shrader and BAH management, Credit Suisse solicited bids for the sale of the government division.[42] Despite receiving expressions of interest from strategic buyers in

---

[37]     *Id.*

[38]     *Id.* at ¶ 38.

[39]     *Id.*

[40]     *Id.* at ¶ 39.

[41]     *Id.*

[42]     *Id.* at ¶ 44.

the process, Kocourek alleges that Shrader made it known to these potential bidders that their continued interest would be futile because he would steer the sale toward a financial buyer.[43]  No strategic buyers submitted formal bids.[44]

Several financial buyers submitted bids in the auction, and Carlyle emerged as the victor after increasing its bid to $2.54 billion.[45]  Kocourek alleges that the Carlyle bid represented a gross undervaluation of the government business and that awarding the government division to Carlyle at that discounted price was caused by Shrader's manipulation of the auction process.[46]

> ### d.    *The Credit Suisse Presentation*

In October 2007, Credit Suisse made a presentation to its credit committee urging that Credit Suisse itself loan money to Carlyle in order to finance the purchase of the government division.[47]  The presentation materials allegedly estimated the purchase price to be approximately $3.25 billion, based on an analysis of comparable transactions.[48]  Shrader and others allegedly kept the Credit Suisse analysis a secret until it was disclosed in discovery subject to a confidentiality order

---

[43]    *Id.* at ¶ 45.

[44]    *Id.* at ¶ 44.

[45]    *Id.*; IC at 27.

[46]    ACC at ¶ 44.

[47]    *Id.* at ¶ 41.

[48]    *Id.* at ¶¶ 41-42.

in a separate case.[49]

 

       e.     *The Information Circular*

     In May 2008, BAH entered into an agreement of merger and sale with Carlyle, conditioned on, *inter alia*, approval of the holders of at least 75% of the shares of BAH's Class A Common Stock and Class B Common Stock outstanding.[50]  The structure of the Transaction and the auction process were described in the IC sent to partner-shareholders on May 22, 2018.  A cover letter, written by Shrader, accompanied the IC and sought approval of the Transaction.[51]  Kocourek's securities fraud claims involve allegations of material misstatements and omissions contained within the IC.[52]  The defendants allegedly included these misstatements and omissions to secure the votes needed to approve the Transaction.[53]

     The IC described the background of the transaction and the expressions of interest

---

[49]

    *Id.* at ¶ 43.

    Defendants move to strike paragraphs 41-43 of the ACC pursuant to Rule 12(f) on the grounds that Kocourek's counsel admitted that he received the presentation from plaintiffs' counsel in the *Nemec* litigation and that it now is being used for purposes other than that litigation, in violation of the Court's confidentiality order.  Brief at 32.  Plaintiff argues that using the Credit Suisse presentation in this manner does not violate the Court's confidentiality order because the presentation was entered as an exhibit at the *Nemec* trial, and therefore is part of the public record.  Opp. Br. at 33.

[50]

    ACC at ¶ 49; IC at 17.

[51]

    *Id.* at ¶ 51.

[52]

    *Id.* at ¶ 53.

[53]

    *Id.* at ¶ 52.

received from potential buyers.  It explained that "[a]t the request of BAH, Credit Suisse explored transactions involving three groups of potential parties:  (i) strategic investors such as companies in the defense industry; (ii) consulting investors such as professional services firms; and (iii) financial investors such as private equity firms."[54]  Such efforts included, *inter alia*, Credit Suisse approaching twelve potential strategic buyers and six financial buyers.[55]  Carlyle was the first financial investor to express interest in acquiring the government business.  Following Carlyle's indication of interest, several other financial investors expressed interest and executed non-disclosure agreements.[56]  Separate from the Carlyle offer, BAH received two written indicative offers that were insufficient to allow the potential buyers to proceed because the offers were below the price of $2 billion, and two indicative offers sufficient to permit the potential buyers access to additional due diligence.[57]  The IC then described the details surrounding the evaluation of the competitive bids that had been received, the negotiations with all competitive bidders throughout the process, and the rationale for selecting the Carlyle bid.[58]

The IC annexed two fairness opinions that BAH management had obtained in

---

[54]    IC at 25.

[55]    *Id.* at 25-26.

[56]    *Id.* at 26.

[57]    *Id.*

[58]    *Id.* at 26-27.

connection with the Transaction:  one from Houlihan Lokey and one from Credit Suisse.[59]  Houlihan Lokey rendered a fairness opinion specifically with respect to the interests of the group of BAH shareholders that constitute the proposed class.[60]  The financial advisors based their opinions upon multi-year revenue projections assuming a constant net revenue growth rate of 11 percent for fiscal years 2010-2014 and an approximate 11 percent revenue growth rate for the fiscal year 2009 revenue projection over the fiscal year 2008 result.[61]

     *f.*     *The Structure of the Transaction*

     The Transaction was complicated.  We elucidate only the aspects that weigh on the present motion.

     As described in the IC, the Transaction contemplated a separation of BAH's government and commercial divisions whereby, at the close of the Transaction, (1) the government business would be substantially owned by an affiliate of Carlyle and the BAH partners in the government business, and (2) the commercial business would be owned by partners primarily engaged in the commercial business.[62]  The government business would continue to operate, post-Transaction, under the name BAH, which would become an independent subsidiary of "Buyer

---

[59]     ACC at ¶64.

[60]     IC at 27.

[61]     ACC at ¶65.

[62]     IC at 19; DI 117-2 at ECF 2.

Parent," a vehicle established by Carlyle to effectuate the Transaction.[63]  The commercial division would be spun-off as an independent entity operating under the name "Booz & Company," which ultimately would be controlled by the commercial division partners.[64]

With limited exception, active government partners were required to exchange at least 40 percent of their pre-Transaction shares for stock and options in Buyer Parent.[65]  Additionally, there was a process whereby commercial partners could exchange up to 85 percent of their Company Class A Common Stock for stock in Buyer Parent, subject to a cap of 125,000 shares of Company Class A Common Stock in the aggregate.[66]  However, the Buyer Parent shares held by government partners would have voting rights, while those held by commercial partners would not.[67]  Reciprocally, there was a process whereby government partners could retain non-voting stock in Booz & Company after the Transaction.[68]  As described in the IC, "[t]he structure of the Transactions, including the restriction of voting rights to active partners of the relevant company, ensures that active partners continue to be invested in the success of their respective businesses."[69]

---

[63]     IC at 19.

[64]     *Id.*

[65]     *Id.*

[66]     *Id.* at 20.

[67]     *Id.*

[68]     *Id.*

[69]     *Id.*

g.    *Approval of the Transaction*

In July 2018, the partner-shareholders voted in favor of the Transaction.  Prior to the approval of the Transaction, Kocourek transferred his 27,300 shares of BAH common stock to a trust established in his name.[70]  Upon approval of the Transaction, the trust exchanged Kocourek's shares for cash consideration in the amount of $763 per share, for a total of nearly $21 million.[71]  Kocourek received also a dividend of 27,300 shares of Booz & Company, Inc., with a purported value of $32 per share.[72]  Kocourek alleges that, as a result of the Transaction, he exchanged his BAH common shares at a significant discount from their actual value.[73]

h.    *Following the Transaction*

Shrader continued serving as chief executive officer of BAH after the Transaction.[74]  His annual compensation allegedly increased to $4.25 million per year from $2 million.[75]  He was provided with additional shares on top of those he had rolled-over, and received other valuable perks,

---

[70]    ACC at ¶10.

[71]    *Id.*

[72]    *Id.*

[73]    *Id.*

[74]    *Id.* at ¶105.

[75]    *Id.*

16

such as compensation for flights on private jets and the ability to work remotely from Florida.[76]

Kocourek alleges that Shrader collectively was enriched by $178.6 million over six years as a result

of the Carlyle sale.[77]

In November 2010, Kocourek alleges, Carlyle took the government division public

at a valuation of nearly double what it had paid in 2008.[78]   In June 2010, Carlyle filed an S-1

Registration Statement with the SEC ("the Registration Statement") in connection with the IPO,

which revealed information about the total price that Carlyle paid in the Transaction, the increase in

valuation of BAH from the time of the Carlyle Transaction to the IPO, as well as post-Transaction

remuneration to Shrader.[79]

*Discussion*

I.     *Motion to Dismiss Standard*

To survive a motion to dismiss, a complaint must allege sufficient factual matter "to

state a claim to relief that is plausible on its face."[80]   The Court reviews a motion to dismiss

"accepting all factual allegations in the complaint as true and drawing all reasonable inferences in

---

[76]
        *Id.* at ¶¶105-6.

[77]
        *Id.* at ¶107.

[78]
        *Id.*

[79]
        *Id.* at ¶¶108-15.

[80]
        *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted).

the plaintiffs' favor."[81]  The Court is not obliged to accept as true legal conclusions.[82]  Additionally,

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements,

[will] not suffice" to defeat a motion to dismiss.[83]  In a securities case, the Court may consider also

"any written instrument attached to the complaint, statements or documents incorporated into the

complaint by reference, legally required public disclosure documents filed with the SEC, and

documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[84]

A complaint that pleads securities fraud must satisfy the heightened pleading

requirements of Rule 9(b) and the PSLRA.[85]  Rule 9(b) requires a plaintiff to plead "with particularity

the circumstances constituting fraud."[86]  To satisfy the rule, the complaint must: "(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and

when the statements were made, and (4) explain why the statements were fraudulent."[87]  The PSLRA

requires the complaint to "specify each statement alleged to have been misleading, the reason or

reasons why the statement is misleading, and, if an allegation regarding the statement or omission

---

[81]
  *Rombach*, 355 F.3d at 169.

[82]
  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

[83]
  *Id.* (*quoting Iqbal*, 556 U.S. at 678).

[84]
  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[85]
  *Id.* at 99.

[86]
  FED. R. CIV. P. 9(b).

[87]
  *ATSI*, 493 F.3d at 99.

is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."[88]  The plaintiff may do so by identifying documentary evidence that supports the belief or by providing a "sufficient general description of the personal sources" of the belief.[89] Conclusory or unsupported allegations are insufficient.[90]

## II.   *Section 10(b) and Rule 10b-5 Claims*

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."[91]  Rule 10b-5 implements that statute.  To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[92]

---

[88]

15 U.S.C. § 78u–4(b)(1).

[89]

*Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).

[90]

*ATSI*, 493 F.3d at 99.

[91]

15 U.S.C. § 78j(b).

[92]

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (internal quotations and citations omitted).

a.      *Material Misrepresentations and/or Omissions*

"A plaintiff who brings a securities fraud claim under Section 10(b) and Rule 10b-5 must clear a number of hurdles."[93]  The first requires a plaintiff adequately to allege that defendants made a "material misrepresentation or omission."[94]  In order sufficiently to do so, a plaintiff must plead facts that, if true, would be sufficient to show that the defendant either (1) made "an untrue statement of a material fact," or (2) "omit[ted] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."[95] A fact is considered material if "there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares [of stock]."[96]

A complaint alleging that a defendant made an untrue statement of a material fact must plead facts that, if true, are sufficient to show that the statement alleged was "false *at the time it was made*."[97]  To that end, Section 10(b) plaintiffs "must do more than simply assert that a

---

[93]

*City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 65-66 (S.D.N.Y. 2015)

[94]

*Halliburton Co.*, 134 S. Ct. at 2407.

[95]

17 C.F.R. § 240.10b-5(b).

[96]

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92-93 (2d Cir. 2010) (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994)) (internal quotation marks omitted).

[97]

*City of Westland*, 129 F. Supp. 3d at 67 (emphasis in original) (internal quotation marks and citation omitted).

statement is false—they must demonstrate with specificity why that is so."[98]  A complaint alleging

an omission of material fact "must plead facts that, if true, would be sufficient to show that the

defendant had a duty to disclose the omitted information and failed to do so."[99]  "Such a duty may

arise expressly, pursuant to a statute or regulation, or implicitly 'as a result of the ongoing duty to

avoid rendering existing statements misleading by failing to disclose material facts.'"[100]

## III.    *The Allegedly Material Misstatements and Omissions*

Kocourek alleges that the IC contained numerous material misstatements and

omissions.  Specifically, he claims that it:

> (a)  Mischaracterized the process and reasons for pursuing a leveraged buyout
> transaction by falsely representing that BAH's efforts to pursue strategic buyers had
> failed when, in fact, on information and belief, BAH engaged in no good faith efforts
> to pursue a sale to any strategic buyers;
>
> (b)  Relied on flawed fairness opinions that were based on incorrect data that BAH
> management knowingly provided to BAH's financial advisors;
>
> (c) Knowingly and materially understated the value of the Transaction to Carlyle by
> a material sum; and
>
> (d)  Knowingly concealed management's conflicts of interests, making it seem like
> they had been acting to secure a deal that was best for all shareholders when they in

---

[98]
   *Id.* (quoting *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (internal
   quotation marks omitted) (quoting *Rombach*, 355 F.3d at 174)).

[99]
   *Id.*

[100]
   *Id.* (quoting *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 572).

fact were prioritizing their own bottom line through self-dealing.[101]

We address each of these allegations in turn.

        *a.*    *Alleged Mischaracterization of Efforts to Pursue Strategic Buyers*

The IC contained, *inter alia*, information describing the background of the Transaction and the auction process.  It stated that

> "[i]n mid-2006, the Board of Directors tasked its Chairman, Dr. Ralph Shrader, to explore strategic options that would maximize the business prospects of all parts of BAH while enhancing stockholder value.  This again reflected the view of many stakeholders, including Entry-Level Partners, that the current stock program did not provide sufficient opportunities for wealth creation and that the book value of BAH stock was falling further and further behind the value that could be obtained in a sale."[102]

The IC explained further that Credit Suisse was asked to assist BAH in exploring potential transactions with other parties, including: "(i) strategic investors such as companies in the defense

---

[101]    ACC at ¶ 142.

    The ACC alleges also that the IC "[f]ailed to disclose relevant transaction metrics that would have informed the Class members that the Information Circular was materially misleading." *Id.*  Specifically, Kocourek claimed that although the Credit Suisse fairness opinion provided the identity of comparable transactions that Credit Suisse had examined, BAH shareholders would have lacked information about the net revenues of those comparable companies sufficient to perform an "apples to apples" comparison. *Id.* at ¶ 84.  Defendants argue that there was no obligation to provide this publicly-available information.  Brief at 15.  Plaintiff has failed to respond in his reply, and therefore, this argument is abandoned.

    Kocourek initially pleaded also that the $95 million price of the commercial division contemplated by the Transaction was understated and that "[b]ased upon appropriate comparables" it "should have been assigned a value hundreds of millions of dollars higher." ACC at ¶¶ 93-94.  Kocourek provides no support for this claim, nor is this point addressed in any of the briefing.

[102]    IC at 25.

industry; (ii) consulting investors such as professional services firms; and (iii) financial investors such as private equity firms."[103]   Regarding the outreach to and interest of strategic buyers, the IC stated that

> "[a]t BAH's request, Credit Suisse approached twelve (12) potential strategic buyers chosen because of their broad role in BAH's business, their strategic aspirations, and their ability to finance such a transaction . . . [a]s a result of this process, four (4) additional strategic buyers indicated an interest in the Government Business in April and May of 2007.  Each of these companies executed non-disclosure agreements in April and May, and management made presentations to three (3) of the bidders in May and June of 2007.  However, during the course of the process, it became apparent that the level of interest from strategic buyers was beginning to wane. Based on discussions and feedback from strategic buyers, it appeared that the waning interest on the part of the strategic buyers reflected the growing appreciation of the difficulties associated with integrating BAH's operations with a strategic buyer, and in particular, the increasing complexity of 'organizational conflict [sic] of interest' under applicable governmental regulations between BAH and strategic buyers."[104]

Kocourek alleges that the description of the auction process was materially misleading because "the process had not been fully open, but was instead steered toward financial buyers."[105] He alleges also that the IC's statement that a transaction with a financial buyer "could" maximize the purchase price was false and misleading because "the only way to maximize the purchase price was a sale to a strategic buyer or by way of an IPO."[106]

Kocourek pleads, on information and belief, that contrary to the description of good-faith efforts to solicit interest from other buyers described in the IC,

---

103

    *Id.*

104

    *Id.* at 25-26.

105

    ACC at ¶ 55.

106

    *Id.* at ¶ 62.

> "there was no bona fide or good faith solicitation of strategic buyers or professional service firms; rather, Shrader and the Individual Defendants directed Credit Suisse toward financial buyers, and only financial buyers ultimately participated in the auction process. Indeed, there were no genuine conflicts of interest or other difficulties precluding a transaction with key strategic buyers and the IC's statements to the contrary were untrue."[107]

Kocourek attempts to support this belief by pointing to the following facts:

First, he claims that "[s]uch transactions [with strategic competitors] are commonplace between companies engaged in the defense and national security industries."[108]

Next, he alleges that Douglas Swenson, BAH's former chief financial officer, gave deposition testimony in 2013 that was inconsistent with the statements in the IC regarding conflicts of interest causing the interest of strategic buyers to wane.  He there recounted discussions he had with one potential strategic buyer.  He stated that SAIC "seemed very interested" in BAH's government division but ultimately declined to bid on it.  Kocourek alleges that "Swenson made no mention of any supposed organizational conflicts of interest that might explain why SAIC failed to bid; he instead referred vaguely to SAIC concerns over differences in partner compensation."[109]

Lastly, Kocourek alleges that "Shrader admitted in testimony before this Court that he took steps to conceal the details of Credit Suisse's engagement and their initial discussions"[110] and

---

[107]

*Id.* at ¶ 58.

[108]

*Id.*

[109]

*Id.* at ¶ 60.

[110]

Opp. Br. at 10.

Shrader's testimony took place over two days in the trial of *Nemec v. Shrader*, No. 09-07466 (LAK) in April 2015.  Following Shrader's testimony on April 16, 2015, the parties advised the Court that all claims had been settled.  The Court thereafter ordered the action

that "Shrader unapolagetically admitted that the IC contained material misstatements concerning the timing of Credit Suisse's engagement and [the] BAH Board's awareness thereof."[111]

Specifically,

"Shrader [allegedly] conceded that Credit Suisse had been engaged in January 2006, not the middle of 2006 as the IC had misrepresented. Shrader [allegedly] further acknowledged that the statement that 'the Board' was involved in Credit Suisse's $500,000 retention was materially misleading, as he was the *sole* member of the Board who was aware of the retention (although he informed the Individual Defendants, who were not Board members), and that he had taken steps to suppress the retention from his fellow BAH partners."[112]

According to Kocourek, this "deception," to which Shrader is said "unapologetically" to have admitted, was "his way of getting rid of obstacles standing in the way of his preferred outcome."[113]

There's a lot to unpack with regard to Kocourek's claims over the import of Shrader's testimony. A good place to start is by looking to what Shrader actually said.

First, regarding the timing of the Credit Suisse engagement, Shrader testified that the initial engagement of Credit Suisse occurred in January 2016.[114] Shrader's testimony involved questioning over the scope of the initial engagement, and whether is was limited to exploring the difference in the book value versus the market value of BAH shares, or whether it included also

---

discontinued. No. 09-cv-07466 DI 195.

[111]

ACC at ¶ 95.

[112]

*Id.* at ¶ 97 (emphasis in original).

[113]

*Id.* at ¶¶ 95, 98.

[114]

09-cv-07466 DI 202, Tr. at 397-98.

exploring strategic alternatives in early 2006.[115]  Shrader testified that BAH began an evaluation of strategic alternatives in early 2006 relating to potential alternatives for the company and engaged Credit Suisse to assist.[116]

Regarding the awareness of other BAH partners of the Credit Suisse engagement, Shrader testified that Strickland, Abbleby and Swenson were the only other partners aware of the initial engagement in early 2016.[117]  Shrader testified further that the board of directors and the finance committee initially were not aware of the Credit Suisse engagement, but that the engagement originated in response to the request of a member of the board to assess the difference in book value versus the market value of BAH shares.[118]

Regarding Shrader's motive for not making the initial Credit Suisse engagement widely-known, Shrader testified that:  (i) "as part of my discretion as the chairman and CEO of the firm, this was the kind of an effort that did not at this point merit disclosure to the partners," (ii) he believed "it was best held confidential," and (iii) he "felt it would help to preserve the organization, not bring harm to the organization."[119]  He testified also that initially he did not tell partners about hiring Credit Suisse because he was concerned that partners would draw inferences from hiring an investment bank and did not want to distract them from pursuing the existing "One Firm Evolution"

---

[115]
See, e.g., id. at 431:5-15.

[116]
Id. at 443; 463:3-10.

[117]
Id. at 397-98.

[118]
Id. at 444:5-445:5; 457:18-458:19.

[119]
Id. at 399:10-23.

initiative, which he believed at the time to be the "answer for the future of the firm."[120]

      The facts upon which Kocourek relies are insufficient to "support a reasonable belief as to the misleading nature"[121] of the description of the auction process and interest of strategic competitors contained in the IC.

      The assertion that similar transactions with strategic competitors are "commonplace" in the industry adds nothing to the analysis. The IC disclosed, *inter alia*, that Credit Suisse engaged twelve potential strategic buyers and that none of these companies ultimately submitted bids. The assertion that similar transactions are commonplace, which the Court accepts as true for purposes of the motion, does not give rise to a reasonable belief that this description was false.

      Reliance on Swenson's deposition testimony is unavailing because it does not contradict or render misleading any information contained in the IC.[122] Swenson testified to his recollection of interactions with one of several potentially-interested companies and stated that this particular company expressed concerns over differences in partner compensation. The IC, on the other hand, included a brief description about the waning interest of strategic buyers in general, and that "based on discussion and feedback from strategic buyers, *it appeared* that the waning interest . . . reflected the growing appreciation of the difficulties associated with integrating BAH's operations with a strategic buyer, and in particular, the increasing complexity of 'organizational

---

[120]

    *Id.* at 461:15-18; 459:4-14.

[121]

    *Antigenics Inc. v. U.S. Bancorp Piper Jaffray, Inc.*, 2004 WL 51224, at *4 (S.D.N.Y. 2004) (citation omitted).

[122]

    "[A] Section 10(b) plaintiff who challenges a *statement* must allege adequately that the statement is untrue." *City of Westland*, 129 F. Supp. 3d at 67 (emphasis in original) (internal quotation marks and citation omitted).

conflict [sic] of interest' under applicable governmental regulations between BAH and strategic buyers."[123]  Swenson's testimony, which was given more than five years after the events in question, concerned his recollection of interactions with SAIC in particular.  The IC did not purport to communicate the precise motivations of SAIC or any other specific strategic competitor involved in the outreach and auction process.

        Finally, Shrader's testimony in the *Nemec* case does not support a reasonable belief that he and others manipulated the sale of the government division away from strategic buyers and toward financial buyers.   Shrader's testimony indicates that Credit Suisse was engaged earlier in 2016 than initially disclosed in the IC and that the initial retention of Credit Suisse was not directed by the full board or widely known amongst BAH partners.  The Court, however, sees no connection between these facts and the allegation that Shrader manipulated the auction process against strategic buyers.  Kocourek claims that Shrader admitted to concealing the Credit Suisse retention in order to achieve his preferred outcome, but his actual testimony shows nothing of the sort.  Rather, his testimony reveals that he believed that retaining Credit Suisse was well within his discretion as chief executive officer and chairman of the board at the time of the initial engagement and that doing so in a confidential capacity was in the best interest of the company.[124]

---

123

        IC at 26 (emphasis added).

124

        Kocourek pleads also that Shrader's testimony "demonstrates that the IC contained material misstatements about the timing of Credit Suisse's engagement and BAH's Board's awareness thereof." ACC at ¶ 95.  This appears to be a separate and distinct argument from whether Shrader's testimony supports Kocourek's belief that the description of the outreach to strategic buyers contained in the IC was false.  Considered as a separate argument, it too fails to allege adequately a material misstatement or omission.

        The precise timing and purpose of Credit Suisse's engagement in 2006 was directly relevant in the *Nemec* litigation.  The plaintiffs in that case retired in March 2006 and claimed that

The IC described Credit Suisse's outreach to twelve potential strategic buyers, the fact that non-disclosure agreements were signed with four of these companies, that presentations were given to three of these companies, and that their interest waned and none submitted bids.[125]  The facts alleged do not support a reasonable belief that, in contrast to this description of BAH's consideration of strategic buyers, Shrader actually sabotaged the auction process against them.

b.    *Allegations that the Fairness Opinions in the IC Were Based on False Data*

BAH management obtained fairness opinions from Credit Suisse and Houlihan Lokey

---

they would not have done so if they had known of the Credit Suisse engagement and exploration of strategic alternatives at that time. *See, e.g.*, 09-cv-07466 DI 202, Tr. 445:23-446:12 ("You do know there's a big difference, for purposes of Joe Nemec and Gerd Wittkemper, whether what happened happened in early 2006 or mid 2006 . . . [y]ou know it's a matter of some significance what happened in early 2006 as opposed to after their retirement on March 31?") The claims in this case, however, relate to a Transaction that was approved by shareholder vote more than two years after Credit Suisse's initial engagement. Kocourek does not allege that a "reasonable [BAH shareholder] would have considered [the timing of Credit Suisse's initial engagement to be] significant" when voting on the Transaction. *City of Westland*, 129 F. Supp. 3d at 66 (internal quotation mark and citation omitted).

The same is true with regard to the board's initial awareness of the retention of Credit Suisse.  As discussed, *supra*, Shrader testified that the full board was not aware of the initial retention of Credit Suisse, but that the retention originated in response to an inquiry from a member of the board.  Shrader testified also that the initial retention included exploring strategic alternatives.  Kocourek argues that this information "likely would have caused him and others to question the *bona fides* of the process and whether the [b]oard had been involved in the decision not to pursue an IPO."  ACC at ¶ 99.  But the IC disclosed that "[a]t a meeting with management on September 18, 2006, Credit Suisse reviewed and discussed several strategic options and approaches available to BAH, including refinancing BAH with debt, conducting a public offering of BAH's equity and entering into transactions with third-party investors or strategic partners."  IC at 25.

[125]

IC at 25-26.

in connection with the Transaction.[126]  These opinions were annexed to the IC and referred to therein.[127]  Kocourek alleges that the "purpose of including this information in the IC was to convince BAH's partner-shareholders that the price being paid by Carlyle was fair and reasonable so that they would forego exercising their shareholder appraisal rights under Deleware law."[128]

Credit Suisse and Houlihan Lokey based their opinions upon multi-year revenue projections that had been provided to them by BAH management.[129]  These projections "assumed a constant net revenue growth rate of 11% for fiscal years 2010 through 2014 for the government division.  An approximate 11% revenue growth rate over the FY '08 result also was used for the FY '09 revenue projection."[130]  Kocourek alleges these revenue projections were "artificially (and materially and intentionally) too low."[131]

In support of this allegation, Kocourek relies on a presentation that Credit Suisse made to its credit committee on October 30, 2007, urging that Credit Suisse itself loan money to Carlyle in order to finance the purchase of the government division.[132]  The presentation contained

---

[126]      ACC at ¶ 64.

[127]      *Id.*

[128]      *Id.*

[129]      *Id.* at ¶ 65.

[130]      *Id.*

[131]      *Id.*

[132]      *Id.* at ¶¶ 41, 66.

an estimated purchase price of $3.25 billion based upon an analysis of comparable transactions,[133] and allegedly projected a growth rate of 14 percent,[134] although the years in question for that projected growth rate are not entirely clear on the basis of the complaint.  Kocourek alleges further that "in 2007 BAH management had conducted a study that predicted up to 15% growth for fiscal years 2008 and 2009."[135]  Lastly, he claims that "Shrader and the rest of BAH senior management surely expected revenue to continue to increase at or about 17% annually after the proposed Transaction."[136]

Kocourek attempts to support his claim that the 11 percent revenue growth rate used for fiscal years 2009-2014 was intentionally understated also by pointing to earnings reported in the 2010 Registration Statement.  He states that "[a]ctual results confirmed that higher estimates were warranted, as BAH subsequently disclosed growth of 16.9%, 20%, and 17.7% for the fiscal years ending on March 31 of 2008, 2009 and 2010, respectively."[137]

Finally, Kocourek alleges that the defendants knew the 11 percent revenue projections to be false because, as a government contractor, "BAH could project its revenues with far more precision than companies in most other industries," as such projections were a function of

---

[133]

Id. at ¶ 42.

[134]

Id. at ¶ 66.

[135]

Id.

[136]

Id.

[137]

Id.

"government contracts that were carefully planned in advance, and for which government appropriations were required."[138]   In support of this, he references the statement of former BAH senior vice president Reginald Boudinot, that "BAH could project with pinpoint accuracy the amount the U.S. government would pay BAH in connection with a contract for the next fiscal year and could estimate revenue for the year after that with a high degree of accuracy as well."[139]   To bolster this claim, Kocourek notes that the 2010 Registration Statement indicated that revenue increased 20 percent from pro forma 2008 to 2009, and that "revenue was primarily driven by the deployment during pro forma 2009 of approximately 2,700 net additional consulting staff against funded backlog."[140]

As an initial matter, the financial projections used in the IC, including the constant net revenue growth rate of 11 percent for fiscal years 2010 through 2014 for the government division, were properly identified forward-looking statements.   The IC stated that the financial projections "should not be regarded as an indication that BAH . . . considered, or now considers [the projections] to be a reliable prediction of future results."[141]   It stated further that "there can be no assurance that the Company's projections will be realized, and actual results *may be materially greater or less* than

---

[138]

    *Id.* at ¶ 67.

[139]

    *Id.*

[140]

    *Id.* at ¶ 68.

[141]

    IC at 33.

those contained in the projections."[142]  The IC disclosed also that the projections offered to Carlyle

were different than those utilized in their fairness opinions.  It stated:

> "stockholders should note that the projections discussed herein differ from the
> projections provided by the Company to Buyer Parent in connection with its
> evaluation of the Transactions, target performance measures utilized by the Company
> and Buyer Parent in the performance vesting provisions of the Equity Incentive Plan
> of Buyer Parent and the projections to be utilized by the Company and Buyer Parent
> in connection with the financing needed to consummate the Merger.  The projections
> referred to in the immediately preceding sentence for the fiscal year ending March
> 31, 2009 assume increased projected performance and utilize a 12% constant net
> revenue growth rate for fiscal years 2010 through 2014. These adjustments result in
> an estimated EBITDA for fiscal year 2009 that is $25.2 million greater under these
> projections than the estimated EBITDA set forth below, and due to the use of a
> growth rate greater than the 11% net revenue growth reflected below, this difference
> increases over time."[143]

Kocourek argues that the financial projections contained in the IC are not protected

by the "bespeaks caution" doctrine, notwithstanding the cautionary language, because the defendants

knew they were false.[144]

As an initial matter, the projected revenue growth rates were statements of belief or

opinion.[145]  These statements, therefore, are subject to a separate analysis distinct from that applied

to allegedly misleading statements of pure fact.[146]  A plaintiff who alleges that a statement of belief

---

[142]

    IC at 32 (emphasis added).

[143]

    *Id.*

[144]

    Opp. Br. at 12.

[145]

    "[T]hese projections reflect numerous assumptions and estimates as to future events that the
Company's management believed were reasonable at the time the projections were
prepared."  IC at 32.

[146]

    *See City of Westland*, 129 F. Supp. 3d at 68-70.

or opinion was misleading must plead facts that, if true, would be sufficient to show either:  (1) that the speaker "did not actually hold the stated belief,"[147] or (2) in circumstances where the statement is "reasonably understood to rest on a factual basis that justifies it as accurate," there are facts that "call into question the [defendants'] basis for offering the opinion."[148]

Plaintiff fails to plead facts sufficient to:  (1) show that the defendants did not believe that the 11 percent revenue growth rate used for fiscal years 2010-2014, or the approximate 11 percent growth rate for fiscal year 2009 was appropriate, or (2) call into question the bases for those projections.  The alleged higher growth rate projections for fiscal years 2008-2010 referred to in the complaint were made in 2007, and therefore were based on assumptions outdated at the time the IC was circulated in May 2008.[149]

---

[147]

*Id.* at 69 (internal quotations omitted).

[148]

*Id.* at 70; *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015) ("The [plaintiff] must identify particular (and material) facts going to the basis for the [defendant's] opinion – facts about the inquiry the [defendant] did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.").

[149]

A modicum of historical perspective demonstrates the fallacy of plaintiff's argument that revenue projections from October 2007 support the claim that defendants did not believe that diminished projections were warranted in May 2008.  The same month of the Credit Suisse presentation, the Dow Jones Industrial Average ("DJIA") achieved its peak closing price before commencing a 17-month bear market known as the Great Recession.  By June 2008, the DJIA had dropped approximately 20 percent from its October 2007 high. https://www.wsj.com/articles/SB121460787893112069?mod=googlenews_wsj.

Even treated as statements of fact, Kocourek has failed to allege that defendants knew the growth rate projections to be false because a plaintiff must allege facts sufficient to show that a statement of fact is "false *at the time it was made*." *City of Westland*, 129 F. Supp. 3d at 67 (emphasis in original) (internal quotation marks and citation omitted).

Furthermore, the IC identifies that the 11 percent growth rate used for 2010-2014 was based on the annual business plan for the fiscal year ending March 31, 2009. This business plan was submitted to the finance committee for review and approval in the final fiscal quarter of 2008 and then approved by the board.[150] Additionally, Kocourek does not allege that any of the defendants saw the Credit Suisse presentation or was aware of the financial projections it contained. In fact, he pleads that it was an internal presentation addressing whether Credit Suisse itself should loan money to Carlyle to finance the Transaction.

Next, while plaintiff argues that the Registration Statement filed in 2010 showed that revenue growth rates turned out to be higher for fiscal years 2008-2010 than BAH predicted, this allegation amounts to nothing more than fraud-by-hindsight.[151] The same is true for the allegation that, based on these later-realized gains, senior management "surely expected revenue to continue to increase at or about 17% annually after the proposed Transaction."[152]

Lastly, the allegation that the defendants knew that the 11 percent revenue projections were understated because revenue forecasting could be projected with a high degree of accuracy is not plausible. The finance committee and board of directors approved the fiscal year 2009 annual business plan with a revenue growth rate protection of approximately 11 percent (which formed the

---

[150]

   IC at 32.

[151]

   *See Novak*, 216 F.3d at 309 (stating that the Second Circuit has "refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight'" (*quoting Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999))); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 228-29 (S.D.N.Y. 2008) (indicating that a plaintiff cannot satisfy the requirement that he or she plead false or misleading statements with particularity if the complaint pleads "fraud by hindsight").

[152]

   ACC at ¶ 66.

basis of the 2010-2014 revenue projections).  Kocourek does not allege that the board or the finance committee was complicit in understating the revenue projections.  It is therefore inexplicable how the board and the finance committee could approve a business plan with understated revenue projections if such figures were capable of the precise estimation claimed by Kocourek.

       c.      *Alleged Understatement of the Value of the Transaction to Carlyle by a Material Sum*

      Kocourek alleges that "BAH had significant option-related obligations to its employees which generated a valuable tax deduction for BAH and any acquirer" which were not disclosed in the IC.[153]  He claims that a combination of cashed-out stock options and certain payments pursuant to an employee compensation program qualified as tax-deductible expenses.[154] The settlement of these obligations allegedly generated approximately $800 million in tax deductions which "would have had a value as a deferred tax asset of $325 million up front and an additional $58 million later."[155]  Kocourek claims that "only a few BAH partners were aware of the value of these deductions, including, upon information and belief, Swenson as CFO," but that the class members were not.[156]

      Kocourek alleges further that "the IC reference[d] the contemplated compensation

---

153

      *Id.* at ¶ 75.

154

      *Id.*

155

      *Id.* at ¶ 79.

156

      *Id.* at ¶ 80.

deduction arising from the stock option payments," stating that "BAH had petitioned the IRS for rulings concerning the manner in which settlement of the shadow stock obligation would be treated under certain tax regulations."[157]   Inclusion of this select tax information allegedly indicated "that careful study had been given to the impact of the deductions" but that "[d]espite this, no disclosure was made to BAH partners concerning the magnitude of this aspect of consideration."[158]   At bottom, Kocourek argues that the defendants knew that the mechanics of the Transaction would produce material tax deductions, yet the value of this tax asset was not disclosed.[159]   But Kocourek's argument has several infirmities.

First, he alleges a material omission, but does not plead any statement that was rendered misleading by failing to include the information he references.   Kocourek claims that discussion of the IRS tax rulings "indicated that careful study had been given to the impact of the deductions."   But those rulings, as alleged, dealt with the reduction of the sale price resulting from the settlement of the shadow stock obligations under certain tax regulations.   The IC did not purport to expound on the overall potential tax deductions that Carlyle, or any other acquirer, could claim in the future.

Where there is no insider trading or affirmative disclosure obligation, disclosure is required only when necessary to make statements contemporaneously or previously made not

---

[157]

       *Id.*

[158]

       *Id.*

[159]

       *Id.* at ¶ 82.

misleading.[160]  It is not required to disclose all facts that "would be interesting" in relation to a disclosed fact.[161]  It does not also automatically render statements of fact on a certain topic misleading due to the omission of another fact concerning the same topic.[162]

Second, the information that was disclosed regarding the IRS tax ruling, if it was material at all to the partners voting for the transaction, would have been so because it dealt with impacts on the price that would be paid by a potential buyer, which in turn corresponded with the valuation of shares.  The alleged future tax deductions to Carlyle, on the other hand, would have been available to any future buyer.

Third, Kocourek pleads, on information and belief, that Swenson and potentially others were aware of the value of these deductions.  But he alleges no facts in support of this belief.  It therefore amounts to an unsupported allegation that is impermissible under the PSLRA.

Kocourek argues that *In re Scottish Re Group Securities Litigation*[163] lends support for the argument that *known* tax issues that have a meaningful impact on the value of the transaction must be disclosed.[164]  But that case offers no help.  It discussed a specific instance in which the court found that a complaint alleged adequately that the value of a company had been overstated by not

---

160

       *In re Rockwell Medical, Inc. Sec. Litig.*, No. 16-cv-1691 (RJS), 2018 WL 1725553, at *10 (S.D.N.Y. Mar. 30, 2018).

161

       *Id.* (*quoting In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008)).

162

       *In re Rockwell Medical*, 2018 WL 1725553, at *10-11.

163

       524 F. Supp. 2d 370 (S.D.N.Y. 2007).

164

       Opp. Br. at 13-14.

disclosing that a tax benefit would be eliminated in a future transaction.[165]  First, as discussed above, Kocourek does not allege facts sufficient to warrant the belief that Swenson or any other defendant knew the value of the future deductions.  But more fundamentally, whatever the potential value of these deductions, they would have been available to any potential buyer.

   d.   *The Alleged Omission of Material Conflicts of Interest*

    Kocourek alleges that the IC addressed conflicts of interest relating to the Transaction, "but limits that discussion to the differing interests of Commercial Division partners versus the Government Division partners."[166]  He alleges that the IC omitted mention of the "conflict of interest of BAH management with respect to strategic versus financial buyers" and "the ability of Shrader and his allies to prevent a sale to a strategic buyer."[167]  Furthermore, Kocourek alleges that "[t]he IC failed to disclose that Senior officers of the Commercial Division requested that separate representation be procured to represent the conflicting interests of the Commercial and Government partners, and they requested that a reputable financial advisor such as Goldman Sachs or Morgan Stanley be engaged" but "[t]heir request was denied."[168]

    Kocourek claims also that BAH management elected to "paper over" the conflict by creating a "deal team" which touted the involvement of Mr. Bertone—a commercial division partner

---

[165]   524 F. Supp. 2d at 393-94.

[166]   ACC at ¶ 87.

[167]   *Id.*

[168]   *Id.* at ¶ 89.

—"in an effort to cloak the group in credibility despite it being largely dominated by partners from the government division."[169]  No disclosure was made, however,  that "Bertone opted to rollover his shares and [] remained a shareholder in the Government Division" and that, consequently, the "only Commercial Division partner member on the Deal Team [] invested in the Carlyle transaction alongside Carlyle."[170]  Kocourek claims that the "Commercial Division partners relied on these misstatements and omissions in concluding that their interests had been adequately represented in connection with the consideration of alternative transactions, when in fact they had not been."[171]

The allegations relating to omitted material conflicts of interest are confusing and contradictory.  Kocourek claims that the IC should have disclosed that senior officers of the commercial division requested that separate advisors be procured to represent the conflicting interests of the commercial and government partners, and that they requested a reputable financial advisor such as Goldman Sachs or Morgan Stanley be engaged.

As an initial matter, it is not disputed that a reputable financial advisor— Houlihan Lokey—was retained to represent the interests of the commercial division partners.[172]

---

[169]

*Id.* at ¶ 90.

[170]

*Id.* at ¶ 91.

[171]

*Id.* at ¶ 92.

[172]

ACC at ¶ 64; IC at 27.

Houlihan Lokey's website reports that it is ranked as the No. 1 M&A advisor for all U.S. transactions, the No. 1 global restructuring advisor, and the No. 1 global M&A fairness opinion advisor over the past 20 years, according to Thomson Reuters. https://www.hl.com/about-us/international/UK/

It is undisputed also that significant attention was placed on the potential conflicts between commercial and government partners.[173]  Plaintiff appears to argue that a firm "such as Goldman Sachs or Morgan Stanley" would have offered "a more sophisticated opinion than the one they were given" by Houlihan Lokey.[174]  But they offer no explanation for why the Houlihan Lokey opinion was deficient, how a different opinion would have been "more sophisticated," or what metrics could be used to ascertain whether Houlihan Lokey was sufficiently reputable to satisfy the alleged request of the un-named senior commercial partners in question.

To the extent Kocourek argues that the IC should have disclosed that senior management would continue to serve in their roles post-Transaction, or that Bertrand intended voluntarily to roll-over shares into Buyer Parent, it fails also.  As discussed above, the ability of commercial partners to roll-over shares was a known and disclosed feature of the Transaction.  Furthermore, there is no allegation that Bertrand knew at the time the IC was released that he would do so.  Finally, the continued management of BAH by government partners was made clear in the IC.  In fact, it was a central feature of the Transaction.[175]

As previously discussed, disclosure of omitted information is required only when

---

[173]

See, e.g., IC at 44.  ("The Board of Directors focused, in particular, on potential conflicting interests between Government Partners and Commercial Partners . . . With respect to the different perspectives of Government Partners and Commercial Partners on the Transaction Agreements and other post-closing commercial arrangements to be entered into in connection with the Transactions, the Board of Directors noted that separate teams of Government Partners and Commercial Partners were involved in detailed and extensive negotiations with respect to these arrangements and that these teams were satisfied with the results of those negotiations.")

[174]

Opp. Br. at 15.

[175]

See IC at 23, 44.

necessary to make statements contemporaneously or previously made not misleading.  None of the information allegedly omitted from the IC makes the conflicts information that was disclosed misleading.

## IV.    Damages

Persons pursuing Exchange Act claims are prohibited from recovering an amount "in excess . . . of actual damages,"[176] which is "the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct."[177]

Defendants argue that Kocourek has not suffered cognizable damages owing to the fact that, as a result of the Transaction, he exchanged his BAH shares for significantly more than he would have received had the Transaction not occurred.  Kocourek retired in April 2007.  BAH therefore was entitled to buy back his shares in April 2009 at the prevailing book-value, which would have been a fraction of the nearly $21 million he received in the Transaction.[178]  Kocourek readily concedes that it is "not in dispute" that he "realized gains from the Carlyle transaction."[179]

---

[176]

15. U.S.C. § 78bb(a)(1).

[177]

*Acticon Ag v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012 (*citing Affiliated Ute Citizens v. U.S.*, 406 U.S. 128 (1972).

[178]

The Court explained in a previous opinion that the price Kocourek received in the Transaction for his BAH shares was more than four times the amount of their book-value. *Boudinot*, 2012 WL 489215, at *2.

[179]

Opp Br. at 22.

Kocourek argues that defendants' fraud caused him and the putative class to suffer damages in three ways: (1) by causing him to receive less consideration than his BAH shares were worth, (2) by causing him to forego their appraisal rights under Delaware law, (3) and by causing him to forego the opportunity to roll-over his shares in the government business.[180]   We address these arguments in turn.

a.    *The Actual Value of the BAH Shares*

Defendants argue that Kocourek's principal theory of damages requires impermissible speculation under the benefit-of-the-bargain doctrine.[181]   In support of this position, they cite to *Barrows v Forest Labs,  Inc.*[182] for the proposition that benefit-of-the-bargain damages "must be based on the bargain that was actually struck, not on a bargain whose terms must be supplied by hypothesis about what the parties would have done if the circumstances surrounding their transaction had been different."[183]   They claim that *Barrows* forecloses speculation into what a strategic buyer would have paid for the government division in 2008 or the price that it would have fetched had an IPO been pursued in 2008 absent the alleged fraudulent conduct of the defendants in foreclosing those options of sale.

---

[180]

     *Id.*; ACC at ¶ 10.

[181]

     Brief at 7-8.

[182]

     742 F.2d 54 (2d Cir. 1984).

[183]

     *Id.* at 60.

Kocourek argues that *Tracinda Corp. v. DaimlerChrysler AG*[184] is a "useful analogue" in assessing whether the damages they allege can survive a motion to dismiss.[185]  In that case, plaintiffs exchanged their Chrysler shares in what was purported to be a "merger of equals."[186]  It was revealed after the transaction, however, that Chrysler would be treated instead as a division of the combined entity.   This fact allegedly was known beforehand and concealed from the Chrysler shareholders to secure their votes in favor of the deal.  The court noted that the

> "proper characterization of the transaction that occurred is precisely one of the issues in this case. Plaintiffs allege that the transaction was not a 'merger of equals' but actually a take-over, and had Defendants revealed the allegedly true nature of the transaction as a take-over, Plaintiffs would have sought and perhaps more importantly, Defendants may have been willing to pay, a higher acquisition premium."[187]

But the court explained also why the case was distinguishable from *Barrows*, and demonstrated why Kocourek's argument is unsupportable:

> "*Barrows* is distinguishable from this case . . . because Plaintiffs are not relying on a bargain whose terms must be supplied by hypotheses, but on the transaction *that actually occurred*.  Plaintiffs' allegation is that the transaction that occurred was billed as something other than it actually was to conceal its true nature. In other words, the transaction was a wolf in sheep's clothing."[188]

In other words, *Tracinda* did not concern speculation into a different transaction that could have been

---

[184]   197 F. Supp. 2d 42 (D. Del. 2002).

[185]   Opp. Br. at 24.

[186]   *Tracinda Corp.*,197 F. Supp. 2d at 50.

[187]   *Id.* at 68.

[188]   *Id.* at fn. 12 (emphasis added) (internal quotations omitted).

44

reached with another buyer, but the appropriate price that should have been paid for Chrysler had the *same transaction been revealed for what it was at the time*. Kocourek, on the other hand, rests his claims on hypothesis about what a strategic buyer would have paid in a different transaction, or the price that could have been fetched in a non-existent IPO in 2008. This is precisely what *Barrows* forbids in stating that damages must be based on "the bargain that was actually struck."[189]

b.      *Appraisal Rights*

The IC explained that "[i]f the Merger is consummated, holders of shares of BAH common stock who do not vote in favor of the adoption of the Merger Agreement and who properly demand appraisal of their shares will be entitled to appraisal rights in connection with the Merger under Section 262 of the DGCL."[190]

Kocourek's next theory of damages is that he would have exercised his appraisal rights, but for defendants' fraud, and received the "true" value of his shares. Kocourek's theory of damages fails because it misapprehends the nature of the Transaction and is inconsistent with other allegations in the ACC. Appraisal was available only if the Transaction was approved and only for those who did not vote in favor of it. Had the class members voted against the Transaction, it would not have been approved. Approval required the affirmative vote of at least 75 percent shares of outstanding common stock.[191] The cover letter to the IC explained that "approximately two-thirds

---

[189]      *Barrows,* 742 F.2d at 60.

[190]      IC at 134.

[191]      IC at 17.

of the issued and outstanding capital stock of BAH is owned by partners primarily engaged in the Commercial Business."[192]  Kocourek pleaded that "BAH shareholders in the Commercial Division had far more voting shares than members of the Government Division . . ."[193]  In other words, approval of the Transaction required the affirmative vote of a substantial portion of putative class members.  But a class member voting in favor of the Transaction would not have been entitled to appraisal rights.

These features of the Transaction are fatal to Kocourek's appraisal theory of damages because he goes on to allege that "[h]ad Plaintiff and the members of the Class have [sic] known the truth, they would not have agreed to tender or vote their shares for the consideration offered [] and would not have received the low price that was paid."[194]  Accepting that allegation as true, as we are obligated to do when considering a motion to dismiss, we are left with the inescapable result that had defendants' alleged fraud been known, the Transaction would have been voted-down.  Consequently, there would have been no appraisal rights to which Kocourek or any other class member could have availed themselves.

c.   *Rollover of Shares*

Kocourek alleges also that he would have decided to roll-over his shares into Buyer Parent and shared in the upside of the sale to Carlyle, but for defendants' fraud in concealing the true

---

[192]
    DI 117-2 at ECF 2.

[193]
    ACC at ¶ 102.

[194]
    *Id.* at ¶ 150.

46

value of the government business.[195]

Kocourek is under a fundamental misconception on the pivotal question of whether, as a retired partner, he would have been entitled to roll-over shares based on the terms of the Transaction.

As explained previously, Kocourek retired as a partner within the commercial division in April 2007.  However, he remained a BAH security holder throughout the duration of the class period because two years had not yet elapsed since the date of his retirement.  Nevertheless, the IC explained that commercial partners could elect to exchange "certain Company Shares for non-voting stock of Buyer Parent" through "Discretionary Rolling Stockholder Exchange Agreements," as that term is defined in the Merger Agreement.[196]  That term means "the exchange agreements entered into by and between Buyer Parent, on the one hand, and the Discretionary Rolling Stockholders, on the other hand, pursuant to Section 8.9 [of the Merger Agreement]."[197]  "Discretionary Rolling Stockholders," in turn, is defined as "all Company Stockholders [] who hold Company Common Shares and have executed and delivered an Exchange Agreement in accordance with Section 8.9(b)."[198]  Finally, "Company Common Shares" is defined as "shares of Common Stock of the Company, par value $0.25 per share."[199]  Whether Kocourek was eligible, therefore, to roll-over

---

[195]

See Opp. Br. at 25-26.

[196]

IC at 2.

[197]

DI 117-2 at ECF 161.

[198]

Id.

[199]

Id. at ECF 159.

shares into Buyer Parent is a function of whether he was a holder of "Company Common Shares," as defined by the Merger Agreement, during the period of exchange.

Paragraph 8 of the BAH SRP provided that, within 90 days following a partner's date of retirement, the retiring partner shall deposit and BAH shall convert "all shares of Common Stock [held in the partner's name] to an equal number of shares of Class A Non-Voting Common Stock."[200] The BAH SRP defined "Common Stock" as "shares of the Company's Common Stock, $.25 par value," *as distinguished from* "Class A Non-Voting Common Stock," which was not included in the definition of "Common Stock.[201]  Kocourek therefore would not have been a holder of "Common Stock" during the time in which some BAH personnel would have been eligible to roll-over voting shares in the Transaction because he previously would have been required to exchange his voting shares—his Common Stock, $.25 par value—for Class A Non-Voting Common Stock, no later than July 1, 2007 (90 days following his retirement), in accordance with the terms of the SRP.  Indeed, in the first consolidated complaint, Kocourek effectively admitted that this had occurred when he alleged that a revision to the SRP in 2000 eliminated the ability of retired partners to vote and that "Kocourek and other retired Stock Pension Plan participants could not vote their stock."[202]  He

---

[200]

DI 22-2 at ¶ 8.

[201]

*Id.* at ¶¶ 1(c) and (e).

The IC elsewhere defined "Common Stock" as "Company Class A Common Stock," as distinguished from "Company Class A Non-Voting Common Stock," which does not alter the analysis.  *See* IC at 2.

[202]

CC at ¶¶ 17, 63.

therefore would have been ineligible to roll-over his shares.[203]  Accordingly, Kocourek has failed

adequately to plead damages on a theory that he would have rolled-over shares in the Transaction

had he known of defendants' allegedly fraudulent conduct.

V.      *Section 20(a) Claims*

              Section 20(a) imposes joint and several liability on control persons for underlying

violations of the Exchange Act.[204]  To state a claim under Section 20(a), a plaintiff must allege both

a primary violation of the Exchange Act and the defendant's control over the primary violator.[205]

Plaintiff has failed to allege a primary violation of the Exchange Act, and therefore, his claims under

Section 20(a) are dismissed.[206]

VI.     *Section 14(e) Claims*

              Kocourek alleges that the Transaction qualified as a tender offer because

misstatements in the IC were "reasonably calculated to result in the procurement of tenders from

BAH shareholders in favor of Caryle's offer to purchase BAH for a price of approximately $763 per

---

[203]
              This accords with the description in the IC that "Commercial Partners *holding voting stock*
              were being given a limited ability to participate in the roll-over of equity at the same price
              as the Government Partners."  IC at 44 (emphasis added).

[204]
              *See* 15 U.S.C. § 78t.

[205]
              *City of Westland*, 129 F. Supp. 3d at 87.

[206]
              *See id.*

share."[207]  This claim fails because the Transaction was not a tender offer.  Section 14(e) therefore

is inapplicable.  "[S]tate and federal law clearly treat mergers as distinct from tender offers,"[208] and

unlike in the tender offer context, the Transaction required the affirmative vote of BAH shareholders.

### Conclusion

For the foregoing reasons, the Court grants defendants' motion to dismiss in its

entirety.[209]  The Clerk shall enter judgment and close the case.

SO ORDERED.

Dated:          June 12, 2019

_____

Lewis A. Kaplan.

United States District Judge

---

[207]      ACC at ¶ 159; Reply Br. at 32.

[208]      *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 779 (2d Cir. 1991).

[209]      Because Kocourek has failed to allege adequately a material misrepresentation/omission or damages, we need not discuss whether he has pleaded sufficiently *scienter*.

Additionally, because Kocourek's individual claims fail we do not address defendants' argument that the class claims are time-barred.